NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
PATRICK J. RICHARD (SBN 131046)
prichard@nossaman.com
50 California Street, Thirty-Fourth Floor
San Francisco, California 94111-4707
Telephone: (415) 398-3600
Facsimile: (415) 398-2438

Attorneys for Defendants
SIVAKUMAR SINNARAJAH,
a/k/a MANO SINNARAJAH;
H&S GROUP OF COMPANIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ALTIN HAVAYOLU TASIMACILIGI TURIZM VE TIC, A.S., a corporation organized under the laws of Turkey, doing business as GOLDEN INTERNATIONAL AIRLINES,<br><br>Plaintiff,<br><br>vs.<br><br>SIVAKUMAR SINNARAJAH, an individual, also known as MANO SINNARAJAH; H&S GROUP OF COMPANIES, INC., a Florida corporation; and DOES 1 to 10 inclusive,,<br><br>Defendants. | Case No:    CV 07-6475 EDL<br><br>ASSIGNED FOR ALL PURPOSES TO:<br>THE HONORABLE  ELIZABETH D. LAPORTE<br><br>**DECLARATION OF SIVAKUMAR SINNARAJAH IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO CHANGE VENUE**<br><br>[FRCP 12(b)(2) and 12(b)(3); 28 U.S.C. §1404(a) and §1406(a)]<br><br>Action Filed:<br><br>Date:  March 11, 2008<br>Time:  9:00 a.m.<br>Ctrm:  E<br><br><br>**PART 1 OF 3** |

I, Sivakumar Sinnarajah, declare as follows:

1.      I am the Chairman of H&S Group of Companies, Inc. and am an individual defendant in this lawsuit. I make this declaration based on my own personal knowledge and could competently testify to the matters stated herein if called upon to do so.

2.      I am a resident of Miami Florida, and have lived in Miami for the last 23 years. I am in the business of leasing and brokering sales of aircraft and aircraft components. The name of my business is H&S Group of Companies, Inc.

3.      I do not own any property in California. Neither H&S Group nor me nor my immediate family own or operate any offices in California. I last visited California 8 or 9 years ago, other than stopping at an airport on my way to visit relatives in India or Singapore.

4.      When I negotiated the Lease in this matter on behalf of H&S Group, I negotiated with Mr. Bilgen and Captain Guler. All discussions occurred in Miami, Florida. These gentlemen visited with me at my home. We signed the papers at my lawyer's office in Miami.

5.      At all pertinent time, H&S Group has been incorporated in Florida. It has never been incorporated in California. It does not do business in California, and did not conduct business in California in July 2007. I never told any of the plaintiffs or anyone else that H&S Group was incorporated in California or a California business. The Lease we signed, a true and correct copy of which is attached hereto as exhibit A, clearly says we are a Florida Corporation:

> "H&S GROUP OF COMPANIES, INC., a Florida corporation whose
> principal place of business is at 9749 SW 111th Terrace, Miami, Florida,
> 33176, United States of America ("LESSOR")."

6.      Neither I nor H&S Group have maintained bank accounts in California, obtained licenses or permits, maintained any local telephone listings or mailing addresses, directed any mass mailings to California residents or businesses, shipped product to California, or filed lawsuits in California.

7.      The records and witnesses regarding the matters alleged in the complaint are in Florida. The lawyer mentioned in the Complaint, Mr. Dale, is in Florida, and his office and any pertinent records are in Florida. I live in Florida, as does m y wife, Harija sinnarajah.

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.  Dated this 26th of January, 2008 at Miami, Florida Dade County, Florida.

3

4

5    SIVAKUMAR SINNARAJAH,
     a/k/a MANO SINNARAJAH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Altin Havayolu Tasimaciligi Turizm Ve Tic, A.S. v. Sivakumar Sinnarajah, *et al.*</u>
<u>U.S. District Court Case No. 07-6475</u>

# EXHIBIT "A"

AIRCRAFT LEASE AGREEMENT
(TURKISH FINANCIAL LEASE)

Dated as of October 17, 2007

Between

ALTIN HAVAYOLU TASIMACILIGI TURIZM VE TIC. A.S.
(GOLDEN INTERNATIONAL AIRLINES)

as LESSEE

and

H & S GROUP OF COMPANIES, INC.
Or its assignee
as LESSOR

| | |
|---|---|
| Aircraft Make and Model: | Used B757-200 |
| Aircraft Manufacturer's Serial Number: | 28484 |
| Make and Model of Engines: | Pratt & Whitney PW2037 |
| Serial Numbers of Engines: | 727282 and 727283 |

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | SUMMARY OF TRANSACTION | 1 |
| 1.1 | Description of Aircraft | 1 |
| 1.2 | Scheduled Delivery Date and Location | 1 |
| 1.3 | Initial Lease Term | 1 |
| 1.4 | Extension Lease Term | 1 |
| 1.5 | Security Deposit | 2 |
| 1.6 | Transaction Fee | 2 |
| 1.7 | Rent During Initial Lease Term | 2 |
| 1.8 | Rent During Extension Term | 2 |
| 1.9 | Reserves | 2 |
| 1.10 | Additional Rent for Excess Airframe and Engine Cycles | 3 |
| 1.11 | Country of Aircraft Registration | 3 |
| 1.12 | Agreed Value of Aircraft | 3 |
| 1.13 | LESSOR's Bank Account | 3 |
| | | |
| ARTICLE 2 | DEFINITIONS | 3 |
| 2.1 | General Definitions | 3 |
| 2.2 | Specific Definitions | 9 |
| | | |
| ARTICLE 3 | PLACE AND DATE OF DELIVERY | 10 |
| 3.1 | Place of Delivery | 10 |
| 3.2 | Scheduled Delivery Date | 10 |
| 3.3 | Delivery subject to Prior Lessee Delivery | 10 |
| 3.4 | No LESSOR Liability | 10 |
| 3.5 | Total Loss of Aircraft prior to Delivery | 10 |
| 3.6 | Cancellation for Delay | 10 |
| | | |
| ARTICLE 4 | LEASE TERM AND EXTENSION OPTION | 10 |
| 4.1 | Initial Lease Term | 10 |
| 4.2 | Lease Extension Option | 10 |
| 4.3 | "Lease Term" and "Expiration Date" | 11 |
| 4.4 | "Termination Date" | 11 |
| | | |
| ARTICLE 5 | SECURITY DEPOSIT, TRANSACTION FEE, RENT, RESERVES AND OTHER PAYMENTS | 12 |
| 5.1 | Security Deposit | 12 |
| 5.2 | Transaction Fee | 12 |
| 5.3 | Rent | 12 |
| 5.4 | Reserves | 13 |
| 5.5 | Additional Rent for Excess Cycles | 14 |
| 5.6 | LESSOR's Bank Account | 15 |
| 5.7 | Default Interest | 15 |
| 5.8 | Increase in Rent | 15 |
| 5.9 | No Deductions or Withholdings | 15 |

| | | |
|---|---|---|
| 5.10 | Value Added Taxes | 16 |
| 5.11 | Wire Transfer Disbursement Report | 16 |
| 5.12 | Net Lease | 16 |
| 5.13 | Currency Indemnity | 17 |
| 5.14 | Authorization for Payments | 17 |
| 5.15 | LESSOR Performance of LESSEE Obligation | 17 |
| 5.16 | Consideration for Rent and other Amounts | 17 |
| | | |
| ARTICLE 6 | DELIVERY CONDITION AND INSPECTION OF AIRCRAFT | 18 |
| 6.1 | LESSEE Selection of Aircraft | 18 |
| 6.2 | Condition at Delivery | 18 |
| 6.3 | LESSEE Inspection of Aircraft at Delivery | 18 |
| 6.4 | Delivery of Aircraft to LESSEE | 18 |
| 6.5 | LESSEE Acceptance of Aircraft | 18 |
| | | |
| ARTICLE 7 | PRE-DELIVERY, DELIVERY AND POST-DELIVERY DOCUMENTARY AND OTHER REQUIREMENTS | 18 |
| 7.1 | Translation and Notarization | 18 |
| 7.2 | Pre-Delivery Requirements | 19 |
| 7.3 | Delivery Requirements | 20 |
| 7.4 | Post-Delivery Requirements | 21 |
| | | |
| ARTICLE 8 | DISCLAIMERS AND WAIVERS | 21 |
| 8.1 | "As Is, Where Is" | 21 |
| 8.2 | Waiver of Warranty of Description | 22 |
| 8.3 | LESSEE Waiver | 23 |
| 8.4 | Conclusive Proof | 23 |
| 8.5 | No Liability to Repair or Replace | 23 |
| 8.6 | No Waiver | 23 |
| 8.7 | Consideration for Disclaimers and Waivers | 23 |
| | | |
| ARTICLE 9 | MANUFACTURERS' AND VENDORS' WARRANTIES | 23 |
| 9.1 | Warranties | 23 |
| 9.2 | Reassignment | 23 |
| 9.3 | Warranty Claims | 23 |
| | | |
| ARTICLE 10 | OPERATION OF AIRCRAFT | 24 |
| 10.1 | Costs of Operation | 24 |
| 10.2 | Compliance with Laws | 24 |
| 10.3 | Training | 24 |
| 10.4 | No Violation of Insurance Policies | 24 |
| 10.5 | Flight and Airport Charges | 24 |
| | | |
| ARTICLE 11 | SUBLEASES | 24 |
| 11.1 | No Sublease without LESSOR Consent | 25 |
| 11.2 | LESSOR Costs | 25 |

3



| | | |
|---|---|---:|
| 11.3 | Any Approved Sublease | 25 |
| 11.4 | Assignment of Sublease | 25 |
| 11.5 | Wet Leases | 25 |
| 11.6 | Continued Responsibility of LESSEE | 25 |
| | | |
| ARTICLE 12 | MAINTENANCE OF AIRCRAFT | 25 |
| 12.1 | General Obligation | 25 |
| 12.2 | Specific Engine Requirements | 26 |
| 12.3 | Specific Obligations | 27 |
| 12.4 | Replacement of Parts | 28 |
| 12.5 | Removal of Engines | 29 |
| 12.6 | Removal of APU | 29 |
| 12.7 | Pooling of Engines, APU and Parts | 30 |
| 12.8 | Installation of Engines on other aircraft | 30 |
| 12.9 | Modifications | 31 |
| 12.10 | Performance of Work by Third Parties | 31 |
| 12.11 | Reporting Requirements | 32 |
| 12.12 | Maintenance Policies and Procedures Manuals | 32 |
| 12.13 | LESSOR Inspection Rights | 32 |
| | | |
| ARTICLE 13 | USE OF RESERVES | 33 |
| 13.1 | Airframe Reserves | 33 |
| 13.2 | Engine Performance Restoration Reserves | 33 |
| 13.3 | Engine LLP Reserves | 34 |
| 13.4 | Landing Gear Reserves | 34 |
| 13.5 | APU Reserves | 34 |
| 13.6 | Reimbursement | 35 |
| 13.7 | Reimbursement Adjustment | 35 |
| 13.8 | Costs in Excess of Reserves | 36 |
| 13.9 | Reimbursement after Termination Date | 36 |
| | | |
| ARTICLE 14 | TITLE AND REGISTRATION | 36 |
| 14.1 | Title to the Aircraft | 36 |
| 14.2 | Registration of Aircraft | 36 |
| 14.3 | Cape Town Convention | 37 |
| 14.4 | Filing of this Lease | 37 |
| 14.5 | Evidence of Registration and Filings | 37 |
| | | |
| ARTICLE 15 | IDENTIFICATION PLATES | 38 |
| 15.1 | Airframe Identification Plates | 38 |
| 15.2 | Engine Identification Plates | 38 |
| | | |
| ARTICLE 16 | TAXES | 38 |
| 16.1 | General Obligation of LESSEE | 38 |
| 16.2 | Exceptions to Indemnity | 39 |
| 16.3 | After-Tax Basis | 39 |

| 16.4 | Timing of Payment | 39 |
|---|---|---|
| 16.5 | Contests | 39 |
| 16.6 | Refunds | 40 |
| 16.7 | Cooperation in Filing Tax Returns | 40 |
| 16.8 | Survival of Obligations | 40 |
| | | |
| ARTICLE 17 | INDEMNITIES | 40 |
| 17.1 | General Indemnity | 40 |
| 17.2 | Exceptions to General Indemnities | 41 |
| 17.3 | After-Tax Basis | 41 |
| 17.4 | Timing of Payment | 41 |
| 17.5 | Subrogation | 42 |
| 17.6 | Notice | 42 |
| 17.7 | Refunds | 42 |
| 17.8 | Defense of Claims | 42 |
| 17.9 | No Double Recovery | 42 |
| 17.10 | Survival of Obligation | 42 |
| | | |
| ARTICLE 18 | INSURANCE | 42 |
| 18.1 | Categories of Insurance | 42 |
| 18.2 | Write-back of any Date Recognition Exclusion | 43 |
| 18.3 | Write-backs of L5W555.C and AVN48C Exclusions | 43 |
| 18.4 | Installation of Third Party Engine | 43 |
| 18.5 | LESSOR Coverage for LESSEE's Employees | 43 |
| 18.6 | Insurance for Indemnities | 43 |
| 18.7 | Insurance required by Manufacturer | 43 |
| 18.8 | Pre-Delivery Work or Delivery of Aircraft with Spare En2ine | 43 |
| 18.9 | Renewal | 44 |
| 18.10 | Assignment of Rights by LESSOR | 44 |
| 18.11 | Deductibles | 44 |
| 18.12 | Insurance for Wet Lease Operations | 44 |
| 18.13 | Other Insurance | 44 |
| 18.14 | Information | 44 |
| 18.15 | Currency | 44 |
| 18.16 | Grounding of Aircraft | 44 |
| 18.17 | Failure to Insure | 45 |
| 18.18 | Reinsurance | 45 |
| 18.19 | Limit on Hull in favor of LESSEE | 45 |
| | | |
| ARTICLE 19 | LOSS, DAMAGE AND REQUISITION | 45 |
| 19.1 | Definitions | 45 |
| 19.2 | Notice of Total Loss | 47 |
| 19.3 | Total Loss of Aircraft or Airframe | 47 |
| 19.4 | Surviving Engine(s) | 48 |
| 19.5 | Total Loss of Engine and not Airframe | 48 |
| 19.6 | Total Loss of APU | 49 |



| | | |
|---|---|---|
| 19.7 | Other Loss or Damage | 49 |
| 19.8 | Copy of Insurance Policy | 50 |
| 19.9 | Government Requisition | 50 |
| ARTICLE 20 | REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE | 50 |
| 20.1 | Representations and Warranties | 50 |
| 20.2 | Covenants | 52 |
| ARTICLE 21 | REPRESENTATIONS, WARRANTIES, AND COVENANTS OF LESSOR | 53 |
| 21.1 | Representations and Warranties | 53 |
| 21.2 | Covenant of Quiet Enjoyment | 54 |
| ARTICLE 22 | FINANCIAL AND OTHER INFORMATION | 76 |
| ARTICLE 23 | RETURN OF AIRCRAFT | 55 |
| 23.1 | Date of Return | 55 |
| 23.2 | Last Engine Shop Visits | 55 |
| 23.3 | Technical Report | 55 |
| 23.4 | Return Location | 55 |
| 23.5 | Full Aircraft Documentation Review | 55 |
| 23.6 | Maintenance Policies and Procedures Manuals | 55 |
| 23.7 | Aircraft Inspection | 56 |
| 23.8 | Certificate of Airworthiness Matters | 56 |
| 23.9 | General Condition of Aircraft at Return | 57 |
| 23.10 | Checks Prior to Return | 60 |
| 23.11 | Part Lives | 62 |
| 23.12 | Export and Deregistration of Aircraft | 63 |
| 23.13 | LESSEE's Continuing Obligations | 64 |
| 23.14 | Airport and Navigation Charges | 64 |
| 23.15 | Return Acceptance Receipt | 64 |
| 23.16 | Indemnities and Insurance | 65 |
| 23.17 | Storage | 65 |
| ARTICLE 24 | ASSIGNMENT | 65 |
| 24.1 | No Assignment by LESSEE | 65 |
| 24.2 | Sale or Assignment by LESSOR | 65 |
| 24.3 | LESSOR's Lender | 65 |
| 24.4 | LESSEE Cooperation | 66 |
| 24.5 | Advance Consent Under Cape Town Convention | 66 |
| 24.6 | Protections | 66 |
| ARTICLE 25 | DEFAULT OF LESSEE | 67 |
| 25.1 | LESSEE Notice to LESSOR | 67 |
| 25.2 | Events of Default | 67 |



| 25.3 | LESSOR's General Rights | 69 |
| 25.4 | Deregistration and Export of Aircraft | 70 |
| 25.5 | Cape Town Convention Remedies | 70 |
| 25.6 | LESSEE Liability for Damages | 70 |
| 25.7 | Waiver of Default | 71 |
| 25.8 | Present Value of Payments | 71 |
| 25.9 | Use of "Termination Date" | 71 |
| ARTICLE 26 | NOTICES | 71 |
| 26.1 | Manner of Sending Notices | 71 |
| 26.2 | Notice Information | 72 |
| ARTICLE 27 | GOVERNING LAW AND JURISDICTION | 72 |
| 27.1 | California Law | 72 |
| 27.2 | Non-Exclusive Jurisdiction in California | 72 |
| 27.3 | Personal Jurisdiction | 72 |
| 27.4 | Service of Process | 73 |
| 27.5 | Prevailing Party in Dispute | 73 |
| 27.6 | Future Amendments or Agreements | 73 |
| 27.7 | Waiver | 73 |
| ARTICLE 28 | MISCELLANEOUS | 73 |
| 28.1 | Transportation of Personnel | 73 |
| 28.2 | Press Releases | 73 |
| 28.3 | Power of Attorney | 73 |
| 28.4 | LESSOR Performance for LESSEE | 74 |
| 28.5 | LESSOR's Payment Obligations | 74 |
| 28.6 | Application of Payments | 74 |
| 28.7 | Usury Laws | 74 |
| 28.8 | Delegation by LESSOR | 74 |
| 28.9 | Confidentiality | 74 |
| 28.10 | Rights of Parties | 75 |
| 28.11 | Further Assurances | 75 |
| 28.12 | Translations of Lease | 75 |
| 28.13 | Use of Word "including" | 75 |
| 28.14 | Headings | 75 |
| 28.15 | Invalidity of any Provision | 75 |
| 28.16 | Time is of the Essence | 75 |
| 28.17 | Amendments in Writing | 75 |
| 28.18 | Counterparts | 76 |
| 28.19 | Delivery of Documents by Fax or E-mail | 76 |
| 28.20 | Entire Agreement | 76 |
| EXHIBIT A | AIRCRAFT DESCRIPTION | 86 |
| EXHIBIT B | CONDITION AT DELIVERY | 87 |
| EXHIBIT C | CERTIFICATE OF INSURANCE (FOR LESSOR) | 94 |

EXHIBIT D    BROKERS' LETTER OF UNDERTAKING (FOR LESSOR)    100
EXHIBIT E    CERTIFICATE OF INSURANCE (FOR MANUFACTURER)    102
EXHIBIT F    AVIATION AUTHORITY UNDERTAKING LETTER    106
EXHIBIT G    ESTOPPEL AND ACCEPTANCE CERTIFICATE    107
EXHIBIT H    OPINION OF COUNSEL    111
EXHIBIT I    FORM OF POWER OF ATTORNEY    115
EXHIBIT J    FORM OF CAPE TOWN POWER OF ATTORNEY    117
EXHIBIT K    RETURN ACCEPTANCE RECEIPT    119
EXHIBIT L    MONTHLY REPORT    123
EXHIBITM    AIRCRAFT DOCUMENTATION    127
EXHIBIT N    TECHNICAL EVALUATION REPORT    129



## AIRCRAFT LEASE AGREEMENT

THIS AIRCRAFT LEASE AGREEMENT (together with all Exhibits hereto, the "Lease") is made and entered into as of October 17, 2007.

BETWEEN:

ALTIN HAVAYOLU TASIMACILIGI TURIZM VE TIC. A.S. (GOLDEN INTERNATIONAL AIRLINES), a Turkish company whose principal place of business is at Yesilkoy Cad. No: 9 B/2, Florya, Bakirkoy 34153, Istanbul, Turkey ("LESSEE"); and

H & S GROUP OF COMPANIES, INC., a Florida corporation whose principal place of business is at 9749 SW 111th Terrace, Miami, Florida, 33176, United States of America ("LESSOR").

The subject matter of this Lease is one (1) used B757-200 aircraft. In consideration of and subject to the mutual covenants, terms and conditions contained in this Lease, LESSOR hereby agrees to lease to LESSEE and LESSEE hereby agrees to lease from LESSOR the aircraft and the parties further agree as follows:

## ARTICLE 1  SUMMARY OF TRANSACTION

The following is a summary of the lease transaction between LESSEE and LESSOR. It is set forth for the convenience of the parties only and will not be deemed in any way to amend, detract from or simplify the other provisions of this Lease.

1.1    Description of Aircraft

One used B757- 200 aircraft serial number 28484

1.2    Scheduled Delivery Date and Location

On or about December 30th 2007

1.3    Initial Lease Term

From the Delivery Date until and including sixty (60) months and extendable an additional twenty four (24) months subject to six (6) months notice by Lessee prior to lease end.

1.4    Extension Lease Term

**24 Months**

1.5    <u>Security Deposit</u>

US$ 1,120,000.00 payable as follows (in U.S. Dollars):

| Payment Date | Amount |
|---|---|
| PAID | $ 280.000.000 |
| Within two (2) business days after Lease execution | $ 280.000.000 |

Letter of credit Three business days prior to the scheduled delivery date $ 560.000.000.

1.6    <u>Transaction Fee</u>

50.000 USD payable within 2 business days after execution of this lease.

1.7    <u>Rent During Initial Lease Term</u>

Payable monthly in advance as follows (in U.S. Dollars):

| Period of Lease Term | Amount |
|---|---|
| Sixty (60) months | $ 280,000 USD per month |

1.8    <u>Rent During Extension Term</u>

Payable monthly in advance as follows (in U.S. Dollars):

| Period of Lease Term | Amount |
|---|---|
| 24 month | $ 250,000 USD per month |

1.9    <u>Reserves</u>

| Type of Reserves | Amount of Reserves |
|---|---|
| Airframe Reserves: | US$ 90* per airframe flight hour |
| Engine Performance Restoration Reserves: | US$ 120* per engine flight hour for each engine |
| Engine LLP Reserves: | US$ 111* per engine cycle for each engine |
| Landing Gear Reserves: | US$ 2500* per calendar month |
| APU Reserves: | US$ 22 * per APU hour |

10

*The reserves rates set forth above will be escalated by four percent (4%) from and including January 01st 2009 and on January 1 of every year thereafter (compounded from year to year) until the termination date.

1.10   Additional Rent for Excess Airframe and Engine Cycles

US$ 250,00 for each cycle the airframe and US$ 275,00 for each cycle an engine operated during a calendar year in excess of the maximum number of cycles which would result from an average hour/cycle ratio of 2.5 to 1

1.11   Country of Aircraft Registration

Republic of Turkey

1.12   Agreed Value of Aircraft

Provided no event of default has occurred and is continuing, on the date of each annual renewal by LESSEE of its insurance policies, commencing with the annual renewal occurring after the expiration of lease term year 1, the agreed value of the Aircraft will be decreased by one and one half percent (1 1/2%) of the agreed value then in effect. Thus, at the first annual renewal after the expiration of lease term year 1, the agreed value will be 98.5% of the agreed value of the Aircraft on the delivery date. At the second annual renewal after the expiration of lease term year 2, the agreed value will be 98.5% of the agreed value applicable during the first annual renewal period. A similar calculation will be made at each annual insurance renewal.

1.13   LESSOR's Bank Account

**Account Name: H&S Group of companies**
**Account No.: 5040012739**
**Bank Name: HATTON NATIONAL BANK**
　　　　**FCBU**
　　　　**CITY OFFICE**
　　　　**16 JANADHIPATHIMW**
　　　　**COLOMBO 01**
　　　　**SRILANKA**

**Swift Code:**　　　　　　　　**HBLILKLXA001**
**Corresponding Bank:**　　　　**BANKER TRUST COMPANY,**
　　　　　　　　　　　　　　**NEW YORK**

## ARTICLE 2  DEFINITIONS

Except where the context otherwise requires, the following words have the following meanings for all purposes of this Lease. The definitions are equally applicable to the singular and plural forms of the words. Any agreement defined below or in this Lease includes each amendment, modification, supplement, and waiver thereto in effect from time to time.



2.1    <u>General Definitions.</u>

"Aircraft" means the Airframe, Two (2) Engines, APU, Parts, and Aircraft Documentation, collectively. As the context requires, "Aircraft" may also mean the Airframe, any Engine, the APU, any Part, the Aircraft Documentation or any part thereof individually. For example, in the context of return to LESSOR the term "Aircraft" means the Airframe, Engines, APU, Parts and Aircraft Documentation collectively, yet in the context of LESSEE not creating any Security Interests other than Permitted Liens on the Aircraft, the term "Aircraft" means any of the Airframe, any Engine, the APU, any Part or the Aircraft Documentation individually.

"Aircraft Documentation" means all (a) log books, Aircraft records, manuals and other documents provided to LESSEE in connection with the Aircraft, (b) documents listed in the Estoppel and Acceptance Certificate and Exhibit 0 and (c) any other documents required to be maintained during the Lease Term and until the Termination Date by the Aviation Authority, LESSEE's Maintenance Program and this Lease.

"Airframe" means the airframe listed in the Estoppel and Acceptance Certificate executed at Delivery together with all Parts relating thereto (except Engines or engines and the APU).

"Airworthiness Directives" or "ADs" means all airworthiness directives (or equivalent) applicable to the Aircraft issued by any one or more of the Aviation Authority, FAA and EASA.

"APU" means (a) the auxiliary power unit of the Aircraft listed in the Estoppel and Acceptance Certificate executed at Delivery, (b) any replacement auxiliary power unit acquired by LESSOR and leased to LESSEE pursuant to Article 19.6 following a Total Loss of the APU and (c) all Parts installed in or on such APU at Delivery (or substituted, renewed or replacement Parts in accordance with this Lease) so long as title thereto is or remains vested in LESSOR in accordance with the terms of Article 12.4.

"Aviation Authority" means the Turkish Directorate General of Civil Aviation Authority (Turkish DCGA) or any Government Entity which under the Laws of Turkey from time to time has control over civil aviation or the registration, airworthiness or operation of aircraft in Turkey. If the Aircraft is registered in a country other than Turkey, "Aviation Authority" means the agency which regulates civil aviation in such other country.

"Aviation Documents" means any or all of the following which at any time may be obtainable from the Aviation Authority: (a) if required, a temporary certificate of airworthiness from the Aviation Authority allowing the Aircraft to be flown after Delivery to the State of Registration, (b) an application for registration of the Aircraft with the appropriate authority in the State of Registration, (c) the certificate of registration for the Aircraft issued by the State of Registration, (d) a full certificate of airworthiness for the Aircraft specifying transport category (passenger), (e) an air transport license, (f) an air operator's certificate, (g) such recordation of LESSOR's title to the Aircraft and interest in this Lease as may be available in the State of Registration and (h) all such other authorizations, approvals, consents and certificates in the State of Registration as may be required to enable LESSEE lawfully to operate the Aircraft.



"Basic Engine" means, with respect to an Engine, the Engine manufacturer's engine modules, components and systems as specified in the Engine manufacturer's delivered bill of material for that engine model. The "Basic Engine" does not include the nacelle, installed components related to the Aircraft systems, thrust reversers, quick engine components (QEC), primary exhaust nozzle and any other Parts which are not considered by the Engine manufacturer to be part of a "basic engine".

"BDDK" means the Turkish Banking Supervision and Regulation Agency.

"Business Day" means a day other than a Saturday or Sunday on which the banks in the city where LESSOR's Bank is located are open for the transaction of business of the type required by this Lease.

"CAD" means the Civil Aviation Directorate of the Ministry of Transport of Turkey.

"Cape Town Convention" means both the Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters specific to Aircraft Equipment which were adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa (as may be amended from time to time).

"Creditor" means any lessor, owner, bank, lender, mortgagee, or other Person which is the owner of or has any interest in an aircraft engine or aircraft operated by LESSEE.

"Creditor Agreement" means the applicable agreement between a Creditor and LESSEE or between Creditors pursuant to which such Creditor owns, leases or has an interest in either an aircraft operated by LESSEE on which an Engine may be installed or in an aircraft engine which may be installed on the Airframe.

"Default" means any event which, upon the giving of notice, the lapse of time and/or a relevant determination, would constitute an Event of Default.

"Delivery" means the delivery of the Aircraft from Prior Lessee to LESSOR and the simultaneous delivery of the Aircraft from LESSOR to LESSEE pursuant to Articles 3 and 6.

"Delivery Check" means the accomplishment of all tasks which are necessary pursuant to the MPD (including all non-routine work generated as a result of performance of such MPD tasks) to clear the Aircraft for three (3) months and 1200 hours of operation from the Delivery Date. For avoidance of doubt, if the inspection interval pursuant to the MPD for a particular task only refers to one or two of the three measurements above (i.e. months, hours or cycles), then only those particular measurements referred to in the MPD will be utilized in determining whether the task must be performed.

"Delivery Date" means the date on which Delivery takes place.

"Dollars", "$" and "US$" mean the lawful currency of the U.S.

"EASA" means the European Aviation Safety Agency or any successor thereto. Where it is stated in this Lease that a repair station or a repair, overhaul or maintenance facility will be an "EASA-approved" station or facility, such station or facility must be approved by EASA to perform maintenance and repair work on the Aircraft, an Engine or Part submitted to it for maintenance or repair, as applicable.

"Engine" means (a) each of the engines listed on the Estoppel and Acceptance Certificate; (b) any replacement engine acquired by LESSOR and leased to LESSEE pursuant to Article 19.5 following a Total Loss of an Engine; and (c) all Parts installed in or on any of such engines at Delivery (or substituted, renewed or replacement Parts in accordance with this Lease) so long as title thereto is or remains vested in LESSOR in accordance with the terms of Article 12.4.

"Eurocontrol" means the European Organization for the Safety of Air Navigation established by the Convention related to the Co-operation for the Safety of Air Navigation (Eurocontrol) signed on December 13, 1960, as amended.

"Event of Default" means any of the events referred to in Article 25.2.

"FAA" means the Federal Aviation Administration of the U.S. Department of Transportation or any successor thereto under the Laws of the U.S. Where it is stated in this Lease that a repair station or a repair, overhaul or maintenance facility will be an "FAA-approved" station or facility, such station or facility must be approved by the FAA to perform maintenance and repair work on the Aircraft, an Engine or Part, as applicable.

"FARs" means the U.S. Federal Aviation Regulations embodied in Title 14 of the U.S. Code of Federal Regulations, as amended from time to time, or any successor regulations thereto.

"Geneva Convention" means the Convention on the International Recognition of Rights in Aircraft signed in Geneva, Switzerland on June 19, 1948.

"Government Entity" means any (a) national, state or local government, (b) board, commission, department, division, instrumentality, court, agency or political subdivision thereof or (c) association, organization or institution of which any of the entities listed in (a) or (b) is a member or to whose jurisdiction any such entity is subject.

"JAA" means the Joint Aviation Authorities, an associated body of the European Civil Aviation Conference. In the event that the Aviation Authority adopts the rules of EASA or the JAA is dissolved, then references in this Lease to the JAA will automatically be deemed to refer to EASA, where applicable.

"JARs" means the EASA/JAA regulations, as amended from time to time, or any successor regulations thereto.

"Landing Gear" means the installed main and nose landing gear, components and their

associated actuators, side braces and parts.

"Law" means any (a) statute, decree, constitution, regulation, order or any directive of any Government Entity, (b) treaty, pact, compact or other agreement to which any Government Entity is a signatory or party, (c) judicial or administrative interpretation or application of any of the foregoing or (d) any binding judicial precedent having the force of law.

"LESSOR's Lien" means any Security Interest created by LESSOR.

"Maintenance Program" means LESSEE's maintenance program as approved by the Aviation Authority or such other maintenance program as LESSOR may, in its discretion, accept in writing.

"Manufacturer" means The Boeing Company.

"Module Performance Restoration" means that each module of the Engine shall have as a minimum, a Heavy Maintenance workscope accomplished in accordance with the current PW2000 Maintenance Planning Guide recommendations.

"MPD" means the then-current Maintenance Planning Document published by Manufacturer and applicable to the Aircraft.  With respect to the hour/cycle/calendar time limitation of Parts and inspections, references to the MPD mean the most restrictive limitation set forth therein.

"Overhaul" means the full reconditioning of the Aircraft, an Engine, the APU, Landing Gear, module or Part, as the case may be, in which such equipment has been fully disassembled, cleaned, thoroughly inspected and returned to the highest standard specified by the applicable manufacturer's manual.

"Part" means any part, component, appliance, system module, engine module, accessory, material, instrument, communications equipment, furnishing, LESSEE-furnished or LESSOR-purchased equipment or other item of equipment (other than complete Engines or engines or the APU) for the time being installed in or attached to the Airframe, any Engine or the APU or which, having been removed from the Airframe, any Engine or the APU, remains the property of LESSOR.

"Permitted Lien" means (a) LESSOR's Liens; (b) Security Interests arising in the ordinary course of LESSEE's business for Taxes either not yet assessed or, if assessed, not yet due or being contested in good faith in accordance with Article 16.5 or (c) materialmen's, mechanics', workmen's, repairmen's, employees' liens or similar Security Interests arising by operation of Law after the Delivery Date in the ordinary course of LESSEE's business for amounts which are either not yet due or are being contested in good faith by appropriate proceedings (and for which adequate reserves have been made or, when required in order to pursue such proceedings, an adequate bond has been provided) so long as such proceedings do not involve any danger of sale, forfeiture or loss of the Aircraft.

"Person" means any individual, firm, partnership, joint venture, trust, corporation,

company, Government Entity, committee, department, authority or any body, incorporated or unincorporated, whether having distinct legal personality or not.

"Prime Rate" means the rate of interest from time to time announced by JPMorgan Chase Bank in New York as its prime commercial lending rate.

"Prior Lessee" means American Airlines

"Prior Lessee Lease Agreement" means the aircraft lease agreement between Prior Lessee pursuant to which Prior Lessee will return the Aircraft to LESSOR.

"Prohibited Country" means any country to which the export and/or use of an B757-200 aircraft with Pratt & Whitney engines attached thereto is not permitted under (a) any United Nations sanctions, (b) the Council Regulation (EC) No. 149/2003 which updates and amends Council Regulation (EC) 13 34/2000, (c) the United States Export Administration Act 1979 (as amended) or any successor legislation and/or the Export Administration Regulations promulgated thereunder, (d) where applicable, the various regulations administered from time to time by the Office of Foreign Assets Control of the U.S. Treasury Department, (e) any similar or corresponding legislation then in effect in the U.S., the United Kingdom, France, Spain or Germany or (f) any subsequent United Nations Sanctions Orders the effect of which prohibits or restricts the export and/or use of B757-200 aircraft with Pratt & Whitney engines attached thereto to such country.

"Qualified Performance Restoration" means a Module Performance Restoration performed on the Fan & Low Pressure Compressor, Intermediate Case & High Pressure Compressor, Diffuser & Combustor, Turbine Nozzle & High Pressure Turbine, Low Pressure Turbine, and Gearboxes modules of an Engine.

"Return Check" means the accomplishment of all tasks which are necessary pursuant to the MPD (including all non-routine work generated as a result of performance of such MPD tasks) to clear the Aircraft for 3 months and 1200 hours of operation from the Termination Date. If pursuant to the MPD, the performance interval for a task is shorter than every 18 months or 6,000 hours of operation, then such task, will also be performed. For avoidance of doubt, if the inspection interval pursuant to the MPD for a particular task only refers to one or two of the three measurements above (i.e. months, hours or cycles), then only those particular measurements referred to in the MPD will be utilized in determining whether the task must be performed.

"Security Interest" means any encumbrance or security interest, however and wherever created or arising including (without prejudice to the generality of the foregoing) any right of ownership, security, mortgage, pledge, charge, encumbrance, lease, lien, statutory or other right in rem, hypothecation, title retention, attachment, levy, claim or right of possession or detention.

"State of Registration" means The Republic of Turkey or such other country or state of registration of the Aircraft as LESSOR may, in its absolute discretion, approve in writing.

"Treasury" means the Undersecretariat of Treasury of the Prime Ministry of the Republic

16

of Turkey.

"U.S." or "U.S.A." means the United States of America.

2.2    Specific Definitions.  The following terms are defined in the Articles referenced below:

| Terms | Article |
|---|---|
| Additional Security Deposit | 5.3.3 |
| Agreed Value | 19.1 |
| Airframe Reserves | 5.4.1 |
| APU Reserves | 5.4.1 |
| Default Interest | 5.7 |
| Delivery Location | 3.1 |
| Engine LLP Reserves | 5.4.1 |
| Engine Performance Restoration Reserves | 5.4.1 |
| Expenses | 17.1 |
| Expiration Date | 4.3 |
| Extension Term | 4.2 |
| Future Agreements | 27.6 |
| Indemnitees | 17.1 |
| Initial Lease Term | 4.1 |
| Insolvency Proceedings | 25.2.1(o) |
| Landing Gear Reserves | 5.4.1 |
| Lease Term | 4.3 |
| LESSOR's Assignee | 24.2.1 |
| LESSOR's Bank | 5.6 |
| LESSOR's Lender | 24.3 |
| Modification | 12.9.1 |

| Terms | Article |
|---|---|
| Net Total Loss Proceeds | 19.1 |
| OEM Parts | 12.2.2 |
| Operative Documents | 20.1.3 |
| PMA Parts | 12.2.2 |
| Rent | 5.3.1 |
| Reserves | 5.4.1 |
| Scheduled Delivery Date | 3.2 |
| Security Deposit | 5.1.1 |
| Taxes | 16.1 |
| Termination Date | 4.4 |
| Total Loss | 19.1 |
| Total Loss Date | 19.1 |
| Total Loss Proceeds | 19.1 |



| Transaction Fee | 5.2 |
| Waste Expense | 13.3 |

## ARTICLE 3   PLACE AND DATE OF DELIVERY

3.1    Place of Delivery. LESSOR will deliver the Aircraft to LESSEE in Miami, Florida USA at Avborne Repair Facility, or such other place as may be agreed in writing between the parties (the"Delivery Location").

3.2    Scheduled Delivery Date. As of the date of this Lease, delivery of the Aircraft from Prior Lessee to LESSOR and LESSOR to LESSEE is scheduled to occur on or about December 30, 2007. LESSOR will notify LESSEE from time to time and in a timely manner of the exact date on which LESSOR expects Delivery to take place (the "Scheduled Delivery Date").Delivery of the aircraft will not be later than December 30th 2007

3.3    Delivery subject to Prior Lessee Delivery. LESSOR and LESSEE expressly acknowledge that Delivery of the Aircraft to LESSEE is subject to and conditioned upon redelivery of the Aircraft by Prior Lessee to LESSOR in accordance with the terms of the Prior Lessee Lease Agreement.

3.4    No LESSOR Liability. LESSOR will not be liable for any loss or expense, or any loss of profit, arising from any delay or failure in Delivery to LESSEE unless such delay or failure arises as a direct consequence of the willful misconduct of LESSOR, and in no event will LESSOR be liable for any delay or failure which is caused by any breach or delay on the part of Prior Lessee.

3.5    Total Loss of Aircraft prior to Delivery. If a Total Loss of the Aircraft occurs prior to Delivery, neither party will have any further liability to the other except that LESSOR will return to LESSEE the Security Deposit in accordance with Article 5.1.3 and any prepaid Rent.

3.6    Cancellation for Delay. Promptly after LESSOR becomes aware that a delay will cause Delivery to be delayed beyond December 30th 2007, LESSOR will notify LESSEE. By written notice given within ten (10) Business Days after LESSEE's receipt of such LESSOR notice, either party may by written notice to the other party terminate this Lease or this Lease will terminate on the date of receipt of such notice. In the event of such termination, neither party will have any further liability to the other party except that LESSOR will return to LESSEE the Security Deposit in accordance with Article 5.1.3 and any prepaid Rent. If neither party gives notice of termination within such ten (10) Business Days, both parties lose all right to terminate under this Article 3.6 unless otherwise agreed in writing by the parties.

## ARTICLE 4   LEASE TERM AND EXTENSION OPTION

4.1    <u>Initial Lease Term</u>. The term of leasing of the Aircraft will commence on the Delivery Date and continue for an initial lease term ending on December 30th 2012 (the **"Initial Lease Term"**).

4.2    <u>Lease Extension Option</u>.  So long as no Default or Event of Default has occurred and is continuing hereunder on the date of exercise of the option or at any time from such date to the commencement date of the lease term with respect to such option, LESSEE will have one (1) option to extend the term of the Lease for a period of two (2) years from the then-existing Expiration Date (the "Extension **Lease Term"**). For avoidance of doubt, LESSEE will have the option to extend the term of the Lease from December 30th 2012 until and including, 2014. In order to exercise the option, LESSEE must give written notice to LESSOR not less than six (6) months prior to the then-existing Expiration Date of this Lease.  Any notice given by LESSEE in accordance herewith will be irrevocable.

4.3    "Lease Term" and "Expiration Date".  **"Lease Term"** means the term of leasing commencing on the Delivery Date and terminating on the Expiration Date.  **"Expiration Date"** means the date on which LESSEE is required to redeliver the Aircraft to LESSOR in the condition required by this Lease on the last day of the Initial Lease Term or Extension Lease Term, if and as applicable.

4.4    "Termination Date".  If LESSEE returns the Aircraft to LESSOR on the Expiration Date in the condition required by Article 23, then **"Termination Date"** has the same meaning as "Expiration Date". If LESSEE does not do so, then **"Termination Date"** means the date on which the first of the following events occurs:

(a)    there is a Total Loss of the Aircraft prior to Delivery pursuant to Article 3.5;

(b)    cancellation of this Lease occurs pursuant to Article 3.6;

(c)    there is a Total Loss of the Aircraft and payment is made to LESSOR in accordance with Article 19.3;

(d)    prior to the Expiration Date, LESSOR repossesses the Aircraft or otherwise terminates this Lease and recovers possession and control of the Aircraft following an Event of Default;

(e)    an Event of Default occurs hereunder by LESSEE returning the Aircraft in the condition required by this Lease after the Expiration Date; or

(f)    after the Expiration Date, LESSOR repossesses the Aircraft or otherwise terminates this Lease and recovers possession and control of the Aircraft following an Event of Default.

19

**ARTICLE 5  SECURITY DEPOSIT, TRANSACTION FEE, RENT, RESERVES AND OTHER PAYMENTS**

5.1    **Security Deposit.**

5.1.1    LESSEE will pay LESSOR a security deposit of Five hundred sixty U.S. Dollars (US$560,000) in cash and $560,000 in LC acceptable to Financing Bank for its lease of the Aircraft (the **"Security Deposit"). The** Security Deposit is payable as follows (in U.S. Dollars):

| Payment Date | Amount |
| --- | --- |
| PAID | US$ 280,000 |
| Within two (2) Business Days after Lease execution | US$ 280,000 |
| Three Business Days prior to the Scheduled Delivery Date | US$ 560, 000 LC |

acceptable to the Bank

5.1.2    The Security Deposit may be commingled with LESSOR's general funds and any interest earned on such Security Deposit will be for LESSOR's account. If the Security Deposit is reduced below the required amount by application to meet LESSEE's unperformed obligations under this Lease, LESSEE will replenish the Security Deposit within ten (10) days after LESSOR's demand therefor. The Security Deposit will serve as security for the performance by LESSEE of its obligations under this Lease and any other agreements between LESSEE and LESSOR or any direct or indirect subsidiary of LESSOR relating to aircraft, engines, aircraft equipment or the extension of credit and may be applied by LESSOR upon the occurrence of a Default or Event of Default hereunder or of a default by LESSEE under any such other agreements.

5.1.3    Upon termination of this Lease in accordance with Article 4.4 other than if an Event of Default has occurred and is continuing, LESSOR will timely return to LESSEE the undisputed amount of the Security Deposit then held by LESSOR (so long as no default by LESSEE exists under any other agreement between LESSEE and LESSOR relating to aircraft, engines or aircraft equipment or the extension of credit by LESSOR to LESSEE), without interest, less an amount determined by LESSOR to be a reasonable estimate of the costs, if any, which LESSOR will incur to remedy any unperformed obligations of LESSEE under this Lease, including the correction of any discrepancies from the required condition of the Aircraft on return of the Aircraft.

5.2    **Transaction Fee.**

USD 50.000.-

5.3    **Rent.**

5.3.1    LESSEE will pay LESSOR the following amounts monthly in advance as rent for the Aircraft (**"Rent"**):

Initial Lease Term

| Period of Lease Term | Amount |
|---|---|
| **60 Months** | **USD 280.000 per month** |

Extension Term

| Period of Lease Term | Amount |
|---|---|
| **24 Months (Extension)** | **USD 250.000 per month** |

5.3.2    The first payment of Rent during the Lease Term will be paid no later than three (3) Business Days prior to the Scheduled Delivery Date. Each subsequent payment of Rent will be due monthly thereafter no later than the same day of the month as the Delivery Date of the Aircraft except that, if such day is not a Business Day, the Rent will be due on the immediately preceding Business Day. If Delivery occurred on the 29th, 30th or 31st of the month and in any given month during the Lease Term in which a Rent payment is due there is no such corresponding date, Rent will be payable on the last Business Day of such month.

5.3.3    Notwithstanding anything to the contrary in Article 5.3.2 of this Lease, in the event that LESSEE has not received the authorization from the BDDK to make the first Rent payment under the Lease by the due date, LESSEE will pay LESSOR by such due date an additional Security Deposit in the amount of US$ 280,000 (the **"Additional Security Deposit"**). Upon receipt by LESSEE of authorization from the BDDK to make lease payments under the Lease, at LESSEE's option, LESSOR will either (i) return the Additional Security Deposit upon receipt by LESSOR of the first month Rent payment or (ii) LESSOR will apply such Additional Security Deposit towards the first Rent payment.

5.4    **Reserves.**

5.4.1    LESSEE will pay to LESSOR supplemental Rent, based on LESSEE's use of the Aircraft during the Lease Term, in the form of the following reserves in the following amounts (individually, **"Airframe Reserves"**, **"Engine Performance Restoration Reserves"**, **"Engine LLP Reserves"**, **"Landing Gear Reserves"** and **"APU Reserves"**, and collectively **"Reserves"**):

| Type of Reserves | Amount of Reserves |
|---|---|
| Airframe Reserves: | US$90* per airframe flight hour |

| | |
|---|---|
| Engine Performance | US$120* per Engine flight hour for each |
| Restoration Reserves: | Engine (payable when the Engine is utilized on the Aircraft or another aircraft) |
| Engine LLP Reserves: | US$111* per Engine cycle for each Engine (payable when the Engine is utilized on the Aircraft or another aircraft) |
| Landing Gear Reserves: | US$2500* per calendar month |
| APU Reserves: | US$22* per APU hour (payable when the APU is utilized on the Aircraft or another aircraft) |

*The Reserves rates set forth above will be escalated by four (4%) from and including January 01st 2009 and on January 1 of every year thereafter (compounded from year to year) until the Termination Date.

5.4.2    Such Reserves will be paid on or before the 10th day of the calendar month next following the month in which the Delivery Date occurs and on or before the 10th day of each succeeding calendar month for flying performed during the calendar month prior to payment and for the calendar-based Reserves pertaining to such prior calendar month. All Reserves pertaining to the month in which the Termination Date occurs will be paid on the Termination Date, unless otherwise agreed by the parties.

5.4.3    No interest will accrue or be paid at any time to LESSEE on such Reserves and, subject to LESSOR's obligations under Article 13, LESSOR may commingle the Reserves with LESSOR's general funds.

5.5    **Additional Rent for Excess Cycles**. If in any calendar year (or portion thereof) of the Lease Term the Airframe or any Engine operated more cycles than the maximum number of cycles which would result from an average hour/cycle ratio of 2.5 to 1, LESSEE will pay LESSOR as additional Rent of US$250 for each Airframe cycle and US$275 for each Engine cycle the Airframe and any Engine actually operated during such calendar year (or portion thereof) in excess of the number of cycles which result from an average hour/cycle ratio of 2.5 to 1. A calculation will be made as of December 31 of each year and such additional Rent will be due and payable by LESSEE on the date on which the next Reserves payment is due (in accordance with Article 5.4.2) following such hour/cycle calculation period.

Example:    If the Airframe operated 2,500 hours in a calendar year, it would have 1,000 cycles resulting from an average hour/cycle ratio of 2.5 to 1. If in fact the Airframe operated 1,025 cycles in such calendar year, the Airframe operated 25 excess cycles in

such calendar year and LESSEE will pay LESSOR US$ 250 (25 excess cycles x US$ 250 = US$ 6250).

5.6    LESSOR's Bank Account. The Security Deposit, Transaction Fee, Rent, Reserves and any other payment due under this Lease will be paid by wire transfer of immediately available U.S. Dollar funds to LESSOR's bank account at:

**ACCOUNT NAME : H&S GROUP**

**ACCOUNT NO :    5040012739**

**[HATTON NATIONAL BANK**
**FCBU**
**CITY OFFICE**
**16 JANADHIPATHI MW**
**COLOMBO 01**
**SRILANKA**

**SWIFT CODE: HBLILKLXA 001**

**CORRESPONDING BANK:  Bankers Trust company,**
**NEW YORK**

or to such other bank account as LESSOR may from time to time designate by written notice ("LESSOR's Bank"). When it is stated in this Lease that an installment of the Security Deposit, the monthly Rent, Reserves or any other payment is due or must be paid or made by LESSEE by a specific date, then such payment actually must be received by LESSOR's Bank on or before such specific date, even if, in order for such payment to be received by LESSOR's Bank by such specific date, LESSEE must initiate the wire transfer prior to such specific date.

5.7    **Default Interest.** If LESSOR's Bank does not receive the Rent or any other amount on or before the specific date when due, LESSOR will suffer loss and damage the exact nature and amount of which are difficult or impossible to ascertain. LESSEE will pay LESSOR as supplemental Rent (by way of agreed compensation and not as a penalty) interest on any due and unpaid amounts payable by LESSEE under this Lease. Interest will be calculated at a per annum rate (based on a 360 day year) which is equal to five percent (5%) plus the Prime Rate of Deutsche Bank in effect on the date on which the amount was originally due for the period from the date the amount originally was due through the date the amount actually is received at LESSOR's Bank or, in the case of LESSOR's performance of LESSEE's obligations hereunder, from the date of payment by LESSOR through the date of LESSEE's repayment to LESSOR ("Default Interest"). Default Interest will accrue on a day-to-day basis and be compounded monthly.

5.8    **Increase in Rent.** If, at any time during the Lease Term, either (a) LESSEE fails to make any three (3) consecutive payments of Rent, Reserves or Security Deposit installments (or any

combination thereof) as and when required by the Lease or (b) any single Rent, Reserves or Security Deposit installment payment remains due and unpaid for more than ninety (90) days, then the monthly Rent payable by LESSEE in accordance with Article 5.3.1 will automatically increase by three percent (3%) for the remainder of the Lease Term, commencing with the monthly Rent payable immediately after the first to occur of (a) or (b) above. Nothing in this Article 5.8 will limit LESSOR's right to receive Default Interest on such late payments or LESSOR's rights and remedies pursuant to Article 25 on account of such Events of Default.

5.9    **No Deductions or Withholdings.** All payments by LESSEE under this Lease, including the Security Deposit, Transaction Fee, Rent, Reserves, Default Interest, fees, indemnities or any other item, will be made in full without any deduction or withholding whether in respect of set-off, counterclaim, duties, or Taxes (as defined in Article 16) imposed in the State of Registration or any jurisdiction from which such payments are made unless LESSEE is prohibited by Law from doing so, in which event LESSEE will gross up the payment amount such that the net payment received by LESSOR after any deduction or withholding equals the amounts called for under this Lease. LESSEE will also do all of the following:

    (a)    Ensure that the deduction or withholding does not exceed the minimum amount legally required;

    (b)    Pay to the relevant Government Entities within the period for payment permitted by applicable Law the full amount of the deduction or withholding (including the full amount of any deduction or withholding from any additional amount paid pursuant hereto); and

    (c)    Furnish to LESSOR within thirty (30) days after each payment an official receipt of the relevant Government Entities involved for all amounts so deducted or withheld.

5.10    **Value Added Taxes.** The Rent and other amounts payable by LESSEE under this Lease are exclusive of any value added tax, turnover tax or similar tax or duty.

5.11    **Wire Transfer Disbursement Report.** At the time of each Rent or other payment, LESSEE will advise LESSOR in writing of the payment being made by LESSEE and the allocation of such payment to the Security Deposit, Rent, Reserves, Default Interest and other charges. Notwithstanding the allocation set forth in LESSEE's report, in the event LESSEE is in default under this Lease, LESSOR will have complete discretion to allocate LESSEE's payments as LESSOR determines.

5.12    **Net Lease.**

5.12.1 This Lease is a net lease and LESSEE's obligation to pay Rent and make other payments in accordance with this Lease will be absolute and unconditional under any and all circumstances and regardless of other events, including the following:

    (a)    any right of set-off, counterclaim, recoupment, defense or other right (including

24

any right of reimbursement) which LESSEE may have against LESSOR, Prior Lessee, Manufacturer, the Engine manufacturer or any other person for any reason, including any claim LESSEE may have for the foregoing;

(b)     unavailability or interruption in use of the Aircraft for any reason, including a requisition thereof or any prohibition or interference with or other restriction against LESSEE's use, operation or possession of the Aircraft (whether by Law or otherwise), any defect in title, airworthiness, merchantability, fitness for any purpose, condition, design, specification or operation of any kind or nature of the Aircraft, the ineligibility of the Aircraft for any particular use or trade or for registration under the Laws of any jurisdiction or Total Loss of the Aircraft;

(c)     insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation, receivership, administration or similar proceedings by or against LESSOR, LESSEE, Prior Lessee, Manufacturer, the Engine manufacturer or any other Person;

(d)     invalidity or unenforceability or lack of due authorization of or other defect in this Lease;

(e)     failure or delay on the part of any party to perform its obligations under this Lease; or

(f)     any other circumstance which but for this provision would or might have the effect of terminating or in any other way affecting any obligation of LESSEE hereunder.

5.12.2 Nothing in Article 5.12 will be construed to limit LESSEE's rights and remedies in the event of LESSOR's breach of its warranty of quiet enjoyment set forth in Article 21.2 or to limit LESSEE's rights and remedies to pursue in a court of law any claim it may have against LESSOR or any other Person.

5.13    **Currency Indemnity**. If under any applicable Law, whether as a result of a judgment against LESSEE or the liquidation of LESSEE or for any other reason, any payment hereunder is required to be made or recovered in a currency other than Dollars then, to the extent that the payment (when converted into Dollars at the "rate of exchange" on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable Law) falls short of the amount payable under this Lease, LESSEE will as a separate and independent obligation, fully indemnify LESSOR against the amount of the shortfall. If the amount received by LESSOR upon converting the payment into Dollars exceeds the amount payable under this Lease, LESSOR will remit such excess to LESSEE. For the purposes of this paragraph **"rate of exchange"** means the rate at which LESSOR is able on the relevant date to purchase Dollars in New York or London (at LESSOR's option) with such other currency.

5.14    **Authorization for Payments**. LESSEE must file this Lease with the BDDK and Turkish DGCA in order to obtain the permissions necessary to perform its payment obligations under this Lease. LESSEE will obtain all such permissions prior to Delivery of the Aircraft. If at any time

any other permissions are required, LESSEE will obtain all certificates, licenses, permits, exemptions and other authorizations which are from time to time required for the making of the payments required by this Lease on the dates and in the amounts and currency which are stipulated herein, and will maintain the same in full force and effect for so long as the same will be required. LESSOR will, so far as reasonably practical, cooperate with LESSEE in obtaining any such certificates, licenses, exemptions or other authorizations.

5.15 **LESSOR Performance of LESSEE Obligation.** If LESSEE fails to make any payment under this Lease to a third party in connection with the Aircraft or fails to perform any other obligation required under this Lease, LESSOR may (but is not required to) at its election and without waiver of its rights perform such obligation and/or pay such amount. Within five (5) Business Days after written notice to LESSEE of the amount paid by LESSOR on behalf of LESSEE, LESSEE will repay such amount to LESSOR together with Default Interest. Such payment to LESSOR will constitute additional Rent payable by LESSEE to LESSOR hereunder. Any payment, performance or compliance by LESSOR of a LESSEE obligation hereunder will not affect the occurrence or continuance of a Default or Event of Default, as the case may be.

5.16 **Consideration for Rent and other Amounts.** The amount of the Rent and other payments contained in this Lease are in consideration of LESSEE's disclaimers, waiver of warranties and indemnities set forth in Articles 8 and 17, respectively, and the other provisions of this Lease.

## ARTICLE 6  DELIVERY CONDITION AND INSPECTION OF AIRCRAFT

6.1 **LESSEE Selection of Aircraft.** LESSEE COVENANTS TO LESSOR THAT LESSEE HAS USED ITS OWN JUDGMENT IN SELECTING THE AIRCRAFT AND HAS DONE SO BASED ON ITS SIZE, DESIGN AND TYPE. LESSEE ACKNOWLEDGES THAT LESSOR IS NOT A MANUFACTURER, REPAIRER OR SERVICING AGENT OF THE AIRCRAFT.

6.2 **Condition at Delivery.** LESSOR has advised LESSEE that at Delivery the Aircraft will be as set forth in Exhibit A and in the condition set forth in Exhibit B. To the extent that at Delivery there are non-substantial or minor deviations from the condition set forth in Exhibit B which do not affect the airworthiness of the Aircraft, LESSEE will nonetheless accept the Aircraft and LESSEE and LESSOR will adjust the return conditions of the Aircraft set forth in Article 23 accordingly.

6.3 **LESSEE Inspection of Aircraft at Delivery.** LESSEE will have the ground inspection and acceptance flight rights set forth in Exhibit B. LESSEE acknowledges that, as between LESSEE and LESSOR, in accepting the Aircraft LESSEE is relying on its own inspection and knowledge of the Aircraft in determining whether the Aircraft meets the requirements of this Lease.

6.4 **Delivery of Aircraft to LESSEE.** Subject to LESSEE having performed all of the conditions precedent to Delivery set forth in this Lease (or LESSOR's waiver of one or more of such conditions precedent), immediately following redelivery of the Aircraft from Prior Lessee

to LESSOR, LESSOR will deliver the Aircraft to LESSEE at the Delivery Location. Upon tender of the Aircraft by LESSOR to LESSEE in the condition required by Article 6.2, LESSEE will accept the Aircraft and the date of tender by LESSOR to LESSEE will be deemed to be the Delivery Date for all purposes under this Lease, including the commencement of LESSEE's obligation to pay Rent hereunder. However, nothing in this Lease will obligate LESSOR to deliver the Aircraft to LESSEE if LESSEE has not complied with the conditions contained in Articles 7.2 and 7.3.

6.5     **LESSEE Acceptance of Aircraft.** If LESSEE fails to (a) comply with the conditions contained in Articles 7.2 and 7.3 so as to allow Delivery to take place immediately following redelivery of the Aircraft by Prior Lessee to LESSOR or (b) take delivery of the Aircraft when properly tendered for delivery by LESSOR in the condition required hereunder,
LESSEE will indemnify LESSOR for all costs and expenses incurred by LESSOR as a result thereof

## ARTICLE 7  PRE-DELIVERY, DELIVERY AND POST-DELIVERY DOCUMENTARY AND OTHER REQUIREMENTS

7.1     **Translation and Notarization.** Within two (2) weeks following the execution of this Lease, the parties will re-execute (a) this Lease, as amended and supplemented as of such date and (b) a translation of this Lease in Turkish, as amended and supplemented as of such date, in each case before a Turkish notary public. LESSEE will pay the cost of such translation and notarization.

7.2     **Pre-Delivery Requirements. LESSEE** will do each of the following prior to the Scheduled Delivery Date of the Aircraft within the time frames set forth below:

7.2.1   Within one (1) month after execution of this Lease, LESSEE will deliver to LESSOR each of the following:

    (a)     copies of resolutions of the Board of Directors of LESSEE or other written evidence of appropriate action, duly certifying and authorizing the lease of the Aircraft hereunder and the execution, delivery and performance of this Lease, together with an incumbency certificate as to the person or persons authorized to execute and deliver documents on behalf of LESSEE hereunder;

    (b)     if available, a letter from the Aviation Authority in the form and substance of Exhibit F; and

    (c)     an opinion of counsel in the form and substance of Exhibit H.

    (d)     written evidence that a duly certified and notarized Lease has been filed with the BDDK. LESSEE will pay the costs of any required filing.

    (e)     at the date of signing of the lease, the board of directors will provide their individual personal guarantees  guaranteeing the performance of the Lessee's remaining obligations under the lease.

27

7.2.2   At least fourteen (14) days prior to the Scheduled Delivery Date, LESSEE will do each of the following:

(a)   have delivered to LESSOR a Certificate of Insurance and Brokers' Letter of Undertaking in the form and substance of Exhibits C and D evidencing insurance of the Aircraft in accordance with this Lease from the Delivery Date.

(b)   have delivered to Manufacturer, with a copy to LESSOR, a Certificate of Insurance in the form and substance of Exhibit E evidencing insurance of the Aircraft in accordance with this Lease from the Delivery Date.

7.2.3   At least three (3) Business Days prior to the Scheduled Delivery Date, LESSEE will do each of the following:

(a)   pay to LESSOR the first monthly installment of Rent in accordance with Article 5.3.2 or the Additional Security Deposit in accordance with Article 5.3.3, if applicable;

(b)   provide LESSOR with documents evidencing that LESSEE has obtained any necessary licenses for the importation and ferrying of the Aircraft into Turkey and that all applicable customs duties and sales taxes in respect of the Aircraft have been discharged by LESSEE (or arrangements satisfactory to LESSOR have been made for obtaining or paying for the same), such that at return of the Aircraft to LESSOR no additional fees, duties or taxes will be payable in order to export the Aircraft from Turkey;

(c)   provide LESSOR with documents reasonably requested by LESSOR evidencing the issuance of each approval, license and consent which may be required in connection with the remittance to LESSOR of any amount payable under this Lease or the performance by LESSEE of any of its obligations hereunder (including without limitation any exchange control approval);

(d)   provide LESSOR with a copy of such Aviation Documents as may be available prior to the Scheduled Delivery Date;

(e)   provide LESSOR with a power of attorney empowering LESSEE's representative, who may be an officer or employee of LESSEE, to accept the Aircraft on behalf of LESSEE;

(f)   provide LESSOR with a power of attorney in the form of Exhibit I;

(g)   provide LESSOR with a power of attorney for purposes of the Cape Town Convention in the form of Exhibit J; and

(h)   provide LESSOR with such other documents as LESSOR may reasonably request.

28

7.3    **Delivery Requirements. On** the Delivery Date of the Aircraft, each of the following will occur:

7.3.1    LESSEE will execute and deliver to LESSOR an Estoppel and Acceptance Certificate in the form of Exhibit G covering the Aircraft and effective as of the Delivery Date.

7.3.2    LESSEE will deliver a certificate signed by an officer of LESSEE stating all of the following:

    (a)    the representations and warranties contained in Article 20 are true and accurate on and as of the Delivery Date as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date); and

    (b)    no Default or Event of Default has occurred and is continuing or will result from LESSEE's lease of the Aircraft hereunder.

7.3.3    LESSEE's counsel will deliver an opinion confirming the matters set forth in the opinion of counsel described in Article 7.2 and advising that all filing and other requirements described in the earlier opinion of counsel have been met.

7.3.4    If any Creditor Agreement provides or contemplates that such Creditor will obtain any right, title or interest in an Engine which is installed on such Creditor's aircraft, LESSEE will deliver to LESSOR an engines cooperation agreement in form and substance acceptable to LESSOR which is executed by LESSEE and LESSEE's Creditors (as defined therein).

7.3.5    LESSEE and LESSOR will execute assignments of Manufacturer and Engine manufacturer rights in the form and substance of Exhibits K and L, respectively.

7.3.6    LESSEE will deliver to LESSOR a copy of such Aviation Documents as have not been previously delivered which are available.

7.4    **Post-Delivery Requirements.**

7.4.1    Within seven (7) days after Delivery, if not previously provided, LESSEE will do each of the following:

    (a)    procure registration of the Aircraft in the register of aircraft of the State of Registration showing LESSOR as the owner and provide evidence of the same to LESSOR;

    (b)    provide LESSOR with copies of all Aviation Documents not previously delivered;

    (c)    if the Aircraft could not be registered at Delivery, provide LESSOR with a

follow-up opinion of counsel advising that the Aircraft has been registered in the State of Registration and that all necessary filings have been made;

(d)    if the Aircraft was not imported into Turkey at Delivery, provide LESSOR with a follow-up opinion advising that all import and customs formalities in Turkey have been complied with; and

(e)    provide LESSOR with a certified (Customs stamped as a true copy) of the Aircraft Customs Entrance Declaration.

## ARTICLE 8  DISCLAIMERS AND WAIVERS

ANY COMMITMENT OR COVENANT ON THE PART OF LESSOR REGARDING THE CONDITION OF THE AIRCRAFT EXPIRES AFTER DELIVERY AND THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS ARTICLE 8 REGARDING THE CONDITION OF THE AIRCRAFT APPLY. THUS, UPON LESSEE'S ACCEPTANCE OF THE AIRCRAFT AND EXECUTION OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE, THEN AS BETWEEN LESSOR AND LESSEE:

8.1    **"As Is, Where Is"**. LESSEE AGREES THAT IT IS LEASING AIRCRAFT "AS IS, WHERE IS". LESSEE UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT NEITHER LESSOR NOR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES HAVE MADE OR WILL BE DEEMED TO HAVE MADE ANY TERM, CONDITION, REPRESENTATION, WARRANTY OR COVENANT EXPRESS OR IMPLIED (WHETHER STATUTORY OR OTHERWISE) AS TO (a) THE CAPACITY, AGE, AIRWORTHINESS, VALUE, QUALITY, DURABILITY, CONFORMITY TO THE PROVISIONS OF THIS LEASE, DESCRIPTION, CONDITION (WHETHER OF THE AIRCRAFT, ANY ENGINE, ANY PART THEREOF OR THE AIRCRAFT DOCUMENTATION), DESIGN, WORKMANSHIP, MATERIALS, MANUFACTURE, CONSTRUCTION, OPERATION, DESCRIPTION, STATE, MERCHANTABILITY, PERFORMANCE, FITNESS FOR ANY PARTICULAR USE OR PURPOSE (INCLUDING THE ABILITY TO OPERATE OR REGISTER THE AIRCRAFT OR USE THE AIRCRAFT DOCUMENTATION IN ANY OR ALL JURISDICTIONS) OR SUITABILITY OF THE AIRCRAFT OR ANY PART THEREOF, OR THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, KNOWN OR UNKNOWN, APPARENT OR CONCEALED, EXTERIOR OR INTERIOR, (b) THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY RIGHTS, (c) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE OR (d) ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND EXTINGUISHED.

8.2    **Waiver of Warranty of Description**. LESSEE HEREBY AGREES THAT ITS ACCEPTANCE OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE CONSTITUTE

LESSEE'S WAIVER OF THE WARRANTY OF DESCRIPTION, ANY CLAIMS LESSEE MAY HAVE AGAINST LESSOR BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION AND ANY AND ALL RIGHTS IT MAY HAVE TO THE REMEDIES SET FORTH II'~ SECTIONS 10508 THROUGH 10522 OF THE CALIFORNIA COMMERCIAL CODE. EVEN IF AT ANY TIME THE FAILURE OF THE AIRCRAFT TO CONFORM TO SUCH DESCRIPTION SUBSTANTIALLY IMPAIRS THE VALUE AND UTILITY OF THE AIRCRAFT AND EITHER (i) LESSEE ACCEPTED THE AIRCRAFT BASED ON A REASONABLE ASSUMPTION THAT THE NONCONFORMITY WOULD BE CURED AND IT WAS NOT SEASONABLY CURED OR (ii) LESSEE ACCEPTED THE AIRCRAFT WITHOUT DISCOVERING THE NONCONFORMITY BUT LESSEE'S ACCEPTANCE OF THE AIRCRAFT WAS REASONABLY INDUCED EITHER BY LESSOR'S ASSURANCES OR BY THE DIFFICULTY OF DISCOVERING ANY DEFECT PRIOR TO ACCEPTANCE, LESSEE AGREES NOT TO LOOK TO LESSOR FOR DAMAGES OR RELIEF ARISING OUT OF THE FAILURE OF THE AIRCRAFT TO CONFORM TO SUCH DESCRIPTION.

8.3    LESSEE Waiver. LESSEE HEREBY WAIVES AS BETWEEN ITSELF AND LESSOR AND AGREES NOT TO SEEK TO ESTABLISH OR ENFORCE ANY RIGHTS AND REMEDIES, EXPRESS OR IMPLIED (WHETHER STATUTORY, IN CONTRACT OR TORT OR UNI)ER ANY STRICT LIABILITY OR OTHER THEORY) AGAINST LESSOR OR THE AIRCRAFT RELATING TO ANY OF THE MATTERS MENTIONED IN ARTICLES 8.1 OR 8.2 AND THE CONDITION OF THE AIRCRAFT, REGARDLESS OF THE NEGLIGENCE, ACTIVE OR PASSIVE OR ANY OTHER TYPE, OF LESSOR.

8.4    Conclusive Proof. DELIVERY BY LESSEE TO LESSOR OF THE ESTOPPEL AND ACCEPTANCE CERTIFICATE WILL BE CONCLUSIVE PROOF AS BETWEEN LESSOR AND LESSEE THAT LESSEE'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED THE AIRCRAFT AND ENGINES AND (a) EACH IS AIRWORTHY AND IN GOOD WORKING ORDER AND REPAIR AND (b) THE AIRCRAFT AND ENGINES AND THE AIRCRAFT DOCUMENTATION ARE WITHOUT DEFECT (WHETHER OR NOT DISCOVERABLE AT DELIVERY) AND IN EVERY WAY SATISFACTORY TO LESSEE.

8.5    No Liability to Repair or Replace. LESSOR will not be liable for any expense in repairing or replacing any item of the Aircraft or be liable to supply another aircraft or any item in lieu of the Aircraft or any Part thereof if the same is lost, confiscated, damaged, destroyed or otherwise rendered unfit for use.

8.6    No Waiver. Nothing in this Article 8 or elsewhere in this Lease will be deemed to be a waiver by LESSEE of any rights it may have against Manufacturer, the Engine manufacturer or any other Person.

8.7    Consideration for Disclaimers and Waivers. LESSEE's disclaimers and waiver of warranties in this Article 8 are in consideration of(a) LESSEE's rights hereunder to inspect the Aircraft, (b) LESSOR's assignment to LESSEE of any existing and assignable warranties of Manufacturer and the Engine manufacturer and (c) the amount of the Rent and other payments contained in this Lease.

## ARTICLE 9  MANUFACTURERS' AND VENDORS' WARRANTIES

9.1    Warranties. As set forth in Article 7.3.5, at Delivery LESSOR will assign to LESSEE for the duration of the Lease Term the benefit of all warranties and indemnities given to LESSOR by Manufacturer and the Engine manufacturer. Effective on the Delivery Date, all other assignable vendor warranties with respect to the Aircraft are hereby assigned by LESSOR to LESSEE.

9.2    Reassignment. On the Termination Date, the benefit of any warranty assigned by LESSOR to LESSEE pursuant to Articles 7.3.5 and 9.1 will be reassigned automatically to LESSOR or its designee. At LESSOR's election, LESSEE's rights under such warranties (including LESSEE's claims and rights to payment thereunder) will revert to LESSOR during any period in which an Event of Default is continuing. Similarly, any additional warranties received by LESSEE from Manufacturer, the Engine manufacturer and any other vendor or repair facility for work performed on the Aircraft, Engine or any Part during the Lease Term will be automatically assigned by LESSEE to LESSOR or its designee on the Termination Date. LESSEE at its own cost and expense will do all such things and execute such documents as may be required for these purposes.

9.3    Warranty Claims. LESSEE will diligently and promptly pursue any valid claims it may have against Manufacturer and others under such warranties with respect to the Aircraft.

## ARTICLE 10 OPERATION OF AIRCRAFT

10.1    Costs of Operation. LESSEE will pay all costs incurred in the operation of the Aircraft during the Lease Term and until the Termination Date, for profit or otherwise, including the costs of flight crews, cabin personnel, fuel, oil, lubricants, maintenance, insurance, storage, landing and navigation fees, airport charges, passenger service and any and all other expenses of any kind or nature, directly or indirectly, in connection with or related to the use, movement and operation of the Aircraft.

10.2    Compliance with Laws. LESSEE agrees throughout the Lease Term and until the Termination Date to maintain operational control of the Aircraft and use the Aircraft in accordance with applicable Laws of the State of Registration and of any country, state, territory or municipality into or over which LESSEE may operate. LESSEE will not employ, suffer or cause the Aircraft to be used in any business which is forbidden by Law or in any manner which may render it liable to condemnation, destruction, seizure, or confiscation by any authority. LESSEE will not permit the Aircraft to fly to any airport or country if so doing would cause LESSEE or LESSOR to be in violation of any Law applicable to either of them or the Aircraft.

10.3    Training. LESSEE will not use the Aircraft for testing or for training of flight crew members other than LESSEE crew members and will not use the Aircraft for training any more than it utilizes for training the other aircraft in its fleet.

10.4    No Violation of Insurance Policies. LESSEE will not use or permit the Aircraft to be used in any manner or for any purpose which is not covered by the insurance policies LESSEE is

32

required to carry and maintain as set forth in this Lease. LESSEE will not carry any goods of any description excepted or exempted from such policies or do any other act or permit to be done anything which could reasonably be expected to invalidate or limit any such insurance policies.

10.5    **Flight and Airport Charges.**

10.5.1  LESSEE will pay promptly when due all airport or enroute navigation charges (including Eurocontrol charges), navigation service charges, landing fees and all charges payable by LESSEE for the use of or for services provided at any airport, whether in respect of the Aircraft or any other aircraft of LESSEE.

10.5.2  If requested by LESSOR, LESSEE will provide LESSOR with a list of the airports to which LESSEE regularly operates the Aircraft or its other aircraft. LESSEE hereby authorizes Eurocontrol or another aviation authority or airport or creditor claiming rights on the Aircraft to confirm the status of LESSEE's payments to such creditor for the Aircraft and its other aircraft, as and when requested by LESSOR.

## ARTICLE 11        SUBLEASES

11.1    No Sublease without LESSOR Consent. LESSEE WILL NOT SUBLEASE OR PART WITH POSSESSION OF THE AIRCRAFT (EXCEPT FOR MAINTENANCE AND REPAIR) AT ANY TIME WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR (NOT TO BE UNREASONABLY WITHHELD) AND ONLY IF APPLICABLE TURKISH LAW PERMITS AND ONLY IN ACCORDANCE WITH SUCH REQUIREMENTS AS MAY FROM TIME TO TIME BE AGREED IN WRITING BETWEEN LESSOR AND LESSEE. NO SUBLEASING OF AN ENGINE WILL BE PERMITTED.

11.2    LESSOR Costs. LESSEE will indemnify LESSOR on demand for all out-of-pocket expenses (including legal fees) incurred in connection with LESSOR's assessment of the subleasing proposal (whether or not LESSOR's consent to such sublease is ultimately given) and implementation of the sublease.

11.3    Any Approved Sublease. Any sublease approved by LESSOR will be for a term no greater than the remaining Lease Term. The applicable sublease agreement will contain provisions consistent with this Lease protecting LESSOR's title to the Aircraft, providing appropriate LESSOR disclaimers and indemnities, regarding the maintenance and repair standards for the Aircraft and concerning the insurances which will be carried by the sublessee and the circumstances which constitute a Total Loss of the Aircraft. Any such sublease will be subject and subordinate to this Lease. LESSOR will have an opportunity to review the proposed sublease agreement in advance in order to determine that it meets the requirements of this Article 11.3. In its sole discretion, LESSOR may require an opinion of counsel in connection with such sublease, including LESSOR's right to repossess the Aircraft in the event of an Event of Default hereunder or under the sublease. LESSEE will not amend the terms of any approved sublease agreement without the prior written consent of LESSOR, which will not be unreasonably withheld.

11.4    Assignment of Sublease. Any approved sublease will be assigned to LESSOR as security. LESSEE will deliver the original counterpart of the sublease to LESSOR and make any filings necessary to protect LESSOR's security interest.

11.5    Wet Leases. The wet leasing of the Aircraft during the Lease Term (in which LESSEE and its crews retain operational control of the Aircraft) will not be considered a sublease of the Aircraft and will be permitted without LESSOR's consent, provided that (a) the Aircraft remains registered in the State of Registration, (b) the Aircraft will neither be based in nor operated in or to a Prohibited Country, (c) LESSEE provides LESSOR with either a certified copy of the applicable provisions from the wet lease agreement or an officer's certificate indicating whether LESSEE or the wet lessee will be responsible for maintaining the primary passenger, baggage and cargo liability insurance relating to operation under the wet lease and (d) LESSEE complies with Article 18.12.

11.6    Continued Responsibility of LESSEE. LESSEE will continue to be responsible for performance of its obligations under this Lease during any period of sublease or wet lease.

## ARTICLE 12        MAINTENANCE OF AIRCRAFT

12.1    General Obligation. During the Lease Term and until the Termination Date, LESSEE alone has the obligation, at its expense, to maintain and repair the Aircraft, Engines, APU and all of the Parts (a) in accordance with the Maintenance Program, (b) in accordance with the rules and regulations of the Aviation Authority, (c) in accordance with Manufacturer's type design, (d) in accordance with any other regulations or requirements necessary in order to maintain a valid Certificate of Airworthiness for the Aircraft and meet the requirements at all times during the Lease Term and upon return of the Aircraft to LESSOR for issuance of a Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country in accordance with JAR Part 21 (except during those periods when the Aircraft is undergoing maintenance or repairs as required or permitted by this Lease and to the extent in conflict with the requirements of the Aviation Authority) and (e) in the same manner and with the same care as used by LESSEE with respect to similar aircraft and engines operated by LESSEE and without in any way discriminating against the Aircraft.

12.2    Specific Engine Requirements.

12.2.1  No Engine will remain in an unserviceable condition for more than three (3) months except if the engine will be repaired.

12.2.2  When replacing Parts in an Engine, LESSEE will use original equipment manufacturer parts ("OEM Parts"). If LESSEE wishes to replace Parts in an Engine with parts which are not OEM Parts, LESSEE must obtain approval from LESSOR before such parts are installed. If given, LESSOR's approval will generally be given only for the installation of parts manufactured in accordance with FAR Part 21.303 (or its JAA equivalent) ("PMA Parts") which are consumable parts such as brackets, gaskets and seals. The use of stationary and high energy rotating PMA Parts in the gaspath will not be approved by LESSOR. Any proposed repair to an OEM Part or PMA Part in an Engine which has

34

been approved by an FAA Designated Engineering Representative (DER) (or its EASA equivalent) must also be approved by LESSOR prior to performance of the repair, such LESSOR approval not to be unreasonably withheld.

12.2.3 LESSEE will not discriminate against the Engines with respect to build standards and life-limited Part replacements. Without limiting the foregoing, at any shop visit during which a Module Performance Restoration is performed, LESSEE will (a) build the Engine life-limited Parts to at least 2000 cycles remaining and (b) perform, at a minimum, a workscope sufficient to allow such Engine to achieve at least 4000 hours and 2,000 cycles of operation following such shop visit.

12.2.4 With respect to the last Engine shop visit of an Engine prior to return of the Aircraft, LESSEE will submit to LESSOR at least thirty (30) days in advance the intended workscope of such shop visit. If LESSOR requests, LESSEE will perform additional work at such shop visit at LESSOR's cost.

12.2.5 LESSEE will not enter into any Engine maintenance cost per flight hour, power-by-the-hour or similar agreement with the Engine manufacturer or any other Engine maintenance facility or organization without LESSOR's prior written consent. LESSEE will be responsible at its cost for performing all work necessary to meet the return conditions with respect to the Engines set forth in Article 23 even if such work is not covered by LESSEE's Engine maintenance agreement. Without limiting the foregoing, any such Engine maintenance agreement will provide that:

(a)     LESSOR will receive and retain the Engine Performance Restoration Reserves paid by LESSEE with respect to an Engine until an Engine shop visit has been completed and the applicable Engine has been released to LESSEE;

(b)     LESSEE will pay the Engine maintenance facility directly for any costs in excess of the amount reimbursable from the Engine Performance Restoration Reserves, including any differential between the hourly Engine Performance Restoration Reserves payable by LESSEE to LESSOR and the hourly rates charged by the Engine maintenance facility; and

(c)     LESSEE will pay the Engine maintenance facility directly for any services provided by the Engine maintenance facility over and above repair of the Engines, such as trend monitoring, spare engines or spare parts.

12.3     Specific Obligations. Without limiting Article 12.1, LESSEE agrees that such maintenance and repairs will include but will not be limited to the specific items set forth in this Article 12.3.

12.3.1 LESSEE will perform all routine and non-routine maintenance work in accordance with the Maintenance Program.

12.3.2 LESSEE will perform all Airworthiness Directives, all alert service bulletins of

35

Manufacturer, the Engine manufacturer and other vendors or manufacturers of Parts incorporated on the Aircraft and all service bulletins which must be performed in order to maintain the warranties on the Aircraft, Engines, APU and Parts.

12.3.3 LESSEE will incorporate in the Aircraft all other service bulletins of Manufacturer, the Engine manufacturer and other vendors which LESSEE schedules to adopt within the Lease Term for the rest of its B757-200 aircraft fleet. It is the intent of the parties that, in terms of service bulletin compliance (including method of compliance) and other maintenance matters, the Aircraft not be discriminated against in comparison to the rest of LESSEE's fleet.

12.3.4 LESSEE's Maintenance Program for the Aircraft will include a corrosion prevention and control program as recommended by Manufacturer and all discrepancies will be corrected in accordance with the recommendations of Manufacturer and the Structural Repair Manual. In addition, all inspected areas will be properly treated with corrosion inhibitor as recommended by Manufacturer.

12.3.5 If LESSEE performs structural inspections or tasks on its B757-200 fleet on a sampling basis, then all such structural inspections or tasks will be performed on the Aircraft. LESSEE will provide LESSOR with written summaries of the sampling programs involving or affecting the Aircraft.

12.3.6 All Aircraft Documentation will be in English and in an up-to-date status.

12.3.7 All hard-time, time-controlled, time-tracked, life-limited, on-condition and condition-monitored Parts, and all other Parts which can be Overhauled or repaired, which are installed on the Aircraft will have a JAR Form 1, or if accepted by the JAA/EASA, an FAA Form 8 130-3 evidencing the airworthiness of such Part at the time of installation on the Aircraft. In the case of life-limited Parts, the documentation will also state the total hours and cycles since new. In the case of hard-time, time-controlled, time-tracked, on-condition or condition-monitored Parts, or any other Part which can be Overhauled or repaired, the documentation will also state the time since last Overhaul or refurbishment, will have a reference to the relevant section of the Component Maintenance Manual under which the Part was Overhauled or refurbished, as applicable, and will identify the JAA/EASA-approved repair agency which performed the last Overhaul or refurbishment.

12.3.8 All Parts other than those referred to in Article 12.3.7 installed on the Aircraft will have FAA-acceptable or EASA-acceptable documentation demonstrating that such Parts were airworthy at the time of installation on the Aircraft.

12.3.9 All repairs, Modifications and alterations and the addition, removal or replacement of equipment, systems or components will be properly documented in accordance with the rules and regulations of the Aviation Authority and reflected in the Aircraft Documentation, including Manufacturer's manuals. In addition, all repairs to the Aircraft will be accomplished in accordance with Manufacturer's Structural Repair Manual (or FAA-approved data supported by an FAA Form 8110-3 or FAA Form 8 100-9). All

Modifications and alterations will also be accomplished in accordance with FAA-approved data supported by an FAA Form 8110-3, FAA Form 8100-9 or FAA supplemental type certificate.

12.4    Replacement of Parts.

12.4.1 LESSEE, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or rendered unfit or beyond economical repair (BER) for use for any reason. In the ordinary course of maintenance, service, repair, Overhaul or testing, LESSEE may remove any Part provided that LESSEE replaces such Part as promptly as practicable. All replacement Parts will (a) be owned by LESSEE free and clear of all Security Interests (except Permitted Liens) of any kind or description (or, if not owned by LESSEE, LESSEE guarantees to LESSOR such title and clearance of all Security Interests), (b) be in airworthy condition and of at least equivalent model, service bulletin and modification status and have a value and utility at least equal to the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof and (c) meet the requirements of Articles 12.3.7 or 12.3.8, as applicable. So long as a substitution meets the requirements of the Maintenance Program and Aviation Authority, LESSEE may substitute for any Part a part that does not meet the requirements of the foregoing sentence if a complying Part cannot be procured or installed within the available ground time of the Aircraft and as soon as practicable the non-complying part is removed and replaced by a complying Part. Any replacement Parts will also comply with the requirements set forth in Article 12.2.2.

12.4.2 All Parts removed from the Aircraft will remain the property of LESSOR and subject to this Lease no matter where located, until such time as such Parts have been replaced by Parts (which have been incorporated or installed in or attached to the Aircraft) which meet the requirements for replacement Parts specified above and title to such replacement Parts has passed to LESSOR under the Laws of the State of Registration and the lex situs. To the extent permitted by the Laws of the State of Registration and the lex situs, it is the intent of LESSOR and LESSEE that without further act and immediately upon any replacement Part becoming incorporated, installed or attached to the Aircraft as above provided, (a) title to the removed Part will thereupon vest in LESSEE, free and clear of all rights of LESSOR, (b) title to the replacement Part will thereupon vest in LESSOR free and clear of all rights of LESSEE and (c) such replacement Part will become subject to this Lease and be deemed to be a Part hereunder to the same extent as the Parts originally incorporated or installed in or attached to the Aircraft.

12.5    Removal of Engines.

12.5.1 If an Engine is removed for testing, service, repair, maintenance, Overhaul work, alterations, modifications or any other reason, title to such Engine will at all times remain vested in LESSOR.

12.5.2 LESSEE will be entitled to remove any of the Engines from the Aircraft and install

another engine or engines on the Aircraft, provided that LESSEE complies with each of the following obligations:

(a)     The insurance requirements set forth in Article 18 and Exhibit C are in place;

(b)     LESSEE ensures that the identification plates referred to in Article 15 are not removed from any Engine upon such Engine being detached from the Aircraft; and

(c)     Title to the Engine remains with LESSOR free from all Security Interests (except Permitted Liens) regardless of the location of the Engine or its attachment to or detachment from the Aircraft.

12.6    Removal of APU.

12.6.1  If the APU is removed for testing, service, repair, maintenance, Overhaul work, alterations, modifications or for any other reason, title to the APU will at all times remain vested in LESSOR.

12.6.2  LESSEE will be entitled to remove the APU from the Aircraft and install another auxiliary power unit on the Aircraft, provided that LESSEE complies with each of the following obligations:

(a)     The insurance requirements set forth in Article 18 and Exhibit C are in place; and

(b)     Title to the APU remains with LESSOR free from all Security Interests (except Permitted Liens) regardless of the location of the APU or its attachment to or detachment from the Aircraft.

12.7    Pooling of Engines, APU and Parts. With LESSOR's prior written consent, not to be unreasonably withheld, LESSEE may subject the Engines, APU and Parts to normal interchange or pooling agreements with responsible international, scheduled commercial air carriers customary in the airline industry and entered into by LESSEE in the ordinary course of its business with respect to its entire B757-200 fleet so long as (a) in the case of pooling of an Engine or the APU, such Engine or APU is returned to LESSEE within two (2) months, (b) no transfer of title to the Engine or APU occurs, (c) all other terms of this Lease continue to be observed with respect to the Engines, APU or Parts, including but not limited to Articles 8, 10, 12, 14, 15, 16, 17, 18 and 19 and (d) LESSEE continues to be fully responsible to LESSOR for the performance of all of its obligations hereunder.

12.8    Installation of Engines on other aircraft. Any Engine removed from the Aircraft may be installed on another aircraft in LESSEE's fleet which utilizes engines of the same type as the Engine only if one of the situations described in this Article 12.8 exists:

12.8.1  LESSEE or LESSOR has title to such other aircraft free and clear of all Security Interests (except Permitted Liens).

12.8.2 LESSEE, LESSOR and all of the Creditors of LESSEE of such aircraft enter into an engines cooperation agreement in form and substance acceptable to LESSOR in which each party agrees to recognize one another's rights in the engines. LESSEE will reimburse LESSOR and LESSOR's Lender for their reasonable attorneys' fees and costs in negotiating and finalizing engine cooperation agreement arrangements with LESSEE and its Creditors.

12.8.3 Such other aircraft is subject to a Creditor Agreement (but no other Security Interests except Permitted Liens) which by its terms expressly or effectively states that such Creditor and its successors and assigns will not acquire any right, title or interest in any Engine by reason of such Engine being installed on such aircraft. To evidence the foregoing, at or before Delivery, LESSEE will provide LESSOR with an opinion of counsel and officer's certificate as to this matter (and such an opinion of counsel and officer's certificate will be provided during the Lease Term with respect to other Creditor Agreements regarding aircraft entering LES SEE's operating fleet subsequent to Delivery). LESSEE hereby agrees that if LESSOR's title to an Engine is in fact impaired under any such Creditor Agreement, such impairment will be a Total Loss of such Engine and the provisions of Article 19.5 will apply. To the extent another Creditor Agreement contains such provisions, then LESSOR hereby agrees for the benefit of the Creditor of such Creditor Agreement that neither LESSOR nor its successors or assigns will acquire or claim any right, title or interest in any engine in which LESSEE or another Creditor has an interest as a result of such engine being installed on the Airframe.

12.9    Modifications.

12.9.1 No modification, alteration or addition to or removal from the Aircraft ("Modification") expected to cost over Five Hundred Thousand U.S. Dollars (US$500,000) or deviation from the Aircraft's original type design or configuration will be made without the prior written consent of LESSOR, which consent will not be unreasonably withheld. Airworthiness Directives and Manufacturer's recommended service bulletins are not "Modifications" for which LESSOR consent is required.

12.9.2 LESSOR may review LESSEE's proposed designs, plans, engineering drawings and diagrams, and flight and maintenance manual revisions for any proposed Modification. LESSEE will furnish LESSOR (at LESSEE's expense) with such documents in final form and any other documents required by Law, as a result of such Modification. All Modifications incorporated on the Aircraft will be properly documented in the Aircraft Documentation and approved by the FAA and the Aviation Authority. All Modifications and alterations will also be accomplished in accordance with FAA-approved data supported by an FAA Form 8 110-3, FAA Form 8100-9 or FAA supplemental type certificate.

12.9.3 Notwithstanding any other provision of this Lease, no Modification will be made which has the effect of decreasing the utility or value of the Aircraft or invalidating any warranty applicable to the Aircraft.

12.9.4 No Modification will be made by LESSEE if an Event of Default exists and is continuing hereunder.

12.9.5 Unless otherwise agreed by LESSOR in writing, all permanent or structural Modifications will forthwith become a part of the Aircraft and LESSEE relinquishes to LESSOR all rights and title thereto. However, all temporary and non-structural Modifications will remain the property of LESSEE and, at LESSOR's request and LESSEE's cost, will be removed from the Aircraft prior to return of the Aircraft, with LESSEE restoring the Aircraft to the condition it was in prior to the Modification in a manner cosmetically acceptable to LESSOR.
Notwithstanding the foregoing, no such removal will be permitted without LESSOR's permission after the occurrence of an Event of Default hereunder and immediately upon the occurrence of an Event of Default hereunder, without the requirement of any further act or notice, all right, title and interest in such Modifications will immediately vest in LESSOR.

12.9.6 LESSOR will bear no liability for the cost of Modifications of the Aircraft whether in the event of grounding or suspensions of certification, or for any other cause.

12.10  Performance of Work by Third Parties.

12.10.1 All off-wing maintenance and repair work on an Engine, the APU and the Landing Gear must be performed by an JAA/EASA Part 145-approved repair station unless otherwise approved in advance by LESSOR.

12.10.2 Whenever maintenance or repair work on the Airframe or on-wing maintenance or repair work on an Engine or the APU will be performed by a Person other than LESSEE, such Person must be an JAA/EASA Part 145-approved repair station.

12.11  Reporting Requirements.

12.11.1 Commencing with a report furnished ten (10) days after the end of the calendar month in which Delivery occurs, LESSEE will furnish to LESSOR a Monthly Report in English in the form attached hereto as Exhibit N. Each Monthly Report will be furnished within ten (10) days after the end of each calendar month, except that the Monthly Report pertaining to the last month (or any portion thereof) of flying will be furnished to LESSOR on the Termination Date.

12.11.2 On each anniversary of the Delivery Date, LESSEE will provide LESSOR with a Technical Evaluation Report for the Aircraft in the form and substance of Exhibit P, as revised.

12.11.3 From time to time, LESSEE will provide LESSOR with such other technical information or documents as LESSOR may reasonably request.

12.12  <u>Maintenance Policies and Procedures Manuals</u>. At LESSOR's request for the purposes of demonstrating to LESSOR how the Aircraft has been maintained, LESSEE will provide LESSOR with copies of its Maintenance Program, general maintenance manual, general policies and procedures manual, maintenance exposition manual, general engineering manual, or their equivalents, and any other related controlled documentation which affects the Aircraft. Recognizing that LESSEE's maintenance policies and procedures manuals are proprietary to LESSEE, LESSOR agrees that they will be only utilized as set forth in this Article 12.12 and Article 23.6.

12.13  **LESSOR Inspection Rights.**

12.13.1  At any time (subject to Article 12.13.4), LESSOR and/or its authorized agents or representatives (which may be Manufacturer or Engine manufacturer) will have the right to inspect and take photographs of the Aircraft and review the Aircraft Documentation.

12.13.2  LESSEE will give LESSOR reasonable written notice before the Aircraft undergoes any "C" check or equivalent check.

12.13.3  If the Aircraft is at a third party maintenance facility, LESSEE will cause such facility to allow LESSOR and/or its authorized agents or representatives (which may be Manufacturer or Engine manufacturer) to inspect and take photographs of the Aircraft and review the Aircraft Documentation, notwithstanding the fact that LESSEE (as the party opening the work order) is considered the "customer" of such facility.

12.13.4  LESSOR will provide LESSEE with reasonable notice prior to any inspection by LESSOR and/or its authorized agents or representatives (which may be Manufacturer or Engine manufacturer) and will coordinate with LESSEE and/or any applicable third party maintenance facility so as to cause minimum practical disturbance to the operation or maintenance of the Aircraft or the personnel of LESSEE or the applicable third party maintenance facility.

12.13.5  LESSEE expressly authorizes and consents to allowing Manufacturer, Engine manufacturer and their field service representatives to provide LESSOR with information about the condition and maintenance of the Aircraft (including the Aircraft Documentation) on an ongoing basis. Manufacturer, Engine manufacturer and their field service representatives may report their findings and provide documentation to LESSOR without the need for any further notice to or authorization from LESSEE.

12.13.6  LESSOR will have no duty to make any inspection of the Aircraft and will not incur any liability or obligation by reason of (and LESSEE's indemnity obligations pursuant to Article 17 will apply notwithstanding) LESSOR and/or its authorized agents or representatives making or not making any such inspection or by reason of any reports LESSOR receives regarding the Aircraft.

**ARTICLE 13**      **USE OF RESERVES**

13.1    Airframe Reserves. LESSOR will reimburse LESSEE from the Airframe Reserves for the actual cost of the structural inspection portion of completed scheduled "S4C" checks as described in the MPD and the rectification of any structural deficiencies resulting from such inspection, with work performed for all other causes excluded, including those causes set forth in Article 13.7. Subject to Article 16.1 and excluding exchange, material markup and outside vendor fees, and handling, packaging and shipping charges, reimbursement will be made up to the amount in the Airframe Reserves on the commencement date of the zonal or structural task for which reimbursement is requested.

13.2    Engine Performance Restoration Reserves.

13.2.2    For each Basic Engine, LESSOR will reimburse LESSEE from the Engine Performance Restoration Reserves allocated to a particular Engine module of such Engine for the actual cost of Module Performance Restoration of such Engine module during an off-wing Engine shop visit performed, with work performed for all other causes excluded, including those causes set forth in Article 13.7. Subject to Article 16.1 and excluding exchange, material markup and outside vendor fees, and handling, packaging and shipping charges, reimbursement will be made up to the amount in the particular Engine Performance Restoration Reserves account for such Engine module of the applicable Engine at the time of removal of such Engine.

13.2.3    LESSEE will not enter into any Engine maintenance cost per flight hour, power-by-the-hour or similar agreement with the Engine manufacturer or any other Engine maintenance facility or organization without LESSOR's consent.

13.3    Engine LLP Reserves. LESSOR will reimburse LESSEE from the Engine LLP Reserves for an Engine for the actual out-of-pocket materials cost without overhead, mark-up or profit factor, and reduced by the amount of any "Waste Expense", associated with the replacement of life-limited Parts in such Engine during completed Engine shop visits (i.& heavy maintenance visits), with work performed for all other causes excluded, including those causes set forth in Article 13.7. "Waste Expense" means the product of(a) the number of unused cycles on a life-limited Part at the time such life-limited Part is removed for replacement, multiplied by (b) the quotient of the cost of the new replacement life-limited Part divided by the number of cycles which constitutes the approved life of such life-limited Part. Subject to Article 16.1 and excluding exchange, material markup and outside vendor fees, and handling, packaging and shipping charges, reimbursement for replacement of life-limited Parts in an Engine will be made up to the amount in the Engine LLP Reserves applicable to such Engine at the time of removal of such Engine.

13.4    Landing Gear Reserves. LESSOR will reimburse LESSEE from the Landing Gear Reserves for the actual cost of an Overhaul of the Landing Gear, with work performed for all other causes excluded, including those causes set forth in Article 13.7. Subject to Article 16.1 and excluding exchange, material markup and outside vendor fees, and handling, packaging and shipping charges, reimbursement will be made up to the amount in the Landing Gear Reserves at

the time of removal of the Landing Gear.

13.5    APU Reserves. LESSOR will reimburse LESSEE from the APU Reserves for the actual cost of a completed hot section refurbishment or Overhaul of the APU, with work performed for all other causes excluded, including those causes set forth in Article 13.7. Subject to Article 16.1 and excluding exchange, material markup and outside vendor fees, and handling, packaging and shipping charges, reimbursement will be made up to the amount in the APU Reserves at the time of removal of the APU.

13.6    Reimbursement.

13.6.1    LESSEE will be entitled to reimbursement from the Reserves after the work is completed and the Airframe, Engine, Landing Gear or APU, as applicable, has left the repair agency, by submitting invoices (including an original invoice from LESSEE to LESSOR for LESSEE's reimbursement claim) and proper documentation within six (6) months after completion of the work. If LESSEE seeks reimbursement from the Reserves for work performed by LESSEE, such work will be charged at LESSEE's out-of-pocket and unburdened labor and material costs. LESSEE may only seek reimbursement from the Airframe Reserves one time in any calendar year.

13.6.2    For the Airframe, proper documentation includes a list of all routine and non-routine tasks performed with corresponding references to the MPD and an itemized labor and materials report.

13.6.3    For an Engine and the APU, proper documentation includes (a) an original invoice from LESSEE to LESSOR for LESSEE's reimbursement claim, (b) a description of the reason for removal, (c) the date of removal and the aircraft removed from (which may be the Aircraft), (d) the total hours and cycles at the time of removal, (e) the hours and cycles since last shop visit, (f) a full description of the final workscope, (g) a description of the type of maintenance performed (including on each module, if applicable), (h) complete disk records for the Engine both prior to and after the shop visit, (i) a shop findings report, (j) a complete copy of the repair facility's invoice, including a breakdown by Engine module of all material replaced, material exchanged, labor and other costs, and service bulletins and Airworthiness Directives performed, (k) a copy of any test cell performance data, (l) an on and off log of Parts (configuration listing) tracked by LESSEE and the repair facility, (m) a current service bulletin and Airworthiness Directive listing, (n) written verification from the repair facility that the Engine or APU has been released and shipped from the repair facility back to LESSEE, (o) the status of all warranty claims and (p) an itemization of all concessions, warranty credits or other credits which have been or will be provided for work accomplished on the Engine or APU during the applicable shop visit (or, if none, a written statement from LESSEE stating that it has not received and does not have pending any such concessions, warranty credits or other credits).

43

13.6.4    For the Landing Gear, proper documentation includes the total calendar time, hours and cycles on the Landing Gear both prior to and after the Overhaul.

13.7    Reimbursement Adjustment.

13.7.1    By way of example, among the exclusions from reimbursement are work or items:

(a)    resulting from repairs covered by LESSEE's or a third party's insurance, (deductibles being for the account of LESSEE and not reimbursable) or covered by warranties; or

(b)    required as a result of an Airworthiness Directive, manufacturer's service bulletin (unless approved in advance by LESSOR), non-routine or non-scheduled maintenance, faulty maintenance or installation, improper operations, misuse, neglect, accident, incident, ingestion (foreign object damage) or other accidental cause.

13.7.2    Reimbursement from the Reserves will not be available for the non-Basic Engine Parts.

13.7.3    All invoices subject to reimbursement from LESSOR will be reduced (by adjustment between LESSEE and LESSOR retroactively if necessary) by the actual amounts received by LESSEE on account of such work from responsible third parties or other sources, such as insurance proceeds, manufacturer's warranties, guarantees, concessions and credits (including, with respect to Engines, credits due to life remaining on any removed Engine Parts).

13.8    Costs in Excess of Reserves. LESSEE will be responsible for payment of all costs in excess of the amounts reimbursed hereunder. If on any occasion the available balance in the Airframe Reserves, Engine Performance Restoration Reserves allocated to a particular Engine module for a particular Engine, Engine LLP Reserves for a particular Engine, Landing Gear Reserves or APU Reserves (at the time of the structural check, in the case of the Airframe, or at the time of removal, in the case of an Engine, the Landing Gear and the APU) is insufficient to satisfy a claim for reimbursement in respect of the Airframe, such Engine, the Landing Gear or the APU, as applicable, the shortfall may not be carried forward or made the subject of any further claim for reimbursement.

13.9    Reimbursement after Termination Date. LESSEE may not submit any invoice for reimbursement from the Reserves after the Termination Date unless on or prior to such date LESSEE has notified LESSOR in writing that such outstanding invoice will be submitted after the Termination Date and the anticipated amount of such invoice. So long as LESSEE has provided such notice to LESSOR, LESSEE may then submit such outstanding invoice at any time within six (6) months after the Termination Date. Subject to the foregoing, any balance remaining in the Reserves on the Termination Date, including termination on account of a Total Loss of the Aircraft, will be retained by LESSOR.

**ARTICLE 14 TITLE AND REGISTRATION**

14.1    <u>Title to the Aircraft</u>. Title to the Aircraft will be and remain vested in LESSOR. LESSOR and LESSEE intend this Lease to be a "true lease". LESSEE will have no right, title or interest in the Aircraft except as provided in this Lease.

14.2    <u>Registration of Aircraft</u>. LESSEE at its sole cost and expense will (a) register and maintain registration of the Aircraft in the name of LESSOR at the register of aircraft in the State of Registration and (b) from time to time take all other steps then required by Law (including the Geneva Convention or the Cape Town Convention if and as applicable) or by practice, custom or understanding or as LESSOR may reasonably request to protect and perfect LESSOR's interest in the Aircraft and this Lease in the State of Registration or in any other jurisdictions in or over which LESSEE may operate the Aircraft.

14.3    <u>Cape Town Convention</u>. If the Cape Town Convention has been or is ratified or made applicable in Turkey, then:

14.3.1    At LESSOR's request, LESSEE will perform such acts and execute and deliver such agreements and instruments as may be determined by LESSOR to be necessary or appropriate to (a) protect and perfect LESSOR's interest in the Aircraft, this Lease and the other Operative Documents under the Cape Town Convention and (b) enhance the enforceability of the commercial agreements of LESSEE and LESSOR under the Cape Town Convention to the greatest extent permitted by the Cape Town Convention. Actions to be requested by LESSOR may include entering into amendments to this Lease or the other Operative Documents as are necessary to constitute an "international interest" under the Cape Town Convention.

14.3.2    LESSOR may also elect to cause the interests of LESSOR in the Aircraft (including in the Engines), this Lease and the other Operative Documents to be registered in the international registry of the Cape Town Convention to the fullest extent such interests may be registered. At LESSOR's request, LESSEE will provide all assistance and cooperation to LESSOR in order to procure such filing, including consenting to or causing such registration via a "designated entry point" (as such term is defined in the Cape Town Convention) in Turkey.

14.3.3    Unless LESSEE obtains LESSOR's prior written consent, LESSEE undertakes that it will not consent to or permit any Person other than LESSOR to make any international registry filings (including prospective filings) under the Cape Town Convention in relation to the Aircraft (including the Engines), this Lease or the other Operative Documents.

14.3.4    LESSEE will be responsible for all costs and expenses arising out of the requirements of this Article 14.3.

14.4    <u>Filing of this Lease</u>. To the extent permitted by Law and in accordance with the requirements of the Law from time to time, LESSEE at its sole cost and expense will cause this

Lease to be kept, filed, recorded and refiled or rerecorded in the State of Registration and in any other offices necessary to protect LESSOR's rights hereunder.

14.5    Evidence of Registration and Filings. As LESSOR may reasonably request from time to time, LESSEE will furnish to LESSOR an opinion of counsel or other evidence reasonably satisfactory to LESSOR of the registrations and filings required hereunder.

### ARTICLE 15            IDENTIFICATION PLATES

LESSOR will affix and LESSEE will at all times maintain on the Airframe and each Engine the identification plates containing the following legends or any other legend requested by LESSOR in writing:

15.1    Airframe Identification Plates.

| | |
|---|---|
| Location: | One to be affixed to the Aircraft structure above the forward entry door adjacent to and not less prominent than that of Manufacturer's data plate and another in a prominent place on the flight deck. |
| Size: | No smaller than 2" x 3". |
| Legend: | "THIS AIRCRAFT IS OWNED BY HS GROUP. |

MANUFACTURER'S SERIAL NO: 28484

OWNER'S ADDRESS:

H&S Group OF COMPANIES INC
9100 SOUTH DADELAND BLVD  SUIT1500
MIAMI FLORIDA 33156
USA
Fax:  (305) 279-6200

15.2    Engine Identification Plates.

| | |
|---|---|
| Location: | The legend on the plate must be no less prominent than the Engine data plate and must be visible. |
| Size: | No smaller than 1" x 4". |
| Legend: | "THIS ENGINE IS OWNED BY H&S Group, OF COMPANIES INC, 9100 SOUTH DADELAND BLVD SUIT1500 MIAMI, FLORIDA 33156 USA." |

46

### ARTICLE 16          TAXES

16.1    General Obligation of LESSEE. Except as set forth in Article 16.2, LESSEE agrees to pay promptly when due, and to indemnify and hold harmless LESSOR on a full indemnity basis from, all license and registration fees and all taxes, fees, levies, imposts, duties, charges, deductions or withholdings of any nature (including without limitation any value added, franchise, transfer, sales, gross receipts, use, business, excise, turnover, personal property, stamp or other tax) together with any assessments, penalties, fines, additions to tax or interest thereon, however or wherever imposed (whether imposed upon LESSEE, LESSOR, on all or part of the Aircraft, the Engines or otherwise), by any Government Entity or taxing authority in the U.S., Turkey or any foreign country or by any international taxing authority (including the city and county in which HS Group is domiciled for tax purposes), upon or with respect to, based upon or measured by any of the following (collectively, "Taxes"):

    (a)    the Aircraft, Engines, APU or any Parts;

    (b)    the use, operation or maintenance of the Aircraft or carriage of passengers or freight during the Lease Term and until the Termination Date;

    (c)    this Lease, the payments due hereunder and the terms and conditions hereof and

    (d)    the ownership, financing, delivery, import or export, return, sale, payment of Total Loss Proceeds or other disposition of the Aircraft.

16.2    Exceptions to Indemnity. The indemnity provided for in Article 16.1 does not extend to any of the following Taxes:

    (a)    Taxes imposed by the U.S. or the State of California on the net income, gross receipts, capital or net worth of LESSOR;

    (b)    Taxes attributable to the period prior to Delivery or after the Termination Date; or

    (c)    Taxes attributable to LESSOR's gross negligence, willful misconduct or breach of this Lease.

16.3    After-Tax Basis. The amount which LESSEE is required to pay with respect to any Taxes indemnified against under Article 16.1 is an amount sufficient to restore LESSOR on an after-tax basis to the same position LESSOR would have been in had such Taxes not been incurred.

16.4    Timing of Payment. Any amount payable to LESSOR pursuant to this Article 16 will be paid within ten (10) days after receipt of a written demand therefor from LESSOR accompanied by a written statement describing in reasonable detail the basis for such indemnity and the computation of the amount so payable; provided, however, that such amount need not be paid by LESSEE prior to the earlier of (a) the date any Tax is payable to the appropriate Government

Entity or taxing authority or (b) in the case of amounts which are being contested by LESSEE in good faith or by LESSOR pursuant to Article 16.5, the date such contest is finally resolved.

16.5    Contests. If a claim is made against LESSOR for Taxes with respect to which LESSEE is liable for a payment or indemnity under this Lease, LESSOR will promptly give LESSEE notice in writing of such claim; provided, however, that LESSOR's failure to give notice will not relieve LESSEE of its obligations hereunder except to the extent such failure materially impairs or precludes LESSEE's ability to contest the claim. So long as (a) a contest of such Taxes does not involve any danger of the sale, forfeiture or loss of the Aircraft or any interest therein, (b) if LESSOR so requests, LESSEE has provided LESSOR with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim and (c) adequate reserves have been made for such Taxes or, if required, an adequate bond has been posted, then LESSOR at LESSEE's written request will in good faith, with due diligence and at LESSEE's expense, contest (or permit LESSEE to contest in the name of LESSEE or LESSOR) the validity, applicability or amount of such Taxes.

16.6    Refunds. Upon receipt by LESSOR of a refund of all or any part of any Taxes (including any deductions or withholdings referred to in Article 5.9) which LESSEE has paid, LESSOR will pay to LESSEE the net amount of such Taxes refunded.

16.7    Cooperation in Filing Tax Returns. LESSEE and LESSOR will cooperate with one another in providing information which may be reasonably required to fulfill each party's tax filing requirements and any audit information request arising from such filing.

16.8    Survival of Obligations. The representations, warranties, indemnities and agreements of LESSEE provided for in this Article 16 will survive the Termination Date.

## **ARTICLE 17**        **INDEMNITIES**

17.1    General Indemnity. Except as set forth in Article 17.2, LESSEE agrees to indemnify and hold harmless LESSOR and its officers, directors, employees, agents and shareholders (individually an "Indemnitee" and collectively "Indemnitees") from any and all liabilities, obligations, losses, damages, fines, penalties, claims, actions, suits, costs, disbursements and expenses (including legal fees, costs and related expenses) of every kind and nature (collectively "Expenses") which are imposed on, incurred by or asserted against any Indemnitee or the Aircraft by any Person other than LESSEE and which are in any way relating to, based on or arising out of any of the following:

(a)    the operation, possession, use, non-use, control, leasing, subleasing, maintenance, storage, overhaul, testing or inspections of the Aircraft, any Engine, the APU or any Part (whether by LESSEE, any sublessee or any other Person) during the Lease Term and until the Termination Date (including the acceptance flights at return), whether or not the same is in compliance with the terms of this Lease, including without limitation claims for death, personal injury, property damage, other loss or harm to any Person and claims relating to any Laws, including without limitation environmental control, noise and pollution laws, rules or

regulations;

(b)    fuel, airport or enroute navigation charges (including Eurocontrol charges), navigation service charges, landing fees and all charges payable for the use of or for services provided at any airport, whether in respect of the Aircraft or any other aircraft of LESSEE, during the Lease Term and until the Termination Date;

(c)    the manufacture, design, acceptance, rejection, delivery, return, sale after an Event of Default, import, export, condition, repair, modification, servicing, rebuilding, enforcement of warranties whether in LESSOR's or LESSEE's name, customer support, product support, information or training provided by Manufacturer and other vendors, airworthiness, registration, reregistration, performance, sublease, merchantability, fitness for use, substitution or replacement of the Aircraft, an Engine, the APU or any Part under this Lease or other transfer of use or possession of the Aircraft, an Engine, the APU or any Part, including under a pooling or interchange arrangement, including without limitation latent and other defects, whether or not discoverable and patent, trademark or copyright infringement;

(d)    the prevention or attempt to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Aircraft, or in securing the release of the Aircraft; or

(e)    as a consequence of any Default or Event of Default by LESSEE.

The foregoing indemnity by LESSEE is intended to include and cover any Expense to which an Indemnitee may be subject (in contract, tort, strict liability or under any other theory) regardless of the negligence, active or passive or any other type, of such Indemnitee, so long as such Expense does not fall within any of the exceptions listed in Article 17.2.

17.2    Exceptions to General Indemnities. The indemnity provided for in Article 17.1 will not extend to Expenses of any Indemnitee to the extent resulting from or arising out of any of the following:

(a)    Expenses which LESSEE and LESSOR mutually agree or, absent mutual agreement, are judicially determined to have resulted from the willful misconduct of such Indemnitee;

(b)    Expenses which LESSEE and LESSOR mutually agree or, absent mutual agreement, are judicially determined to be attributable to acts or events which occur after the Termination Date and return of the Aircraft to LESSOR in the condition required hereunder, but in any such case only to the extent not attributable to acts or omissions of LESSEE;

(c)    Expenses representing Taxes, it being acknowledged that the terms of Article 16 apply exclusively to LESSEE's indemnity obligations with respect to Taxes; or

(d)    Expenses due to the breach by LESSOR of its covenant of quiet enjoyment pursuant to Article 21.2 (except to the extent covered by the insurances LESSEE is required to carry pursuant to Article 18 or other LESSEE insurances).

17.3    After-Tax Basis. The amount which LESSEE will be required to pay with respect to any Expense indemnified against under Article 17.1 will be an amount sufficient to restore the Indemnitee, on an after-tax basis, to the same position such Indemnitee would have been in had such Expense not been incurred.

17.4    Timing of Payment. It is the intent of the parties that each Indemnitee will have the right to indemnification for Expenses hereunder as soon as a claim is made and as soon as an Expense is incurred, whether or not such claim is meritorious and whether or not liability is established (but subject to Article 17.8). LESSEE will pay an Indemnitee for Expenses pursuant to this Article 17 within ten (10) days after receipt of a written demand therefor from such Indemnitee accompanied by a written statement describing in reasonable detail the basis for such indemnity.

17.5    Subrogation. Upon the payment in full of any indemnity pursuant to this Article 17 by LESSEE, LESSEE will be subrogated to any right of the Indemnitee in respect of the matter against which such indemnity has been made.

17.6    Notice. Each Indemnitee and LESSEE will give prompt written notice one to the other of any liability of which such party has knowledge for which LESSEE is, or may be, liable under Article 17.1; provided, however, that failure to give such notice will not terminate any of the rights of Indemnitees under this Article 17 except to the extent that LESSEE has been materially prejudiced by the failure to provide such notice.

17.7    Refunds. If any Indemnitee obtains a recovery of all or any part of any amount which LESSEE has paid to such Indemnitee, such Indemnitee will pay to LESSEE the net amount recovered by such Indemnitee.

17.8    Defense of Claims. Unless a Default or Event of Default has occurred and is continuing, LESSEE and its insurers will have the right (in each such case at LESSEE's sole expense) to investigate or, provided that LESSEE or its insurers have not reserved the right to dispute liability with respect to any insurance policies pursuant to which coverage is sought, defend or compromise any claim covered by insurance for which indemnification is sought pursuant to Article 17.1 and each Indemnitee will cooperate with LESSEE or its insurers with respect thereto. If LESSEE or its insurers are retaining attorneys to handle such claim, such counsel must be reasonably satisfactory to the Indemnitees. If not, the Indemnitees will have the right to retain counsel of their choice at LESSEE's expense.

17.9    No Double Recovery. Without limiting LESSOR's right to pursue payment from LESSEE for a particular Expense under both this Article 17 and Article 25.6, LESSOR will not be entitled to actually receive payment from LESSEE for the same Expense twice.

17.10    Survival of Obligation. Notwithstanding anything in this Lease to the contrary, the

50