1   NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
    PATRICK J. RICHARD (SBN 131046)
2   prichard@nossaman.com
    50 California Street, Thirty-Fourth Floor
3   San Francisco, California 94111-4707
    Telephone: (415) 398-3600
4   Facsimile: (415) 398-2438

5   Attorneys for Defendants
    SIVAKUMAR SINNARAJAH,
6   a/k/a MANO SINNARAJAH;
    H&S GROUP OF COMPANIES, INC.
7

8

9

10                  UNITED STATES DISTRICT COURT

11      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

12

13   ALTIN HAVAYOLU TASIMACILIGI TURIZM      Case No:    CV 07-6475 EDL
     VE TIC, A.S., a corporation organized under the
14   laws of Turkey, doing business as GOLDEN       ASSIGNED FOR ALL PURPOSES TO:
     INTERNATIONAL AIRLINES,              THE HONORABLE  ELIZABETH D. LAPORTE
15
                                          **DECLARATION OF SIVAKUMAR**
16              Plaintiff,                **SINNARAJAH IN SUPPORT OF**
                                          **DEFENDANTS' NOTICE OF MOTION**
17      vs.                               **AND MOTION TO DISMISS, OR IN THE**
                                          **ALTERNATIVE, TO CHANGE VENUE**
18   SIVAKUMAR SINNARAJAH, an individual,
     also known as MANO SINNARAJAH; H&S    [FRCP 12(b)(2) and 12(b)(3); 28 U.S.C.
19   GROUP OF COMPANIES, INC., a Florida    §1404(a) and §1406(a)]
     corporation; and DOES 1 to 10 inclusive,,
20                                          Action Filed:
                Defendants.
21                                          Date:  March 11, 2008
                                            Time:  9:00 a.m.
22                                          Ctrm:  E

23

24                                         **PART 2 OF 3**

25

26

27

28

                                    i

provisions of this Article 17 will survive the Termination Date and continue in full force and effect notwithstanding any breach by LESSOR or LESSEE of the terms of this Lease, the termination of the lease of the Aircraft to LESSEE under this Lease or the repudiation by LESSOR or LESSEE of this Lease.

## ARTICLE 18        INSURANCE

18.1    Categories of Insurance. Throughout the Lease Term and until the Termination Date, LESSEE will, at its own expense, effect and maintain in full force and effect the types of insurance and amounts of insurance (including deductibles) described in Exhibits C and E through such brokers and with such insurers as may be approved by LESSOR, such approval not to be unreasonably withheld, in London or New York or such other insurance markets as mutually agreed upon by the parties.

18.2    Write-back of any Date Recognition Exclusion. In the event any of LESSEE's insurances (either the primary insurance or the reinsurance) contain any date recognition exclusion clause or similar clause excluding from such insurance coverage damage to any property (including the Aircraft) or death or injury to any person on account of accidents, incidents or occurrences caused by date recognition or other Year 2000-related problems, LESSEE at its cost will obtain for the benefit of itself, Manufacturer and LESSOR the broadest write-back available in the London insurance market with respect to such exclusion.

18.3    Write-backs of L5W555.C and AVN48C Exclusions. In the event that a write-back of the exclusions (losses due to causes such as dirty bombs, electromagnetic weapons, radioactive contamination and chemical, biological and/or biochemical hazards) to the standard London policy forms LSWSSS.C and, if issued, AVN48C becomes available, LESSEE at its cost will obtain for the benefit of itself, Manufacturer and LESSOR the broadest write-back available in the London insurance market with respect to such exclusions.

18.4    Installation of Third Party Engine. If LESSEE installs an engine not owned by LESSOR on the Aircraft, either (a) LESSEE's hull insurance on the Aircraft will automatically increase to such higher amount as is necessary in order to satisfy both LESSOR's requirement to receive the Agreed Value in the event of a Total Loss and the amount required by the third party engine owner or (b) separate additional insurance on such engine will attach in order to satisfy separately the requirements of the LESSEE to such third party engine owner.

18.5    LESSOR Coverage for LESSEE's Employees. LESSOR and the other additional insureds will be covered under LESSEE's legal liability insurance for death or injury to LESSEE's employees.

18.6    Insurance for Indemnities. The insurance referred to in Article 18.1 will in each case include and insure (to the extent of the risks covered by the policies) the indemnity provisions of Article 17 and LESSEE will maintain such insurance of the indemnities for a minimum of two (2) years following the Termination Date.

18.7    Insurance required by Manufacturer. During the Lease Term, LESSEE will carry any

insurance required by Manufacturer in connection with the assignment of any Manufacturer warranties, customer support or product support to LESSEE.

18.8    Pre-Delivery Work or Delivery of Aircraft with Spare Engine. In the event it is necessary for LESSOR to enter into agreements with one or more Persons for (a) the maintenance, repair or modification of the Aircraft (including any Engine or the APU) or (b) the lease of a spare engine, APU or other equipment so that the Aircraft (including any Engine or the APU) will comply with the Delivery conditions set forth in this Lease, LESSEE agrees at LESSOR's request to add each such Person as an additional insured to the insurance policies which LESSEE is required to maintain pursuant to this Lease, with waivers of subrogation, and that each such Person will be an "Indemnitee" for the purposes of Article 17.

18.9    Renewal. Not less than five (5) Business Days before the expiration or termination date of any insurance required hereunder, LESSEE will provide LESSOR with fax or e-mail confirmation from LESSEE's insurance brokers that renewed certificates of insurance evidencing the renewal or replacement of such insurance and complying with Exhibit C will be issued on the termination date of the prior certificate. Within seven (7) days after such renewal, LESSEE will furnish its brokers' certificates of insurance to LESSOR.

18.10    Assignment of Rights by LESSOR. If LESSOR assigns all or any of its rights under this Lease as permitted by this Lease or otherwise disposes of any interest in the Aircraft to any other Person, LESSEE will, upon request, procure that such Person hereunder be added as loss payee and/or additional assured in the policies effected hereunder and enjoy the same rights and insurance enjoyed by LESSOR under such policies. LESSOR will nevertheless continue to be covered by such policies.

18.11    Deductibles. If there is a material adverse change in the financial condition of LESSEE which LESSOR reasonably believes will cause LESSEE to be unable to pay the deductible upon the occurrence of a partial loss of the Aircraft or an Engine, then LESSOR may require LESSEE at LESSEE's expense to lower its deductibles on the insurance maintained hereunder to a level which is available on commercially reasonable terms in the insurance market.

18.12    Insurance for Wet Lease Operations. In the event LESSEE is performing wet lease operations with the Aircraft pursuant to Article 11.5 and the wet lessee is carrying the primary passenger, baggage cargo liability insurance with respect to the flights, then such insurance must meet the requirements of Exhibit C, including with respect to the amounts of coverage, naming of LESSOR as an additional insured and inclusion of the other endorsements set forth in Exhibit C. Moreover, LESSEE will at all times carry contingent passenger, baggage and cargo liability insurances for such flights. Prior to commencement of wet lease operations for a particular wet lessee, LESSOR will receive certificates of insurance from the insurance brokers for LESSEE and, if applicable, the wet lessee evidencing such coverages.

18.13    Other Insurance. LESSOR may from time to time by notice to LESSEE require LESSEE at LESSEE's expense to effect such other insurance or such variations to the terms of the existing insurance as may then be customary in the airline industry for aircraft of the same type as the Aircraft and at the time commonly available in the insurance market.

18.14 <u>Information</u>. LESSEE will provide LESSOR with any information reasonably requested by LESSOR from time to time concerning the insurance maintained with respect to the Aircraft or in connection with any claim being made or proposed to be made thereunder.

18.15 <u>Currency</u>. All proceeds of insurance pursuant to this Lease will be payable in Dollars except as may be otherwise agreed by LESSOR.

18.16 <u>Grounding of Aircraft</u>. If at any time any of the insurance required pursuant to this Lease will cease to be in full force and effect, LESSEE will forthwith ground the Aircraft and keep the Aircraft grounded until such time as such insurance is in full force and effect again.

18.17 <u>Failure to Insure</u>. If at any time LESSEE fails to maintain insurance in compliance with this Article 18, LESSOR will be entitled but not bound to do any of the following (without prejudice to any other rights which it may have under this Lease by reason of such failure):

(a)    to pay any premiums due or to effect or maintain insurance satisfactory to LESSOR or otherwise remedy such failure in such manner as LESSOR considers appropriate (and LESSEE will upon demand reimburse LESSOR in full for any amount so expended in that connection); or

(b)    at any time while such failure is continuing, to require the Aircraft to remain at any airport or (as the case may be), proceed to and remain at any airport designated by LESSOR, until such failure is remedied to LESSOR's satisfaction.

18.18 <u>Reinsurance</u>. Any reinsurance will be maintained with reinsurers and brokers approved by LESSOR. Such reinsurance will contain each of the following terms and will in all other respects (including amount) be satisfactory to LESSOR:

(a)    the same terms as the original insurance;

(b)    a cut-through and assignment clause satisfactory to LESSOR; and

(c)    payment will be made notwithstanding (i) any bankruptcy, insolvency, liquidation or dissolution of any of the original insurers and/or (ii) that the original insurers have made no payment under the original insurance policies.

18.19 <u>Limit on Hull in favor of LESSEE</u>. LESSEE may carry hull all risks or hull war and allied perils on the Aircraft in excess of the Agreed Value (which is payable to LESSOR) only to the extent such excess insurance which would be payable to LESSEE in the event of a Total Loss does not exceed ten percent (10 %) of the Agreed Value and only to the extent that such additional insurance will not prejudice the insurances required in this Lease or the recovery by LESSOR thereunder. LESSEE agrees that it will not create or permit to exist any liens or encumbrances over the insurances, or its interest therein, except as constituted by this Lease.

## ARTICLE 19 LOSS, DAMAGE AND REQUISITION

Throughout the Lease Term and until the Termination Date, LESSEE will bear all risk of loss, theft, damage and destruction to the Aircraft.

19.1    Definitions. In this Article 19 and this Lease:

"Agreed Value" means TWENTY SEVEN Million (US$ 27,000,000). Provided no Event of Default has occurred and is continuing, on the date of each annual renewal by LESSEE of its insurance policies, commencing with the annual renewal occurring after the expiration of Lease Term year 1, the Agreed Value of the Aircraft will be decreased by one and one half percent (1.5%) of the Agreed Value then in effect. Thus, at the first annual renewal after the expiration of Lease Term year 1, the agreed value will be 98.5% of the Agreed Value of the Aircraft on the Delivery Date. At the second annual renewal after the expiration of Lease Term year 2, the Agreed Value will be 98.5% of the Agreed Value applicable during the first annual renewal period. A similar calculation will be made at each annual insurance renewal.

"Net Total Loss Proceeds" means the Total Loss Proceeds actually received by LESSOR following a Total Loss, less any legal and other out-of-pocket expenses, taxes or duties incurred by LESSOR in connection with the collection of such proceeds.

"Total Loss" means any of the following in relation to the Aircraft, Airframe, any Engine or the APU and "Total Loss Date" means the date set forth in parenthesis after each Total Loss:

(a)     Destruction, damage beyond repair or being rendered permanently unfit for normal use for any reason (the date such event occurs or, if not known, the date on which the Aircraft, Airframe, Engine or APU was last heard of);

(b)     Actual, constructive, compromised, arranged or agreed total loss (the earlier of the date on which the loss is agreed or compromised by the insurers or thirty (30) days after the date of notice to LESSEE's brokers or insurers claiming such total loss);

(c)     Requisition of title, confiscation, forfeiture or any compulsory acquisition or other similar event (the date on which the same takes effect);

(d)     sequestration, detention, seizure or any similar event for more than thirty (30) consecutive days (the earlier of the date on which insurers make payment on the basis of a total loss or the date of expiration of such period);

(e)     Requisition for use for more than one hundred eighty (180) consecutive days, except as set forth in Article 19.9 (the earlier of the date on which the insurers make payment on the basis of a total loss or the date of expiration of such period);

(f)     In the case of an Engine, the event described in Article 12.8.3 (the date on which the same takes effect);

(g)     Any sale of the Aircraft in connection with Eurocontrol charges (the date on

which the sale occurs);

(h)    Any sale of the Aircraft in connection with a LESSEE bankruptcy, whether by an administrator, trustee or court (the date on which the intent to sell the Aircraft becomes known); or

(i)    Any other occurrence not permitted under this Lease which deprives LESSEE of use or possession for a period of sixty (60) consecutive days or longer (the $60$th day of such period).

"Total Loss Proceeds" means the proceeds of any insurance or any compensation or similar payment arising in respect of a Total Loss.

19.2    Notice of Total Loss. LESSEE will notify LESSOR in writing within two (2) Business Days after a Total Loss Date of the Aircraft, Airframe, any Engine or the APU.

19.3    Total Loss of Aircraft or Airframe. If the Total Loss of the Aircraft or Airframe occurs during the Lease Term, the following will occur:

19.3.1    After the Total Loss Date and until receipt by LESSOR of the Agreed Value and all other amounts then due under this Lease, LESSEE will continue to pay Rent and the parties will perform all of their other obligations under this Lease.

19.3.2    On the date which is the earlier of the following dates:

(a)    The date on which the Total Loss Proceeds of the Aircraft or the Airframe are paid by LESSEE's insurance underwriters or brokers and

(b)    The date which falls thirty (30) days after the Total Loss Date, LESSEE will pay to LESSOR an amount equal to the sum of:

(x)    The Agreed Value and

(y)    All other amounts then accrued under this Lease,

less an amount equal to the Net Total Loss Proceeds received by LESSOR by such date.

19.3.3    LESSOR will apply the Net Total Loss Proceeds and any amounts received from LESSEE pursuant to Article 19.3.2 as follows:

(a)    first, in discharge of any unpaid Rent and any other amounts accrued and unpaid up to the date of LESSOR's receipt of the Agreed Value;

(b)    second, in discharge of the Agreed Value; and

(c)    third, payment of the balance, if any, to LESSEE.



19.3.4    Upon receipt by LESSOR of all monies payable by LESSEE in Article 19.3, provided no Default or Event of Default has occurred and is continuing, this Lease will terminate except for LESSEE's obligations under Articles 10.5, 16 and 17 which survive the Termination Date.

FOR AVOIDANCE OF DOUBT, THE AGREED VALUE OF THE AIRCRAFT WILL BE PAYABLE TO LESSOR PURSUANT TO THIS ARTICLE 19.3 WHEN A TOTAL LOSS OF THE AIRFRAME OCCURS EVEN IF THERE HAS NOT BEEN A TOTAL LOSS OF AN ENGINE, ENGINES OR THE MU.

19.4    Surviving Engine(s). If a Total Loss of the Airframe occurs and there has not been a Total Loss of an Engine or Engines, then, provided no Default or Event of Default has occurred and is continuing, at the request of LESSEE (subject to agreement of relevant insurers) and on receipt of all monies due under Article 19.3 and payment by LESSEE of all airport, navigation and other charges on the Aircraft, LESSOR will transfer all its right, title and interest in the surviving Engine(s) to LESSEE, but without any responsibility, condition or warranty on the part of LESSOR other than as to freedom from any LESSOR's Lien.

19.5    Total Loss of Engine and not Airframe.

19.5.1    Upon a Total Loss of any Engine not installed on the Airframe or a Total Loss of an Engine installed on the Airframe not involving a Total Loss of the Airframe, LESSEE will replace such Engine as soon as reasonably possible by duly conveying to LESSOR title to another engine from LESSEE (or another Person with a net worth at least equal to that of LESSEE) (a) free and clear of all Security Interests (except Permitted Liens) of any kind or description, (b) in airworthy condition and of the same or improved model, service bulletin and modification status and having a value and utility at least equal to the Engine which sustained the Total Loss, (c) not older (by reference to serial number or manufacture date) than the older of the Two Engines delivered by LESSOR to LESSEE with the Aircraft on the Delivery Date, (d) in the same or better operating condition as the Engine which sustained a Total Loss, including time in service, hours and cycles since new and hours and cycles available to the next inspection, Overhaul or scheduled or anticipated removal and (e) which has not been operated and does not have any modules that have been operated at a higher thrust rating than the Engine which sustained the Total Loss. Such replacement engine will be an "Engine" as defined in this Lease and the Engine which sustained such Total Loss will cease to be an "Engine".

19.5.2    LESSEE agrees at its own expense to take such action as LESSOR may reasonably request in order that any such replacement Engine becomes the property of LESSOR and is leased hereunder on the same terms as the destroyed Engine. LESSEE's obligation to pay Rent will continue in full force and effect, but an amount equal to the Net Total Loss Proceeds received by LESSOR with respect to such destroyed Engine will, subject to LESSOR's right to deduct therefrom any

amounts then due and payable by LESSEE under this Lease, be paid to LESSEE.

19.5.3      Notwithstanding Articles 19.5.1 and 19.5.2, if at the time of a Total Loss of an Engine not installed on the Aircraft or a Total Loss of an Engine installed on the Airframe not involving a Total Loss of the Airframe, LESSOR and LESSEE are parties to a spare engine lease pursuant to which LESSOR is leasing a spare engine to LESSEE of the same model and type as the Engine which has suffered such Total Loss, LESSOR will receive from LESSEE the replacement cost of the Engine instead of accepting a replacement engine. One (1) of such LESSOR spare engines will then be substituted under this Lease for the Engine which suffered such Total Loss and the applicable spare engine lease will terminate.

19.6      Total Loss of APU.

19.6.1      Upon a Total Loss of the APU when not installed on the Airframe or a Total Loss of the APU while installed on the Airframe not involving a Total Loss of the Airframe, LESSEE will replace such APU as soon as reasonably possible by duly conveying to LESSOR title to another auxiliary power unit (a) free and clear of all Security Interests (except Permitted Liens) of any kind or description, (b) in airworthy condition and of the same or improved model, service bulletin and modification status and having a value and utility at least equal to the APU which sustained the Total Loss, (c) not older (by reference to serial number or manufacture date) than the APU delivered by LESSOR to LESSEE with the Aircraft on the Delivery Date and (d) in the same or better operating condition as the APU which sustained the Total Loss, including time in service, hours and cycles since new and hours and cycles available to the next inspection, Overhaul or scheduled or anticipated removal. Such replacement auxiliary power unit will be the "APU" as defined in this Lease and the auxiliary power unit which sustained such Total Loss will cease to be the "APU".

19.6.2      LESSEE agrees at its own expense to take such action as LESSOR may reasonably request in order that any such replacement APU becomes the property of LESSOR and is leased hereunder on the same terms as the destroyed APU. LESSEE's obligation to pay Rent will continue in full force and effect, but an amount equal to the Net Total Loss Proceeds received by LESSOR with respect to such destroyed APU will, subject to LESSOR's right to deduct therefrom any amounts then due and payable by LESSEE under this Lease, be paid to LESSEE.

19.7      Other Loss or Damage.

19.7.1      If the Aircraft or any Part thereof suffers loss or damage not constituting a Total Loss of the Aircraft or the Airframe or any Engine or the APU, all the obligations of LESSEE under this Lease (including payment of Rent) will continue in full force.

19.7.2      In the event of any loss or damage to the Aircraft or Airframe which does not constitute a Total Loss of the Aircraft or the Airframe, or any loss or damage to an

Engine or the APU which does not constitute a Total Loss of such Engine or the APU, LESSEE will at its sole cost and expense fully and promptly repair the Aircraft, Engine or APU in order that the Aircraft, Engine or APU is placed in an airworthy condition and substantially the same condition as it was prior to such loss or damage. All repairs will be performed in a manner which preserves and maintains all warranties and service life policies to the same extent as they existed prior to such loss or damage. LESSEE will notify LESSOR forthwith of any loss, theft or damage to the Aircraft for which the cost of repairs is estimated to exceed Five Hundred Thousand U.S. Dollars (US$500,000), together with LESSEE's proposal and timetable for carrying out the repair. In the event that LESSOR does not agree with LESSEE's proposal for repair, LESSOR will so notify LESSEE within two (2) Business Days after its receipt of such proposal. LESSEE and LESSOR will then consult with Manufacturer and LESSEE and LESSOR agree to accept as conclusive, and be bound by, Manufacturer's directions or recommendations as to the manner in which to carry out such repairs. If Manufacturer declines to give directions or recommendations, LESSEE will carry out the repairs in accordance with the directions of LESSOR. If the Aircraft is airworthy or the Engine or MU serviceable notwithstanding the loss or damage, LESSEE will repair such Aircraft, Engine or MU, as the case may be, within the time frame reasonably established by LESSOR given the circumstances.

19.8    Copy of Insurance Policy. Promptly after the occurrence of a partial loss or Total Loss of the Aircraft, an Engine or the MU, LESSEE will provide LESSOR with a copy of LESSEE's insurance policy.

19.9    Government Requisition. If the Aircraft, Airframe, any Engine or the MU is requisitioned for use by any Government Entity, LESSEE will promptly notify LESSOR of such requisition. All of LESSEE's obligations hereunder will continue as if such requisition had not occurred. So long as no Default or Event of Default has occurred and is continuing, all payments received by LESSOR or LESSEE from such Government Entity will be paid over to or retained by LESSEE. If a Default or Event of Default has occurred and is continuing, all payments received by LESSEE or LESSOR from such Government Entity may be used by LESSOR to satisfy any obligations owing by LESSEE.

**ARTICLE 20          REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE**

20.1    **Representations and Warranties.** LESSEE represents and warrants the following to LESSOR as of the date of execution of this Lease and as of the Delivery Date:

20.1.1       Status. LESSEE is a company validly existing and in good standing under the Laws of Turkey. It has the power and authority to carry on its business as presently conducted and to perform its obligations hereunder.

20.1.2       Governmental Approvals. No authorization, approval, consent, license or order of, or registration with, or the giving of notice to the Aviation Authority or any other

58

Government Entity is required for the valid authorization, execution, delivery and performance by LESSEE of this Lease, except as will have been duly effected as of the Delivery Date.

20.1.3   Binding. LESSEE's Board of Directors has authorized LESSEE to enter into this Lease, any Side Letters hereto and any other documentation in connection with the leasing of the Aircraft from LESSOR (collectively, the **"Operative Documents"**) and perform its obligations under the Operative Documents. This Lease and the other Operative Documents have been duly executed and delivered by LESSEE and represent the valid and binding obligations of LESSEE, enforceable in accordance with their terms except as enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application affecting the enforcement of creditors' rights. When executed by LESSEE at Delivery, the same will apply to the Estoppel and Acceptance Certificate.

20.1.4   No Breach. The execution and delivery of the Operative Documents, the consummation by LESSEE of the transactions contemplated in this Lease and compliance by LESSEE with the terms and provisions hereof do not and will not contravene any Law applicable to LESSEE, or result in any breach of or constitute any default under or result in the creation of any Security Interest upon any property of LESSEE, pursuant to any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, charter, by-law or other agreement or instrument to which LESSEE is a party or by which LESSEE or its properties or assets may be bound or affected. When executed by LESSEE at Delivery, the same will apply to the Estoppel and Acceptance Certificate.

20.1.5   Filings. Except for any filing or recording that may be required with the CAD and except for the filing of the Lease with the registry for cross-border leases maintained by the Turkish BDDK under Law No.3 226, no filing or recording of any instrument or document (including the filing of any financial statement) is necessary under the Laws of the State of Registration in order for this Lease to constitute a valid and perfected lease of record relating to the Aircraft in order for this Lease to constitute a valid and perfected lease of record relating to the Aircraft.

20.1.6   Translation or Notarization. This Lease must be translated into Turkish and both this Lease and the Turkish version of this Lease must be executed by LESSEE and LESSOR in front of a Turkish notary public.

20.1.7   Licenses. LESSEE holds all licenses, certificates and permits from applicable Government Entities in Turkey for the conduct of its business as a certificated air carrier and performance of its obligations under this Lease.

20.1.8   No Suits. There are no suits, arbitrations or other proceedings pending or threatened before any court or administrative agency against or affecting LESSEE which, if adversely determined, would have a material adverse effect on the business, assets or condition (financial or otherwise) of LESSEE or its ability to perform under this

Lease, except as described in the filings provided to LESSOR pursuant to Article 22.

20.1.9  No Withholding. Under the Laws of Turkey, LESSEE will not be required to deduct any withholding or other Tax from any payment it may make under this Lease, except that, as of the date of execution of this Lease, LESSEE is required to pay Turkish withholding tax at a rate of one percent (1%) and pay VAT at a rate of one percent (1%) of the Rent.

20.1.10  No Restrictions on Payments. Under the Laws of Turkey, there are no present restrictions on LESSEE making the payments required by this Lease.

20.1.11  General Obligations. The obligations of LESSEE under this Lease are direct, general and unconditional obligations of LESSEE and rank or will rank at least pari passu with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of LESSEE, with the exception of such obligations as are mandatorily preferred by law and not by reason of any encumbrance.

20.1.12  No Sovereign Immunity. LESSEE, under the Laws of Turkey or of any other jurisdiction affecting LESSEE, is subject to private commercial law and suit. Neither LESSEE nor its properties or assets is entitled to sovereign immunity under any such Laws. LESSEE's performance of its obligations hereunder shall constitute commercial acts done for commercial purposes.

20.1.13  Tax Returns. All necessary returns have been delivered by LESSEE to all relevant taxation authorities in the jurisdiction of its formation and LESSEE is not in default in the payment of any taxes due and payable.

20.1.14  No Material Adverse Effect. LESSEE is not in default under any agreement to which it is a party or by which it may be bound which would have a material adverse effect on its business, assets or condition.

20.1.15  No Default or Event of Default under this Lease. At the time of execution of this Lease, no Default or Event of Default has occurred and is continuing and the financial statements provided to LESSOR pursuant to Article 22 fairly present the financial condition of LESSEE.

20.2  Covenants. LESSEE covenants to LESSOR that it will comply with the following throughout the entire Lease Term:

20.2.1  Licensing. LESSEE will hold all licenses, certificates and permits from applicable Government Entities in Turkey for the conduct of its business as a certified air carrier and performance of its obligations under this Lease. LESSEE will advise LESSOR promptly in the event any such licenses, certificates or permits are cancelled, terminated, revoked or not renewed.

20.2.2    <u>Payments</u>. If at any time any such restrictions may be applicable, LESSEE will obtain all certificates, licenses, permits, exemptions and other authorizations which are from time to time required for the making of the payments required by this Lease on the dates and in the amounts and currency which are stipulated in this Lease, and will maintain the same in full force and effect for so long as the same will be required.

20.2.3    <u>Sovereign Immunity</u>. LESSEE, under the Laws of Turkey or of any other jurisdiction affecting LESSEE, will continue to be subject to private commercial law and suit. Neither LESSEE nor its properties or assets will be entitled to sovereign immunity under any such Laws. LESSEE's performance of its obligations hereunder will constitute commercial acts done for commercial purposes. LESSEE will advise LESSOR promptly of any change in the foregoing.

20.2.4    <u>Information about Suits</u>. LESSEE will promptly give to LESSOR a notice in writing of any suit, arbitration or proceeding before any court, administrative agency or Government Entity which, if adversely determined, would materially adversely affect LESSEE's financial condition, affairs, operations or its ability to perform under this Lease.

20.2.5    <u>Restrictions on Mergers</u>. LESSEE will not sell or convey substantially all of its property and assets or merge or consolidate with or into any other Person unless LESSEE has obtained LESSOR's prior written consent which will not be unreasonably withheld.

20.2.6    <u>Restriction on Relinquishment of Possession</u>. LESSEE will not, without the prior consent of LESSOR, deliver, transfer or relinquish possession of the Aircraft except in accordance with Articles 11 and 12.

20.2.7    <u>No Security Interests</u>. LESSEE will not create or agree to or permit to arise any Security Interest (other than Permitted Liens) on or with respect to the Aircraft, title thereto or any interest therein. LESSEE will forthwith, at its own expense, take all action as may be necessary to discharge or remove any such Security Interest if it exists at any time. LESSEE will within twenty-four (24) hours after becoming aware of the existence of any such Security Interest give written notice thereof to LES SOR.

20.2.8    <u>Representations to Other Parties</u>. LESSEE will not represent or hold out LESSOR as carrying goods or passengers on the Aircraft or as being in any way connected or associated with any operation of the Aircraft.

**ARTICLE 21        REPRESENTATIONS, WARRANTIES AND
COVENANTS OF LESSOR**

21.1    <u>Representations and Warranties</u>. LESSOR represents and warrants the following to LESSEE as of the date of execution of the Lease and as of the Delivery Date and ALL OTHER WARRANTIES, EXPRESS OR IMPLIED HAVE BEEN WAIVED IN ACCORDANCE WITH ARTICLE 8:

21.1.1    <u>Corporate Status</u>. LESSOR is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of California. It has the corporate power and authority to carry on its business as presently conducted and to perform its obligations hereunder.

21.1.2    <u>Governmental Approvals</u>. No authorization, approval, consent, license or order of, or registration with, or the giving of notice to any U.S. Government Entity is required for the valid authorization, execution, delivery and performance by LESSOR of this Lease.

21.1.3    <u>Binding</u>. This Lease and the other Operative Documents have been duly authorized, executed and delivered by LESSOR and represent the valid and binding obligations of LESSOR, enforceable in accordance with their terms except as enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application affecting the enforcement of creditors' rights.

21.1.4    <u>No Breach</u>. The execution and delivery of the Operative Documents, the consummation by LESSOR of the transactions contemplated in this Lease and compliance by LESSOR with the terms and provisions hereof do not and will not contravene any Law applicable to LESSOR, or result in any breach of or constitute any default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, charter, by-law or other agreement or instrument to which LESSOR is a party or by which LESSOR or its properties or assets may be bound or affected.

21.2    <u>Covenant of Quiet Enjoyment</u>. So long as no Default or Event of Default has occurred and is continuing hereunder, LESSOR covenants that neither LESSOR nor any person lawfully claiming through LESSOR will interfere with LESSEE's quiet, peaceful use and enjoyment of the Aircraft.

## ARTICLE 22    FINANCIAL AND OTHER INFORMATION

LESSEE agrees to furnish each of the following to LESSOR:

(a)    within forty-five (45) days after the end of each fiscal quarter of LESSEE, three (3) hard copies of the unaudited consolidated financial statements (including a balance sheet and profit and loss statement) prepared for such quarter in accordance with generally accepted accounting principles in Turkey;

(b)    within one hundred and twenty (120) days after the end of each fiscal year of LESSEE, three (3) hard copies of the audited consolidated financial statements



(including a balance sheet and profit and loss statement) prepared as of the close of such fiscal year in accordance with generally accepted accounting principles in Turkey. LESSEE's chief financial officer will also provide a certificate stating that no Default or Event of Default exists under this Lease;

(c)     promptly after distribution, three (3) hard copies of all reports and financial statements which LESSEE sends or makes available to its stockholders or creditors; and

(d)     from time to time, such other reasonable information as LESSOR or LESSOR's Lender may reasonably request concerning the location, condition, use and operation of the Aircraft or the financial condition of LESSEE.

## ARTICLE 23          RETURN OF AIRCRAFT

23.1    Date of Return. LESSEE is obligated to return the Aircraft, Engines, APU, Parts and Aircraft Documentation to LESSOR on the Expiration Date, unless a Total Loss of the Aircraft occurred prior to the Expiration Date and this Lease was terminated early in accordance with Article 19.3. If an Event of Default occurs hereunder by LESSEE failing to return the Aircraft on the Expiration Date or if an Event of Default occurs prior to or after the Expiration Date and LESSOR repossesses the Aircraft, the return requirements set forth in this Article 23 nonetheless must be met on the date the Aircraft is actually returned to LESSOR or repossessed by LESSOR.

23.2    Last Engine Shop Visits. With respect to the last Engine shop visit of an Engine prior to return of the Aircraft, LESSEE will submit to LESSOR at least thirty (30) days in advance the intended workscope of such shop visit. If LESSOR requests, LESSEE will perform additional work at such shop visit at LESSOR's cost.

23.3    Technical Report. No later than six (6) months prior to the Expiration Date (and in an updated form at return of the Aircraft), LESSEE will provide LESSOR with a Technical Evaluation Report in the form and substance of Exhibit P, as revised, and, in addition upon LESSOR's request, will make copies available of (a) drawings of the interior configuration of the Aircraft both as it presently exists and as it will exist at return, (b) an Airworthiness Directive status list, (c) a service bulletin incorporation list, (d) rotable tracked, hard-time and life-limited component listings, (e) a list of modifications, alterations and repairs, (f) interior material burn certificates, (g) the Maintenance Program, (h) the complete workscopes for the checks, inspections and other work to be performed prior to return, (i) a forecast of the checks, inspections and other work to be performed within eighteen (18) months after return of the Aircraft, (j) a list of all no-charge service bulletin kits with respect to the Aircraft which were ordered by LESSEE from Manufacturer or the Engine manufacturer, (k) current Engine disk sheets, (l) last Engine shop visit reports, (m) takeoff and cruise trend reports for the last twelve (12) months and (n) any other data which is reasonably requested by LESSOR.

23.4    Return Location. LESSEE at its expense will return the Aircraft, Engines, APU, Parts and Aircraft Documentation to LESSOR in Istanbul, Turkey or to such other location as may be mutually agreed to by LESSEE and LESSOR.

23.5    Full Aircraft Documentation Review. For the period commencing at least one (1) month prior to the proposed redelivery date and continuing until the date on which the Aircraft is returned to LESSOR in the condition required by this Lease, LESSEE will provide for the review of LESSOR and/or its representative all of the Aircraft records and historical documents described in Exhibit 0 in one central room with access to telephone, photocopy, fax and internet connections at the Aircraft return location.

23.6    Maintenance Policies and Procedures Manuals. At return of the Aircraft and at LESSOR's request for the purposes of bridging and demonstrating to the next operator and its aviation authority how the Aircraft has been maintained, LESSEE will provide LESSOR with copies of its Maintenance Program, general maintenance manual, general policies and procedures manual, maintenance exposition manual, general engineering manual, or their equivalents, and any other related controlled documentation which affects the Aircraft. Recognizing that LESSEE's maintenance policies and procedures manuals are proprietary to LESSEE, LESSOR agrees that they will be only utilized as set forth in Article 12.12 and this Article 23.6.

23.7    Aircraft Inspection.

23.7.1    During the maintenance checks performed prior to the proposed redelivery and at the actual return of the Aircraft, LESSOR and/or its representatives will have an opportunity to observe functional and operational system checks, perform a visual inspection of the Aircraft (taking into account the Aircraft type, age, use and other known factors with respect to the Aircraft) and perform a full inspection of the Aircraft Documentation (including records and manuals), all to LESSOR's satisfaction. Any deficiencies from the Aircraft return condition requirements set forth in this Article 23 will be corrected by LESSEE at its cost prior to return of the Aircraft.

23.7.2    Prior to the Aircraft acceptance flight described in Article 23.7.3, with LESSOR and/or LESSOR's representatives present, LESSEE will conduct a systems functional and operational inspection of the Aircraft in accordance with Manufacturer's checklist procedures.

23.7.3    Immediately prior to redelivery of the Aircraft, LESSEE will carry out for LESSOR and/or LESSOR's representatives an Aircraft acceptance flight in accordance with Manufacturer's standard flight operation check flight procedures or, if agreed to in writing by LESSOR, in accordance with an airline acceptance flight procedure, either of which will be for not less than two (2) hours and not more than three (3) hours. Flight costs and fuel will be furnished by and at the expense of LESSEE. Any deficiencies from the Aircraft return condition requirements set forth in this Article 23 will be corrected by LESSEE at its cost prior to return of the Aircraft.

23.7.4    To the extent that the ground inspection and acceptance flight extend beyond the Expiration Date, the Lease Term will be deemed to have been automatically

64

extended and the obligations of LES SEE hereunder (including Article 23.13.3) will continue on a day-to-day basis until the Aircraft is accepted by LESSOR executing the Return Acceptance Receipt in the form of Exhibit M.

23.8    Certificate of Airworthiness Matters.

23.8.1    The Aircraft will possess a current Certificate of Airworthiness issued by the Aviation Authority (although this Certificate of Airworthiness may later be replaced by an Export Certificate of Airworthiness or equivalent if requested by LES SOR pursuant to Article 23.12). In addition, even if LESSEE must perform engineering, maintenance and repair work on the Aircraft beyond the requirements of Article 12, the Aircraft at return must be in the condition required in order to meet the requirements for issuance of a Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country in accordance with JAR/EASA Part 21 and, in addition, to meet the operating requirements of JAR Ops 1 and Eurocontrol with no restrictions imposed.

23.8.2    At LESSOR's request, LESSEE at its cost will demonstrate that the Aircraft meets the requirements for issuance of a Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country as specified in Article 23.8.1 by delivering to LESSOR a letter or other document acceptable to LESSOR signed by the aviation authority of a JAA/EASA member country or another Person acceptable to LESSOR stating that such Person has inspected the Aircraft and Aircraft Documentation (including records and manuals) and has found that the Aircraft meets the requirements for issuance of a Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country in accordance with JAR/EASA Part 21 and, in addition, meets the operating requirements of JAR Ops 1 and Eurocontrol with no restrictions imposed.

23.8.3    If the Aircraft is to be registered in a country other than a JAA/EASA member country after return from LESSEE, LESSOR may in its sole discretion waive the requirements of Article 23.8.2 and instead require that LESSEE at its expense (to the extent such expense is no greater than that which LESSEE would have incurred pursuant to Articles 23.8.1 and 23.8.2, with any additional expenses being for LESSOR's account) put the Aircraft in a condition to meet the requirements for issuance of a Certificate of Airworthiness of the aviation authority of the next country of register.

23.9    General Condition of Aircraft at Return.

23.9.1    The Aircraft, Engines, APU and Parts will have been maintained and repaired in accordance with the Maintenance Program, the rules and regulations of the Aviation Authority and this Lease.

23.9.2    If any Part installed on the Airframe, any Engine or the APU at return was not installed at Delivery, then such Part will have met the requirements of Article

12.4.1 at the time of installation.

23.9.3   The requirements of Article 12.2.2 will have been met with respect to the installation of PMA Parts and OEM Parts in the Engines during the Lease Term. Without limiting the foregoing, all stationary high energy Parts in the gas path of the Engines will be OEM Parts.

23.9.4   Aircraft Documentation (including records and manuals) will have been maintained in English and in an up-to-date status, in accordance with the rules and regulations of the Aviation Authority and the FAA and this Lease and in a form necessary in order to meet the requirements of Article 23.8.1. The records and historical documents set forth in Attachment 1 of Exhibit M will be in English. If LESSEE subscribes to Manufacturer's on-line data access services, LESSEE must nonetheless return the Aircraft manuals with all current revisions provided by Manufacturer in CD, microfilm or other format acceptable to LESSOR.

23.9.5   All hard-time, time-controlled, time-tracked, life-limited, on-condition and condition-monitored Parts, and all other Parts which can be Overhauled or repaired, which are installed on the Aircraft will have an FAA Form 8130-3 or EASA Form 1 evidencing the airworthiness of such Part at the time of installation on the Aircraft. In the case of life-limited Parts, the documentation will also state the total hours and cycles since new. In the case of hard-time, time-controlled, time-tracked, on-condition or condition-monitored Parts, or any other Part which can be Overhauled or repaired, the documentation will also state the time since last Overhaul or refurbishment, will have a reference to the relevant section of the Component Maintenance Manual under which the Part was Overhauled or refurbished, as applicable, and will identify the FAA-approved repair agency or EASA-approved repair agency, as applicable, which performed the last Overhaul or refurbishment.

23.9.6   All Parts other than those referred to in Article 23.9.5 installed on the Aircraft will have FAA-acceptable or EASA-acceptable documentation demonstrating that such Parts were airworthy at the time of installation on the Aircraft.

23.9.7   The Aircraft will be in the same working order and condition as at Delivery (subject to the other provisions of this Article 23, reasonable wear and tear from normal flight operations excepted), with all pilot discrepancies and deferred maintenance items cleared on a terminating action basis.

23.9.8   The Aircraft will be airworthy (conform to type design and be in a condition for safe operation), with all Aircraft equipment, components and systems operating in accordance with their intended use and within limits approved by Manufacturer, the Aviation Authority and the FAA.

23.9.9   The Aircraft interior (including cabin and windows) and exterior will be clean and cosmetically acceptable to LESSOR, with all compartments free of foreign objects, dirt, grease, fluids, stains, grime, cracks, tears and rips and ready to be placed into immediate commercial airline operations.

23.9.10    No special or unique Manufacturer, Engine manufacturer or Aviation Authority inspection or check requirements which are specific to the Aircraft or Engines (as opposed to all aircraft or engines of their types) will exist with respect to the Airframe, Engines and Aircraft equipment, components and systems.

23.9.11    All repairs to the Aircraft will have been accomplished in accordance with Manufacturer's Structural Repair Manual (or FAA-approved data supported by an FAA Form 8110-3 or FAA Form 8100-9).

23.9.12    All Modifications and alterations to the Aircraft will have been accomplished in accordance with FAA-approved data supported by an FAA Form 8110-3, FAA Form 8100-9 or FAA supplemental type certificate.

23.9.13    The Aircraft will be returned with LESSOR's Engines and APU installed and with the same equipment as at Delivery, subject only to those replacements, additions and Modifications permitted under this Lease. To the extent LESSEE performed a Modification which cost in excess of Five Hundred Thousand U.S. Dollars U.S. Dollars (US$500,000) and LESSOR did not approve such Modification in accordance with Article 12.9.1, LESSOR may require LESSEE to return the Aircraft in its original condition prior to such Modification.

23.9.14    All Airworthiness Directives which are issued prior to the date of return of the Aircraft and require compliance (either by means of repetitive inspections, modifications or terminating action) prior to return of the Aircraft to LESSOR or within three (3) months after the Termination Date will have been complied with on the Aircraft on a terminating action basis at LESSEE's cost. Airworthiness Directives which do not have a terminating action will be accomplished at the highest level of inspection or modification possible. If, after using best efforts, LESSEE is unable to acquire the material, parts or components necessary to accomplish such Airworthiness Directive, LESSEE will pay to LESSOR upon return of the Aircraft the estimated cost of terminating such Airworthiness Directive. If the estimated cost cannot be mutually agreed upon by LESSEE and LESSOR, LESSEE and LESSOR will each obtain an estimate from a reputable FAA or EASA approved maintenance facility (unaffiliated with LESSEE or LESSOR) and the estimated cost will be the average of the two estimates.

23.9.15    All Modifications which must be performed prior to the date of return of the Aircraft or within three (3) months after the Termination Date in order to meet the EASA requirements applicable for JAR 0ps land Eurocontrol operations will have been incorporated on the Aircraft at LESSEE's cost.

23.9.16    The Aircraft will be in compliance with Manufacturer's Corrosion Prevention and Control Program (CPCP) specified for the model type by Manufacturer and LESSEE will provide LESSOR with documentation substantiating such compliance.

23.9.17    If any waivers, deviations, dispensations, alternate means of compliance, extensions or carry-overs with respect to maintenance or operating requirements, repairs or Airworthiness Directives are granted by the Aviation Authority or permitted by the Maintenance Program, LESSEE at its sole cost and expense will nonetheless perform such maintenance or operating requirements, repairs or Airworthiness Directives as if such waivers, deviations, dispensations, alternate means of compliance, or extensions or carry-overs did not exist.

23.9.18    The Aircraft will be free from any Security Interest except LESSOR's Liens and no circumstance will have so arisen whereby the Aircraft is or could become subject to any Security Interest or right of detention or sale in favor of the Aviation Authority, any airport authority, Eurocontrol or any other authority or Government Entity.

23.9.19    All no-charge vendor and Manufacturer's service bulletin kits received by LESSEE for the Aircraft but not installed thereon will be on board the Aircraft as cargo. All no-charge vendor and Manufacturer's service bulletin kits ordered by LESSEE but not yet received will, upon receipt by LESSEE and at LESSEE's cost, be forwarded as instructed by LESSOR. At LESSOR's request, any other service bulletin kit which LESSEE paid for will also be delivered to LESSOR on board the Aircraft, but LESSOR will reimburse LESSEE for its actual out-of-pocket costs for such kit, unless LESSEE purchased such kit as part of its implementation of a service bulletin on its fleet of aircraft of the same type as the Aircraft but had not yet installed such kit on the Aircraft, in which case such kit will be furnished free of charge to LESSOR.

23.9.20    The Aircraft will be free of any leaks and any damage resulting therefrom. All repairs will have been performed on a permanent basis in accordance with the applicable manufacturer's instructions.

23.9.2 1   The Aircraft fluid reservoirs (including oil, oxygen, hydraulic and water) will be serviced to full and the waste tank serviced in accordance with Manufacturer's instructions. Fuel tanks will be at least as full as at Delivery.

23.10 Checks Prior to Return. Immediately prior to return of the Aircraft to LESSOR, LESSEE at its expense will do each of the following:

23.10.1    LESSEE will have the Return Check performed by a JAA/EASA 145approved repair facility. The Aircraft will also be weighed. LESSEE also agrees to perform during the Return Check any other work reasonably requested by LESSOR (and not otherwise required under this Lease) and LESSOR will reimburse LESSEE for performing such LESSOR-requested work based on LESSEE's out-of-pocket and unburdened labor and material costs.

23.10.2    LESSEE will perform an internal and external corrosion inspection and correct any discrepancies in accordance with the recommendations of Manufacturer and the

Structural Repair Manual. In addition, all inspected areas will be properly treated with corrosion inhibitor as recommended by Manufacturer.

23.10.3    LESSEE will deliver the aircraft on its own livery

23.10.4    LESSEE will clean the exterior and interior of the Aircraft.

23.10.5    If reasonably required by LESSOR, LESSEE will repaint by touch-up the interior of the Aircraft, including flight deck, and replace placards.

23.10.6    In accordance with Article 23.9.11, LESSEE will permanently repair damage to the Aircraft that exceeds Manufacturer's limits and replace any non-flush structural patch repairs installed on the Aircraft with permanent flush-type repairs, in each case with no further inspection requirements. If Manufacturer's Structural Repair Manual does not contain a permanent flush repair scheme for a particular type of damage, LESSEE will obtain a permanent flush repair scheme from Manufacturer (including an FAA Form 8 110-3 or FAA Form 8 100-9) and perform the permanent flush repair recommended by Manufacturer.

23.10.7    With LESSOR and/or its representatives present, LESSEE will perform a full and complete hot and cold section videotape borescope on each Engine and its modules in accordance with Manufacturer's aircraft maintenance manual.

23.10.8    If the Engine historical and technical records and/or condition trend monitoring data of any Engine indicate an acceleration in the rate of deterioration in the performance of an Engine, LESSEE will correct, to LESSOR's satisfaction, such conditions which are determined to be causing such accelerated rate of deterioration.

23.10.9    With LESSOR and/or its representatives present, LESSEE will accomplish a power assurance run on the Engines in accordance with Manufacturer's aircraft maintenance manual. LESSEE will record the Engine power assurance test conditions and results on the Return Acceptance Receipt.

23.10.10   LESSEE will provide evidence to LESSOR's satisfaction that the Engine historical and technical records, borescope inspection, trend monitoring and power assurance run do not reveal any condition which would cause the Engines or any module to be unserviceable, beyond serviceable limits or serviceable with an increased frequency of inspection or with calendar time, flight hour or flight cycle restrictions under the Manufacturer's aircraft maintenance manual. LESSEE will correct any discrepancies in accordance with the guidelines set out by Engine manufacturer which may be discovered during such inspection.

23.10.11   In the event the Engine historical and technical records, borescope inspection, trend monitoring and other checks specified in Article 23.10.9 result in a dispute regarding the conformity of an Engine with the requirements of this Article 23,

LESSEE and LESSOR will consult with the Engine manufacturer and follow the Engine manufacturer's recommendations (including the accomplishment of an Engine test cell operational check) with regard to determining if such Engine complies with the requirements of this Article 23 and the manner in which any discrepancies from the requirements of this Article 23 will be rectified.

23.11    <u>Part Lives</u>. At return, the condition of the Aircraft will be as follows:

23.11.1    The Aircraft will have zero (0) hours consumed since the Return Check (excluding hours consumed on the acceptance flight).

23.11.2    Each Engine will meet all of the following:

    (a)    Each of the high pressure compressor, diffuser/combustion, high pressure turbine nozzles and high pressure turbine modules will have operated no more than 5,000 hours and 4,000 cycles since the last shop visit at which a Module Performance Restoration was performed on it. Life remains on each Life limited part to next scheduled removal shall be not less than 4,000 cycles

    (b)    Each Engine will have at least 5,000 hours and 4,000 cycles remaining to operate until its next anticipated removal (based on a review of the Engine historical and technical records, borescope inspection results, power assurance run results, trend monitoring data and the other checks specified in Articles 23.10.7, 23.10.8, 23.10.9 and 23.10.10).

    (c)    Each Engine will have a remaining hot day takeoff EGT margin sufficient to permit the operation of such Engine for the hours and cycles set forth in the preceding subparagraph (based on a review of the Engine historical and technical records, borescope inspection results, power assurance run results, trend monitoring data and the other checks specified in Articles 23.10.7, 23.10.8, 23.10.9 and 23.10.10).

    (d)    The Engine historical and technical records, borescope inspection, trend monitoring, power assurance run and other checks specified in Article Articles 23.10.7, 23.10.8, 23.10.9 and 23.10.10 indicate that the Engine should operate for the hours and cycles set forth in Article 23.11.2(b).

    (e)    Each Part of an Engine which has a life-limit will have 4,000 cycles (or 2,000 hours, if applicable) remaining to operate until its next removal per the Engine manufacturer's limit.

    (f)    No life-limited Part of an Engine will have more hours and cycles consumed than such Engine's data plate.

23.11.3    The APU will have one thousand (1,000) APU hours consumed since the last hot

section refurbishment (excluding hours consumed on the acceptance flight).

23.11.4    Each leg of the Landing Gear will have at least two (2) years remaining pursuant to the MPD until the next scheduled Overhaul or scheduled removal.

23.11.5    Each Part of the Airframe, Engine or APU which has a hard time limit pursuant to the MPD will have the greater of (a) at least 50% of such hard time Part's full allotment of hours and cycles or (b) 2,000 hours and 2,000 cycles remaining to operate until its next scheduled Overhaul or scheduled removal pursuant to the MPD. However, if such hard time Part's full allotment of hours and cycles between Overhauls pursuant to the MPD is less than 2,000 hours and 2,000 cycles, then such hard time Part will be returned with zero (0) hours and zero (0) cycles out of Overhaul.

23.11.6    Each life-limited Part of the Airframe or the MU will have the greater of (a) at least 50% of such life-limited Part's full allotment of hours and cycles or (b) 2,000 hours and 2,000 cycles remaining to operate until its next scheduled replacement pursuant to the MPD. However, if such life-limited Part's full allotment of hours and cycles remaining to operate pursuant to the MPD is less than 2,000 hours and 2,000 cycles, then such life-limited Part will be returned with 100% of its total approved hours and cycles remaining.

23.11.7    No life-limited Part of the Airframe will have more hours and cycles consumed than the total hours and cycles of the Airframe.

23.11.8    No life-limited Part of the APU will have more hours and cycles consumed than the hours and cycles of the APU.

23.11.9    Each Part which has a calendar time limit will have three (3) months remaining to operate until removal pursuant to the MPD. If a Part with a calendar time limit has a total approved calendar time remaining pursuant to the MPD of less than three (3) months, then such Part will be returned with 100% of its total approved calendar time remaining until removal.

23.11.10   No Part (excluding the life-limited Parts which are covered by Articles 23.11.2(e), 23.11.2(f), 23.11.6, 23.11.7 and 23.11.8) will have total hours or total cycles since new greater than one hundred ten percent (110%) of that of the Airframe and, with respect to all such Parts as a group, such Parts will have an average total time since new no greater than that of the Airframe.

23.11.11   Each Landing Gear tire and brake will have at least fifty percent (50%) of its wear remaining.

23.12    Export and Deregistration of Aircraft. At LESSOR's request, LESSEE at its cost will (a) provide an Export Certificate of Airworthiness or its equivalent from the State of Registration so that the Aircraft can be exported to the country designated by LESSOR, (b) assist with deregistration of the Aircraft from the register of aircraft in the State of Registration, (c) assist

with arranging for prompt confirmation of such deregistration to be sent by the registry in the State of Registration to the next country of registration and (d) perform any other acts reasonably required by LESSOR in connection with the foregoing. If any Aircraft work which LESSEE is not otherwise required to perform hereunder, including engineering, is required in order to obtain such Export Certificate of Airworthiness, LESSEE will perform such work and LESSOR will reimburse LESSEE for such work at LESSEE's out-of-pocket and unburdened labor and material costs.

23.13 <u>LESSEE's Continuing Obligations</u>. In the event that LESSEE does not return the Aircraft to LESSOR on the Expiration Date and in the condition required by this Article 23 for any reason (whether or not the reason is within LESSEE's control):

23.13.1    the obligations of LES SEE under this Lease will continue in full force and effect on a day-to-day basis until such return. This will not be considered a waiver of LESSEE's Event of Default or any right of LESSOR hereunder.

23.13.2    Until such return, the Agreed Value will be an amount equal to the Agreed Value on the day the Aircraft should have been returned to LESSOR pursuant to this Lease.

23.13.3    LESSEE will fully indemnify LESSOR on demand for all losses (including consequential damages), liabilities, actions, proceedings, costs and expenses thereby suffered or incurred by LESSOR and, in addition, until such time as the Aircraft is redelivered to LESSOR and put into the condition required by this Article 23, instead of paying the Rent specified in Article 5.3, LESSEE will pay twice the amount of Rent for each day from the scheduled Expiration Date until the Termination Date (the monthly Rent payable under Article 5.3.1 will be prorated based on the actual number of days in the applicable month). Payment will be made upon presentation of LESSOR's invoice.

23.13.4    LESSOR may elect, in its sole and absolute discretion, to accept the return of the Aircraft prior to the Aircraft being put in the condition required by this Article 23 and thereafter have any such non-conformance corrected at such time as LESSOR may deem appropriate (but within ninety (90) days following the return of the Aircraft) and at commercial rates then-charged by the Person selected by LESSOR to perform such correction. Any direct expenses incurred by LESSOR for such correction will be payable by LESSEE within fifteen (15) days following the submission of a written statement by LESSOR to LESSEE, identifying the items corrected and setting forth the expense of such corrections. LESSEE's obligation to pay such amounts will survive the Termination Date.

23.14 <u>Airport and Navigation Charges</u>. LESSEE will ensure that at return of the Aircraft any and all airport, navigation and other charges which give rise or may if unpaid give rise to any lien, right of detention, right of sale or other Security Interest in relation to the Aircraft, Engine, APU or any Part have been paid and discharged in full and will at LESSOR's request produce evidence thereof satisfactory to LESSOR.

72

23.15 <u>Return Acceptance Receipt</u>. Upon return of the Aircraft in accordance with the terms of this Lease, LESSEE will prepare and execute two (2) Return Acceptance Receipts in the form and substance of Exhibit M and LESSOR will countersign and return one such Return Acceptance Receipt to LESSEE.

23.16 <u>Indemnities and Insurance</u>. The indemnities and insurance requirements set forth in Articles 17 and 18, respectively, will apply to Indemnitees and LESSOR's representatives during return of the Aircraft, including the ground inspection and acceptance flight. With respect to the acceptance flight, LESSOR's representatives will receive the same protections as LESSOR on LESSEE's Aviation and Airline General Third Party Liability Insurance.

23.17 <u>Storage</u>. At LESSOR's request, LESSEE will continue to lease the Aircraft under this Lease for a period not to exceed thirty (30) days. During this period, LESSEE will have no obligations under this Lease except, at LESSOR's cost, to park and store the Aircraft in accordance with Manufacturer's recommended short term storage program at one of LESSEE's principal maintenance facilities in the State of Registration and to maintain all insurance on the Aircraft. LESSEE will not utilize the Aircraft for any reason during this period.

## **ARTICLE 24**      **ASSIGNMENT**

24.1 <u>No Assignment by LESSEE</u>. NO ASSIGNMENT, NOVATION, TRANSFER, MORTGAGE OR OTHER CHARGE MAY BE MADE BY LESSEE OF ANY OF ITS RIGHTS OR OBLIGATIONS WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR PART, OR THIS LEASE.

24.2 <u>Sale or Assignment by LESSOR</u>.

24.2.1    Subject to LESSEE's rights pursuant to this Lease, LESSOR may at any time and without LESSEE's consent sell, assign or transfer its rights, interest and obligations hereunder or with respect to the Aircraft to a third party ("<u>LESSOR's Assignee</u>").

24.2.2    The term "<u>LESSOR</u>" as used in this Lease means the lessor of the Aircraft at the time in question. In the event of the sale of the Aircraft and transfer of LESSOR's rights and obligations under this Lease, LESSOR's Assignee will become "LESSOR" of the Aircraft under this Lease and the transferring party (the prior "LESSOR") will be relieved of all liability to LESSEE under this Lease for obligations arising on and after the date the Aircraft is sold. LESSEE will acknowledge and accept LESSOR's Assignee as the new "LESSOR" under this Lease and will look solely to LESSOR's Assignee for the performance of all LESSOR obligations and covenants under this Lease arising on and after the Aircraft sale date.

24.3 <u>LESSOR's Lender</u>. Subject to LESSEE's rights pursuant to this Lease, LESSOR may at any time and without LESSEE's consent grant security interests over the Aircraft and assign the

73

benefit of this Lease to a lender ("LESSOR's Lender") as security for LESSOR's obligations to LESSOR's Lender. Accordingly, if LESSOR's Lender requires, as a condition to providing financing, any nonsubstantive modification of this Lease, LESSEE agrees to enter into an agreement so modifying this Lease. By way of example, any such nonsubstantive modification may include adding LESSOR's Lender to the notice provisions of this Lease or revising LESSOR's Bank Account information. Subject to the foregoing and to LESSEE's obligations under Article 24.6.2, any such nonsubstantive modifications will not materially increase LESSEE's obligations or materially decrease LESSEE's rights under this Lease.

24.4    <u>LESSEE Cooperation</u>. On request by LESSOR, LESSOR's Assignee or LESSOR's Lender, LESSEE will execute all such documents (such as a lease assignment agreement) as LESSOR, LESSOR's Assignee or LESSOR's Lender may reasonably require to confirm LESSEE's obligations under this Lease and obtain LESSEE's acknowledgment that LESSOR is not in breach of the Lease. LESSEE will provide all other reasonable assistance and cooperation to LESSOR, LESSOR's Assignee and LESSOR's Lender in connection with any such sale or assignment or the perfection and maintenance of any such security interest, including, at LESSOR's cost, making all necessary filings and registrations in the State of Registration and providing all opinions of counsel with respect to matters reasonably requested by LESSOR, LESSOR's Lender or LESSOR's Assignee. LESSOR will reimburse LESSEE for its reasonable out-of-pocket costs in reviewing documents required by LESSOR or LESSOR's Lender.

24.5    <u>Advance Consent Under Cape Town Convention</u>. For the purpose of Article 46(1)(c) of the consolidated text of the Cape Town Convention, LESSEE hereby consents in advance to the transfer of the associated rights and related international interest in respect of any assignment or sale by LESSOR or the granting of any Security Interest by LESSOR in accordance with Articles 24.2 or 24.3. For the avoidance of doubt, no additional consent by LESSEE will be required in connection with any such assignment of associated rights and the related international interests pursuant to the Cape Town Convention.

24.6    <u>Protections</u>.

24.6.1    LESSOR will obtain for the benefit of LESSEE an acknowledgment from any LESSOR's Assignee or LESSOR's Lender that, so long as no Default or Event of Default has occurred and is continuing hereunder, such Person will not interfere with LESSEE's quiet, peaceful use and enjoyment of the Aircraft.

24.6.2    If a financing for the Aircraft is in place at Delivery or LESSOR finances the Aircraft after Delivery, then the term "LESSOR" in the provisions of this Lease relating to disclaimer, title and registration, indemnity and insurance contained in Articles 8, 14, 17 and 18, respectively, or with respect to Article 20.2.8, will be deemed in addition to LESSOR to include LESSOR's Assignee, LESSOR's Lender and associated parties, if applicable. Also, if the Aircraft was previously financed but such financing was no longer in place at the time of Delivery of the Aircraft to LESSEE, the term "LESSOR" in the provisions of this Lease described in this Article 24.6.2 will be deemed to include the former lender and associated parties.

74



24.6.3   If LESSOR sells the Aircraft after Delivery, then the disclaimer and indemnity provisions contained in Articles 8 and 17 will continue to be applicable after the sale to International Lease Finance Corporation and, if applicable, the parties referred to in Article 24.6.2. For a period of two (2) years after such sale or assignment and at LESSEE's cost, LESSEE will continue to name LESSOR and the parties referred to in Article 24.6.2, if applicable, as additional insureds under the Aviation and Airline General Third Party Liability Insurance specified in Exhibit C.

## **ARTICLE 25**        **DEFAULT OF LESSEE**

25.1   LESSEE Notice to LESSOR. LESSEE will promptly notify LESSOR if LESSEE becomes aware of the occurrence of any Default or Event of Default.

25.2   Events of Default. The occurrence of any of the following will constitute an Event of Default and material breach of this Lease by LESSEE:

(a)   LESSEE fails to take delivery of the Aircraft when obligated to do so under the terms of this Lease;

(b)   LESSEE fails to make a Rent or other payment due hereunder in the manner and by the date provided in this Lease;

(c)   LESSEE fails to obtain or maintain the insurance required by Article 18;

(d)   LESSEE fails to return the Aircraft to LESSOR on the Expiration Date in accordance with Article 23;

(e)   LESSEE fails to observe or perform any of its other obligations hereunder and fails to cure the same within fifteen (15) days after written notice thereof to LESSEE. If such failure cannot by its nature be cured within fifteen (15) days, LESSEE will have the reasonable number of days necessary to cure such failure (not to exceed a period of sixty (60) days) so long as it uses diligent and best efforts to do so;

(f)   any representation or warranty of LESSEE in this Lease proves to be untrue in any material respect;

(g)   the registration of the Aircraft is cancelled other than as a result of an act or omission of LESSOR;

(h)   LESSEE abandons the Aircraft or Engines;

(i)   LESSEE or an approved sublessee no longer has unencumbered control (other than Permitted Liens) or possession of the Aircraft or Engines, except as otherwise permitted by this Lease;

(j) LESSEE threatens to discontinue or temporarily or permanently discontinues business or sells or otherwise disposes of all or substantially all of its assets;

(k) a material adverse change occurs in the financial condition of LESSEE;

(l)    LESSEE no longer possesses the licenses, certificates and permits required for the conduct of its business as a certificated air carrier in Turkey;

(m)    LESSEE fails to pay when due any airport or navigation charges (including Eurocontrol charges) or any landing fees assessed with respect to the Aircraft or any aircraft operated by LESSEE which, if unpaid, may give rise to any lien, right of detention, right of sale or other Security Interest in relation to the Aircraft, Engine, APU or any Part;

(n)    LESSEE (i) suspends payment on its debts or other obligations, (ii) is unable to or admits its inability to pay its debts or other obligations as they fall due, (iii) is adjudicated or becomes bankrupt or insolvent or (iv) proposes or enters into any composition or other arrangement for the benefit of its creditors generally;

(o)    any proceedings, resolutions, filings or other steps are instituted or threatened with respect to LESSEE relating to the bankruptcy, liquidation, reorganization or protection from creditors of LESSEE or a substantial part of LESSEE's property, (collectively "Insolvency Proceedings"). If instituted by LESSEE, the same will be an immediate Event of Default. If instituted by another Person, the same will be an Event of Default (i) if not dismissed, remedied or relinquished within sixty (60) days, or (ii) if after such sixty (60) day period, if LESSEE does not provide LESSOR with satisfactory evidence from time to time during the pendency of such Insolvency Proceedings that, notwithstanding such Insolvency Proceedings, LESSEE will be able to fulfill all of its obligations under this Lease;

(p)    any order, judgment or decree is entered by any court of competent jurisdiction appointing a receiver, trustee or liquidator of LESSEE or a substantial part of its property, or if a substantial part of LESSEE's property is to be sequestered. If instituted by or done with the consent of LESSEE, the same will be an immediate Event of Default. If instituted by another Person, the same will be an Event of Default if not dismissed, remedied or relinquished within sixty (60) days;

(q)    any indebtedness for borrowed moneys or a guarantee or similar obligation owed by LESSEE with an unpaid balance of at least Six Hundred Thousand U.S. Dollars (US$600,000) is declared due before its stated maturity or LESSEE is in default under any other purchase agreement, lease, conditional sale agreement or other agreement pursuant to which LESSEE has possession of any aircraft; or

(r)    LESSEE is in default under any other lease or agreement between LESSEE and LESSOR or a direct or indirect subsidiary of LESSOR and the same is not cured

within its specified cure period.

(s)    LESSEE is in default under any other aircraft or aircraft equipment lease agreement which is managed by LESSOR on behalf of another Person and the same is not cured within its specified cure period.

25.3   LESSOR's General Rights. Upon the occurrence of any Event of Default (except an Event of Default under Article 25.2(b) and if so, then on the thirtieth (30th) day after LESSOR's notification to LESSEE about the occurrence of an Event of Default under Article 25.2(b), or such shorter period as may be provided under Turkish Law), all rights of LESSEE hereunder will immediately cease and terminate (but LESSEE's obligations hereunder will continue, including the obligations to protect and insure the Aircraft as required under this Lease),, LESSOR may do all or any of the following at its option (in addition to such other rights and remedies which LESSOR may have by statute or otherwise but subject to any requirements of applicable Law):

(a)    terminate this Lease by giving written notice to LESSEE;

(b)    terminate the rights of LESSEE to use or operate the Aircraft by giving written notice to LESSEE, in which case LESSEE's obligations under this Lease will continue (including the obligations set forth in Articles 17 and 18);

(c)    require that LESSEE immediately cease flying the Aircraft and leave it parked in its then-current location by giving written notice to LESSEE, in which case LESSEE's obligations under this Lease will continue (including the obligations set forth in Articles 17 and 18);

(d)    require that LESSEE immediately move the Aircraft to an airport or other location designated by LESSOR and park the Aircraft there by giving written notice to LESSEE, in which case LESSEE's obligations under this Lease will continue (including the obligations set forth in Articles 17 and 18);

(e)    take possession of the Aircraft. If LESSOR takes possession of the Aircraft, it may enter upon LESSEE's premises where the Aircraft is located without liability. Upon repossession of the Aircraft, LESSOR will then be entitled to sell, lease or otherwise deal with the Aircraft as if this Lease had never been made. LESSOR will be entitled to the full benefit of its bargain with LESSEE;

(f)    instruct any maintenance or repair facility which is in possession of the Aircraft, any Engine, the MU or any Part as to its disposition or release;

(g)    for LESSEE's account, do anything that may reasonably be required to cure any default and recover from LESSEE all reasonable costs, including legal fees and expenses incurred in doing so and Default Interest;

(h)    proceed as appropriate to enforce performance of this Lease and to recover any damages for the breach hereof, including the amounts specified in Article 25.6; or

(i)  apply all or any portion of the Security Deposit and any other security deposits held by LESSOR pursuant to any other agreements between LESSOR and LESSEE to any amounts due.

25.4  Deregistration and Export of Aircraft. If an Event of Default has occurred and is continuing, LESSOR may take all steps necessary to deregister the Aircraft in and export the Aircraft from the State of Registration after terminating this Lease.

25.5  Cape Town Convention Remedies. If the Cape Town Convention has been or is ratified or made applicable in Turkey, then LESSEE and LESSOR acknowledge and agree that:

(a)  each of the Events of Default set forth in Article 25.2 will be deemed to be an event that constitutes a "default" as such term is used in the Cape Town Convention; and

(b)  upon the occurrence of any Event of Default (i) LESSOR will be afforded all rights and remedies specified in the Cape Town Convention as a result of such Event of Default, (ii) all of the rights of LESSOR specified in Article 25.3 will be construed to be "additional remedies" as permitted by the Cape Town Convention which may be exercised by LESSOR pursuant to this Lease subject to the requirements of applicable Law and (iii) LESSOR may take all steps as are contemplated by the Cape Town Convention to deregister the Aircraft, export the Aircraft from the State of Registration and, if applicable, discharge the international interest in respect of the Aircraft, this Lease and the other Operative Documents from the international registry of the Cape Town Convention.

25.6  LESSEE Liability for Damages. If an Event of Default occurs, in addition to all other remedies available at law or in equity, LESSOR has the right to recover from LESSEE and LESSEE will pay LESSOR within two (2) Business Days after LESSOR's written demand, all of the following:

(a)  any losses suffered by LESSOR as a result of a delay in Delivery of the Aircraft to LESSEE, including Aircraft parking, maintenance costs and insurance costs during the period of delay;

(b)  all amounts which are then due and unpaid hereunder and which become due prior to the earlier of LESSOR's recovery of possession of the Aircraft or LESSEE making an effective tender thereof~

(c)  any losses suffered by LESSOR because of LESSOR's inability to place the Aircraft on lease with another lessee or to otherwise utilize the Aircraft on financial terms as favorable to LESSOR as the terms hereof or, if LESSOR elects to dispose of the Aircraft, the funds arising from a sale or other disposition of the Aircraft are not as profitable to LESSOR as leasing the Aircraft in accordance with the terms hereof would have been (and LESSOR will be entitled to

accelerate any and all Rent which would have been due from the date of LESSOR's recovery or repossession of the Aircraft through the Expiration Date);

(d)     all costs associated with LESSOR's exercise of its remedies hereunder, including repossession costs, legal fees, Aircraft storage costs, Aircraft re-lease or sale costs and LESSOR's internal costs and expenses (including the cost of personnel time calculated based upon the compensation paid to the individuals involved on an annual basis and a general LESSOR overhead allocation);

(e)     any amount of principal, interest, fees or other sums paid or payable on account of funds borrowed in order to carry any unpaid amount;

(f)     any loss, premium, penalty or expense which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any financial instrument relating in whole or in part to LESSOR's financing of the Aircraft;

(g)     any loss, cost, expense or liability sustained by LESSOR due to LESSEE's failure to redeliver the Aircraft in the condition required by this Lease; and

(h)     any other loss, damage, expense, cost or liability which LESSOR suffers or incurs as a result of the Event of Default and/or termination of this Lease.

25.7    Waiver of Default. By written notice to LESSEE, LESSOR may at its election waive any Default or Event of Default and its consequences and rescind and annul any prior notice of termination of this Lease. The respective rights of the parties will then be as they would have been had no Default or Event of Default occurred and no such notice been given.

25.8    Present Value of Payments. In calculating LESSOR's damages hereunder, upon an Event of Default all Rent and other amounts which would have been due hereunder during the Lease Term if an Event of Default had not occurred will be calculated on a present value basis using a discounting rate of four percent (4%) per annum discounted to the earlier of the date on which LESSOR obtains possession of the Aircraft or LESSEE makes an effective tender thereof

25.9    Use of "Termination Date". For avoidance of doubt, it is agreed that if this Lease terminates and the Aircraft is repossessed by LESSOR due to an Event of Default, then, notwithstanding the use of the term "Termination Date" in this Lease, the period of the Lease Term and the "Expiration Date" will be utilized in calculating the damages to which LESSOR is entitled pursuant to Article 25.6. For example, it is agreed and understood that LESSOR is entitled to receive from LESSEE the Rent and the benefit of LESSEE's insurance and maintenance of the Aircraft until expiration of the Lease Term.

## ARTICLE 26        NOTICES

26.1    Manner of Sending Notices. Any notice, request or information required or permissible under this Lease will be in writing and in English. Notices will be delivered in person or sent by fax, letter (mailed airmail, certified and return receipt requested), or by expedited delivery

addressed to the parties as set forth in Article 26.2. In the case of a fax, notice will be deemed received on the date set forth on the confirmation of receipt produced by the sender's fax machine immediately after the fax is sent. In the case of a mailed letter, notice will be deemed received upon actual receipt. In the case of a notice sent by expedited delivery, notice will be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery. If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.

26.2    Notice Information. Notices will be sent:

If to LESSOR:        H&S GROUP OF COMPANIES, INC.
                     9749 SW 111th Terr.
                     Miami, FL 33176
                     Attention:    Mano Sinnarajah_____

                     Fax:          305 279 6200
                     Telephone:    305 279 2500

With copy to:        Jerry Dale P.A
                     Miami, Florida
                     Fax:
                     Telephone:

If to LESSEE:        ALTIN HAVAYOLU TASIMACILIGI TURIZM VE TIC. A.S.
                     (GOLDEN INTERNATIONAL AIRLINES)
                     Yesilkoy Cad. No:9 B/2
                     Florya - Bakirkoy 34153
                     Istanbul, Turkey

                     Attention:    Mr. Nurullah BILGEN
                     Fax:          +90-212-573 65 24
                     Telephone:    +90-212-662 29 29

or to such other places and numbers as either party directs in writing to the other party.

**ARTICLE 27**        **GOVERNING LAW AND JURISDICTION**

27.1    **Florida Law.** This Lease is being delivered in the State of Florida and the Lease and all other Operative Documents will in all respects be governed by and construed in accordance with the Laws of the State of Florida (notwithstanding the conflict Laws of the State of Florida).

27.2    **Non-Exclusive Jurisdiction in Florida.** As permitted by Section 410.40 of the Florida Code of Civil Procedure, the parties hereby irrevocably submit to the non-exclusive jurisdiction of the Federal District Court for the Central District of Florida and the State of Florida Superior or Municipal Court in Los Angeles, Florida. Nothing in this Lease will prevent either party from

bringing suit in any other appropriate jurisdiction.

27.3    **Personal Jurisdiction.** LESSEE agrees to submit to personal jurisdiction in the courts of any jurisdiction to which LESSEE flies the Aircraft or in which the Aircraft is located.

27.4    **Service of Process.** The parties hereby consent to the service of process (a) in the manner directed by any of the courts referred to above, (b) in accordance with Section 415.40 of the Florida Code of Civil Procedure by mailing copies of the summons and complaint to the person to be served by first-class mail to the address set forth in Article 26.2, postage prepaid, return receipt requested, (c) in one of the manners specified in Article 26.1 or (d) in accordance with the Hague Convention, if applicable.

27.5    **Prevailing Party in Dispute.** If any legal action or other proceeding is brought in connection with or arises out of any provisions in this Lease, the prevailing party will be entitled to recover reasonable attorneys' fees and other costs incurred in such action or proceedings. The prevailing party will also, to the extent permissible by Law, be entitled to receive pre- and post-judgment Default Interest.

27.6    **Future Amendments or Agreements.** With respect to any amendments to this Lease or the other Operative Documents or any other agreements to be entered into between LESSEE and · LESSOR after the date of execution of this Lease in connection with the leasing of the Aircraft, including any amendment to this Lease which may be executed pursuant to Article 14.3 **("Future Agreements"),** LESSEE and LESSOR agree that (a) Future Agreements will in all respects be governed by and construed in accordance with the Laws of the State of Florida (notwithstanding the conflict Laws of the State of Florida) and (b) LESSEE and LESSOR will irrevocably submit to the non-exclusive jurisdiction of the Federal District Court for the Central District of Florida and the State of Florida Superior or Municipal Court in Los Angeles in any suit, action, claim or proceeding seeking to enforce any provision of the Future Agreements, including any claim or proceeding seeking enforcement of LESSOR's rights and remedies arising under the Cape Town Convention.

27.7    **Waiver.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF LESSEE AND LESSOR HEREBY WAIVES THE RIGHT TO A TRIAL BY JURY. EACH OF LESSEE AND LESSOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS LEASE BROUGHT IN ANY OF THE COURTS REFERRED TO IN ARTICLE 27.2, AND HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

## ARTICLE 28    ·    MISCELLANEOUS

28.1    **Transportation of Personnel.** LESSEE will provide transportation to LESSOR's personnel on a positive space basis on the Aircraft or any other aircraft operated by LESSEE for the purposes of conducting business between LESSEE and LESSOR.

28.2    **Press Releases.** The parties will give copies to one another, in advance if possible, of all news, articles and other releases provided to the public media regarding this Lease or the Aircraft.

28.3    **Power of Attorney.** LESSEE hereby irrevocably appoints LESSOR as its attorney for the purpose of putting into effect the intent of this Lease following an Event of Default, including without limitation, the return, repossession, deregistration and exportation of the Aircraft. To evidence this appointment, LESSEE has executed the Power of Attorney in the form of Exhibit I. LESSEE will take all steps required under the Laws of the State of Registration to provide such power of attorney to LESSOR. In addition, for purposes of the Cape Town Convention, LESSEE hereby agrees to execute and deliver to LESSOR the form of Irrevocable Deregistration and Export Request Authorization attached hereto as Exhibit J.

28.4    LESSOR **Performance for** LESSEE. The exercise by LESSOR of its remedy of performing a LESSEE obligation hereunder is not a waiver of and will not relieve LESSEE from the performance of such obligation at any subsequent time or from the performance of any of its other obligations hereunder.

28.5    **LESSOR's Payment Obligations.** Any obligation of LESSOR under this Lease to pay or release any amount to LESSEE is conditioned upon (a) all amounts then due and payable by LESSEE to LESSOR under this Lease or under any other agreement between LESSEE and LESSOR or a direct or indirect subsidiary of LESSOR having been paid in full, (b) all amounts then due and payable by LESSEE under any aircraft or aircraft equipment lease agreement which is managed by LESSOR on behalf of another Person having been paid in full and (c) no Default or Event of Default having occurred and continuing hereunder at the time such payment or release of payment is payable to LESSEE.

28.6    **Application of Payments.** Any amounts paid or recovered in respect of LESSEE liabilities hereunder may be applied to Rent, Default Interest, fees or any other amount due hereunder in such proportions, order and manner as LESSOR determines.

28.7    **Usury Laws.** The parties intend to contract in strict compliance with the usury Laws of the State of Florida and, to the extent applicable, the U.S. Notwithstanding anything to the contrary in the Operative Documents, LESSEE will not be obligated to pay Default Interest or other interest in excess of the maximum non-usurious interest rate, as in effect from time to time, which may by applicable Law be charged, contracted for, reserved, received or collected by LESSOR in connection with the Operative Documents. During any period of time in which the then-applicable highest lawful rate is lower than the Default Interest rate, Default Interest will accrue and be payable at such highest lawful rate; however, if at later times such highest lawful rate is greater than the Default Interest rate, then LESSEE will pay Default Interest at the highest lawful rate until the Default Interest which is paid by LESSEE equals the amount of interest that would have been payable in accordance with the interest rate set forth in Article 5.7.

28.8    **Delegation by LESSOR.** LESSOR may delegate to any Person(s) all or any of the rights,

powers or discretion vested in it by this Lease and any such delegation may be made upon such terms and conditions as LESSOR in its absolute discretion thinks fit.

28.9    **Confidentiality.** The Operative Documents and all non-public information obtained by either party about the other are confidential and are between LESSOR and LESSEE only and will not be disclosed by a party to third parties (other than to such party's auditors or legal advisors; as required in connection with any filings of this Lease in accordance with Article 14; in connection with LESSOR's potential sale of the Aircraft or assignment of this Lease; as required for enforcement by either party of its rights and remedies with respect to this Lease or as required by applicable Law) without the prior written consent of the other party. If any disclosure will result in an Operative Document becoming publicly available, LESSEE and LESSOR will cooperate with one another to obtain confidential treatment as to the commercial terms and other material provisions of such Operative Document.

28.10 **Rights of Parties.** The rights of the parties hereunder are cumulative, not exclusive, may be exercised as often as each party considers appropriate and are in addition to its rights under general Law. The rights of one party against the other party are not capable of being waived or amended except by an express waiver or amendment in writing. Any failure to exercise or any delay in exercising any of such rights will not operate as a waiver or amendment of that or any other such right. Any defective or partial exercise of any such rights will not preclude any other or further exercise of that or any other such right and no act or course of conduct or negotiation on a party's part or on its behalf will in any way preclude such party from exercising any such right or constitute a suspension or any amendment of any such right.

28.11 **Further Assurances.** Each party agrees from time to time to do and perform such other and further acts and execute and deliver any and all such other instruments as may be required by Law, reasonably requested by the auditors of the other party or requested by the other party to establish, maintain or protect the rights and remedies of the requesting party or to carry out and effect the intent and purpose of this Lease.

28.12 **Translations of Lease.** This Lease may be translated into Turkish or another language. However, if this Lease is translated into another language, whether or not signed by LESSEE and LESSOR in such other language, solely the terms and provisions of this English version of the Lease will prevail in any dispute.

28.13 Use **of Word "including".** The term **"including"** is used in this Lease without limitation.

28.14 **Headings.** All article and paragraph headings and captions are purely for convenience and will not affect the interpretation of this Lease. Any reference to a specific article, paragraph or section will be interpreted as a reference to such article, paragraph or section of this Lease.

28.15 **Invalidity of any Provision.** If any of the provisions of this Lease become invalid, illegal or unenforceable in any respect under any Law, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired.

28.16 **Time is of the Essence.** Time is of the essence in the performance of all obligations of the

parties under this Lease and, consequently, all time limitations set forth in the provisions of this Lease will be strictly observed.

28.17 **Amendments in Writing.** The provisions of this Lease may only be amended or modified by a writing executed by LESSOR and LESSEE.

28.18 **Counterparts.** This Lease may be executed in any number of identical counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same instrument when each party has signed and delivered one such counterpart to the other party.

28.19 **Delivery of Documents by Fax or E-mail.** Delivery of an executed counterpart of this Lease or of any other documents in connection with this Lease by fax or e-mail will be deemed as effective as delivery of an originally executed counterpart. Any party delivering an executed counterpart of this Lease or other document by fax or e-mail will also deliver an originally executed counterpart, but the failure of any party to deliver an originally executed counterpart of this Lease or such other document will not affect the validity or effectiveness of this Lease or such other document.

28.20 **Entire Agreement.** The Operative Documents constitute the entire agreement between the parties in relation to the leasing of the Aircraft by LESSOR to LESSEE and supersede all previous proposals, agreements and other written and oral communications in relation hereto. The parties acknowledge that there have been no representations, warranties, promises, guarantees or agreements, express or implied, except as set forth in this Lease.

IN WITNESS WHEREOF, LESSEE and LESSOR have caused this Lease to be executed by their respective officers as of 17|10 , 2007.

H&S GROUP COMPANIES, INC.

By:

Name: Nurullah Sivarumar Sinnappan

Its: PRESIDENT / CEO

ALTIN HAVAYOLU TASIMACILIGI
TURIZM VE TIC. A.S.

By:

Name: Nurullah BILGEN

Its: VICE PRECIDENT

Print Date: 10/17/07 3:31:00 PM
Document Name: F:\TRANSACT\HS Group\Aircraft Lease Agreement (J&A 9-12-07) initial draft.doc
Draft Date: 9/12/07 10:20:31 AM

JERRY M. DALE
MY COMMISSION # DD 677558
EXPIRES: May 23, 2011
Bonded Thru Budget Notary Services
NOTARY PUBLIC STATE OF FLORIDA

## EXHIBIT A

## AIRCRAFT DESCRIPTION

Aircraft Manufacturer and Model:          B757-200

Seating Configuration:                    Per Estoppel and Acceptance Certificate

Manufacturer's Serial Number:             28484

Maximum Gross Takeoff Weight:             Per Estoppel and Acceptance Certificate

Engine Manufacturer and Model:            Pratt Whitney

Engine Serial Numbers:                    Per Estoppel and Acceptance Certificate
                                          727282 & 727283

Engine Type Certificate Thrust Rating:

## EXHIBIT B

## CONDITION AT DELIVERY

### 1.    Technical Report

Prior to the Delivery Date, LESSOR will provide LESSEE with a Technical Evaluation Report in the form and substance of Exhibit P, as revised, and, in addition upon LESSEE's request, will make copies available of(a) drawings of the then-current interior configuration of the Aircraft, (b) an airworthiness directive status list, (c) a service bulletin incorporation list, (d) rotable tracked, hard-time and life-limited component listings, (e) a list of modifications, alterations and repairs, (f) interior material burn certificates, (g) information regarding Prior Lessee's maintenance program for the Aircraft, (h) the complete workscopes for the checks, inspections and other work to be performed prior to Delivery, (i) to the extent received from Prior Lessee, a forecast of the checks, inspections and other work to be performed within eighteen (18) months after Delivery of the Aircraft, (j) a list of all no-charge service bulletin kits with respect to the Aircraft which were ordered by Prior Lessee from Manufacturer or the Engine manufacturer, (k) to the extent received from Prior Lessee, takeoff and cruise trend reports for the last twelve (12) months, (l) current Engine disk sheets, (m) last Engine shop visit reports, and (n) any other data which is reasonably requested by LESSEE.

### 2.    Full Aircraft Documentation Review

For the period commencing at least ten (10) Business Days prior to the Scheduled Delivery Date and continuing until the date on which the Aircraft is delivered to LESSEE in the condition required by this Exhibit B, LESSOR will provide for the review of LESSEE and/or its representative all of the Aircraft records and historical documents described in Exhibit O in one central room at the Delivery Location.

### 3.    Aircraft Inspection

(a)    During the maintenance checks performed prior to Delivery, LESSEE and/or its representatives will have an opportunity to observe functional and operational system checks, perform a visual inspection of the Aircraft (taking into account the Aircraft type, age, use and other known factors with respect to the Aircraft) and perform a full inspection of the Aircraft Documentation (including records and manuals), all to LESSEE's satisfaction. Subject to Article 6.2, any deficiencies from the Aircraft delivery condition requirements set forth in this Exhibit B will be corrected by LESSOR at its cost prior to the Delivery of the Aircraft. Full borscope inspection will be performed after test flight for both engines and APU.

(b)    Prior to the Aircraft acceptance flight, with LESSEE's representatives present, LESSOR will cause a systems functional and operational inspection of the Aircraft to be conducted in accordance with Manufacturer's checklist procedures.

(c)     Immediately prior to the Delivery of the Aircraft, LESSOR will cause to be carried out for LESSEE and/or LESSEE's representatives an Aircraft acceptance flight in accordance with Manufacturer's standard flight operation check flight procedures or, if agreed to in writing by LESSOR, in accordance with LESSEE's or Prior Lessee's acceptance flight procedure, either of which will be for not less than two (2) hours and not more than three (3) hours. Flight costs and fuel will be furnished by and at the expense of LESSOR. Subject to Article 6.2 of the Lease, any deficiencies from the Aircraft delivery condition requirements set forth in this Exhibit B will be corrected by LESSOR at its cost prior to Delivery of the Aircraft.

**4.     Certificate of Airworthiness Matters**

(a)     The Aircraft will possess an Export Certificate of Airworthiness issued by the US Federal Aviation Authority aviation authority. The Aircraft also will be in the condition required in order to meet the requirements for issuance of a JAA/EASA Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country in accordance with JAA/EASA Part 21 and, in addition, to meet the operating requirements of JAR Ops 1 with no restrictions imposed.

(b)     At LESSEE's request, LESSOR at its cost will demonstrate that the Aircraft meets the requirements for issuance of a JAA/EASA Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country by delivering to LESSEE at LESSOR's option either a Certificate of Airworthiness issued by a JAA/EASA member country (if the Aircraft is already or is to be registered in a JAA/EASA member country) or a letter or other document signed by an aviation authority of a JAA/EASA member country or another Person acceptable to LESSEE stating that such Person has inspected the Aircraft and Aircraft Documentation (including records and manuals) and has found that the Aircraft meets the requirements for issuance of a Certificate of Airworthiness for transport category aircraft issued by a JAA/EASA member country in accordance with JAA/EASA Part 21 and, in addition, meets the operating requirements of JAR Ops 1 with no restrictions imposed.

**5.     General Condition of Aircraft at Delivery**

(a)     The Aircraft, Engines, APU and Parts will have been maintained and repaired in accordance with Prior Lessee's maintenance program and the rules and regulations of the US Federal Aviation Authority aviation authority.

(b)     Aircraft Documentation (including records and manuals) will have been maintained in English and in an up-to-date status, in accordance with the rules and regulations of the US Federal Aviation Authority aviation authority and the FAA and in a form necessary in order to meet the requirements of this Exhibit B. The records and historical documents set forth in Attachment 1 of Exhibit M will be in English.

(c)     All hard-time, time-controlled, time-tracked, life-limited, on-condition and condition-monitored Parts, and all other Parts which can be Overhauled or repaired, which are installed on the Aircraft will have an FAA Form 8 130-3 or JAA Form 1 evidencing the

airworthiness of such Part at the time of installation on the Aircraft. In the case of life-limited Parts, the documentation will also state the total hours and cycles since new. In the case of hard-time, time-controlled, time-tracked, on-condition or condition-monitored Parts, or any other Part which can be Overhauled or repaired, the documentation will also state the time since last Overhaul or refurbishment, will have a reference to the relevant section of the Component Maintenance Manual under which the Part was Overhauled or refurbished, as applicable, and will identify the FAA-approved repair agency or JAA-approved repair agency, as applicable, which performed the last Overhaul or refurbishment.

(d)     All Parts other than those referred to in Paragraph 5(c) above installed on the Aircraft will have FAA-acceptable or JAA-acceptable documentation demonstrating that such Parts were airworthy at the time of installation on the Aircraft.

(e)     All pilot discrepancies and deferred maintenance items will have been cleared on a terminating action basis.

(f)     The Aircraft will be airworthy (conform to type design and be in a condition for safe operation), with all Aircraft equipment, components and systems operating in accordance with their intended use and within limits approved by Manufacturer, the US Federal Aviation Authority aviation authority and the FAA.

(g)     The Aircraft interior (including cabin and windows) and exterior will be clean, with all compartments free of foreign objects, dirt, grease, fluids, stains, grime, cracks, tears and rips and ready to be placed into immediate commercial airline operations.

(h)     No special or unique Manufacturer, Engine manufacturer or US Federal Aviation Authority aviation authority inspection or check requirements which are specific to the Aircraft or Engines (as opposed to all aircraft or engines of their types) will exist with respect to the Airframe, Engines and Aircraft equipment, components and systems.

(i)     All repairs to the Aircraft will have been accomplished in accordance with Manufacturer's Structural Repair Manual (or FAA-approved data supported by an FAA Form 8110-3 or FAA Form 8 100-9).

(j)     All Modifications and alterations to the Aircraft will have been accomplished in accordance with FAA/JAA approved data supported by an FAA/JAA Form 8 110-3, FAA/JAA Form 8 100-9 or FAA supplemental type certificate.

(k)     All airworthiness directives which are issued either by the US Federal Aviation Authority aviation authority or the aviation authority of the country of manufacture of the Aircraft prior to the Delivery Date of the Aircraft and require compliance (either by means of repetitive inspections, modifications or terminating action) prior to Delivery of the Aircraft to LESSEE or within three (3) months after Delivery will have been complied with on the Aircraft on a terminating action basis at LESSOR's cost. Airworthiness directives which do not have a terminating action will be accomplished at the highest level of inspection or modification possible.



(l)   All Modifications which must be performed prior to Delivery of the Aircraft or within twelve (12) months after Delivery in order to meet the Full JAA requirements applicable to JAR Ops1 operations will have been incorporated on the Aircraft at LESSOR's cost.

(m)   The Aircraft will be in compliance with Manufacturer's Corrosion Prevention and Control Program (CPCP) specified for the model type by Manufacturer and LESSOR will provide LESSEE with documentation substantiating such compliance.

(n)   If any waivers, deviations, dispensations, alternate means of compliance, extensions or carry-overs with respect to maintenance or operating requirements, repairs or Airworthiness Directives are granted by the US Federal Aviation Authority aviation authority or permitted by Prior Lessee's maintenance program, such maintenance or operating requirements, repairs or Airworthiness Directives will nonetheless have been performed as if such waivers, deviations, dispensations, alternate means of compliance, or extensions or carry-overs did not exist.

(o)   All no-charge vendor and Manufacturer's service bulletin kits provided to LESSOR by Prior Lessee for the Aircraft but not installed thereon will be on board the Aircraft as cargo. All no-charge vendor and Manufacturer's service bulletin kits ordered by Prior Lessee but not yet received will, upon receipt by LESSOR and at LESSOR's cost, be forwarded to LESSEE. At LESSEE's request, any other service bulletin kit which Prior Lessee paid for will also be delivered to LESSEE on board the Aircraft, but LESSEE will reimburse Prior Lessee for its actual out-of-pocket costs for such kit, unless Prior Lessee purchased such kit as part of its implementation of a service bulletin on its fleet of aircraft of the same type as the Aircraft but had not yet installed such kit on the Aircraft, in which case such kit will be furnished free of charge to LESSEE.

(p)   The Aircraft will be free of any leaks and any damage resulting therefrom. All repairs will have been performed on a permanent basis in accordance with the applicable manufacturer's instructions.

(q)   The Aircraft fluid reservoirs (including oil, oxygen, hydraulic and water) will be serviced to full and the waste tank serviced in accordance with Manufacturer's instructions.

6.   **Checks Prior to Delivery**

Immediately prior to Delivery of the Aircraft to LESSEE, the following will be accomplished:

(a)   Perform an internal and external corrosion inspection and correct any discrepancies in accordance with the recommendations of Manufacturer and the Structural Repair Manual. In addition, all inspected areas will be properly treated with corrosion inhibitor as recommended by Manufacturer.



(b)    Clean the exterior and interior of the Aircraft.

(c)    If reasonably required by LESSEE, repaint by touch-up the interior of the Aircraft, including flight deck, and replace placards.

(d)    Permanently repair damage to the Aircraft that exceeds Manufacturer's limits and replace any non-flush structural patch repairs installed on the Aircraft with permanent flush-type repairs, in each case with no further inspection requirements.

(e)    With LESSEE or its representatives present, perform a full and complete hot and cold section videotape borescope on each Engine and its modules in accordance with Manufacturer's aircraft maintenance manual.

(f)    If the Engine historical and technical records and/or condition trend monitoring data of any Engine indicate an acceleration in the rate of deterioration in the performance of an Engine, correct, to LESSEE's satisfaction, such conditions which are determined to be causing such accelerated rate of deterioration.

(g)    With LESSEE and/or its representatives present, accomplish a power assurance run on the Engines in accordance with Manufacturer's aircraft maintenance manual. The Engine power assurance test conditions and results will be recorded on the Estoppel and Acceptance Certificate.

(h)    Provide evidence to LESSEE's satisfaction that the Engine historical and technical records, borescope inspection, trend monitoring and power assurance run specified in this Exhibit B do not reveal any condition which would cause the Engines or any module to be unserviceable, beyond serviceable limits or serviceable with an increased frequency of inspection or with calendar time, flight hour or flight cycle restrictions under the Manufacturer's aircraft maintenance manual. LESSOR will correct any discrepancies in accordance with the guidelines set out by Manufacturer which may be discovered during such inspection.

(i)    In the event the Engine historical and technical records, borescope inspection, trend monitoring and other checks specified in this Exhibit B result in a dispute regarding the conformity of an Engine with the requirements of this Exhibit B, LESSEE and LESSOR will consult with the Engine manufacturer and follow the Engine manufacturer's recommendations (including the accomplishment of an Engine test cell operational check) with regard to determining if such Engine complies with the requirements of this Exhibit B and the manner in which any discrepancies from the requirements of this Exhibit B will be rectified.

(j)    With LESSEE or its representatives present, perform an APU condition test in accordance with Manufacturer's aircraft maintenance manual and a complete hot and cold section videotape borescope on the APU. LESSOR will provide evidence to LESSEE's satisfaction that the APU condition test and borescope inspection do not reveal any condition which would cause the APU to be unserviceable, beyond serviceable limits or serviceable with an increased frequency of inspection or with calendar time, flight hour or

flight cycle restrictions. LESSOR will correct any discrepancies in accordance with the guidelines set out by the APU manufacturer which may be discovered during such test or inspections.

7.    **Part Lives**

At Delivery, the condition of the Aircraft will be as follows:

(a)    The Aircraft will have zero (0) hours consumed since completion of the Delivery Check.

(b)    Each Engine will meet all of the following:

   (i)    Each Engine will be fresh from shop visit

   (ii)    Each Engine will have at least 5,000 hours and 4,000 cycles remaining to operate until its next anticipated removal (based on a review of the Engine historical and technical records and the results of the borescope inspection, trend monitoring and maximum power assurance runs).

   (iii)    Each Engine will have a remaining hot day takeoff EGT margin sufficient to permit the operation of such Engine for the hours and cycles set forth in the preceding subparagraph (based on a review of the Engine historical and technical records and the results of the borescope inspection, trend monitoring and maximum power assurance runs).

   (iv)    Each Part of an Engine which has a life-limit will have 4,000 cycles (or 5,000 hours, if applicable) remaining to operate until its next removal per the Engine manufacturer's limit.

   (v)    No life-limited Part of an Engine will have more hours and cycles consumed than such Engine's data plate.

(c)    The APU will have zero (1000) APU hours consumed since the last hot section refurbishment (excluding hours consumed on the acceptance flight).

(d)    Each leg of the Landing Gear will have at least two (2) years remaining pursuant to the MIPD until the next scheduled Overhaul or scheduled removal.

(e)    Each Part of the Airframe, Engine or APU which has a hard time limit pursuant to the MIPD will have the greater of (i) at least 50% of such hard time Part's full allotment of hours and cycles or (ii) 4,000 hours and 2,000 cycles remaining to operate until its next scheduled Overhaul or scheduled removal pursuant to the MPD. However, if such hard time Part's full allotment of hours and cycles between Overhauls pursuant to the 1VIPD is less than 4,000 hours and 2,000, then such hard time Part will be returned with zero (0) hours and zero (0) cycles out of Overhaul.

(f)    Each life-limited Part of the Airframe or the APU will have the greater of(i) at least 50% of such life-limited Part's full allotment of hours and cycles or (ii) 4,000 hours and 2,000 cycles remaining to operate until its next scheduled replacement pursuant to the MPD. However, if such life-limited Part's full allotment of hours and cycles remaining to operate pursuant to the MPD is less than 4,000 hours and 2,000 cycles, then such life-limited Part will be returned with 100% of its total approved hours and cycles remaining.

(g)    No life-limited Part of the Airframe will have more hours and cycles consumed than the total hours and cycles of the Airframe.

(h)    No life-limited Part of the APU will have more hours and cycles consumed than the hours and cycles of the APU.

(i)    Each Part which has a calendar time limit will have three (3) months remaining to operate until removal pursuant to the MPD. If a Part with a calendar time limit has a total approved calendar time remaining pursuant to the MPD of less than three (3) months, then such Part will be delivered with 100% of its total approved calendar time remaining until removal.

(j)    No Part (excluding life-limited Parts on the Engines, Airframe and APU) will have total hours or total cycles since new greater than one hundred ten percent (110%) of that of the Airframe and, with respect to all such Parts as a group, such Parts will have an average total time since new no greater than that of the Airframe.

(k)    Each Landing Gear tire and brake will have at least fifty percent (5 0%) of its wear remaining.

## EXHIBIT C

## CERTIFICATE OF INSURANCE (FOR LESSOR)

[Refer to Aircraft Lease Agreement dated as of _____ between LESSEE and LESSOR (the "Lease"). If applicable, insurance certificates from both the insurers and reinsurers will be provided. If there is a LESSOR's Lender, include references to it where appropriate after references to LESSOR.]

     To:    HS Group
              9749 SW 111th Terr.
              Miami, FL 33176

     Re:    ALTIN HAVAYOLU TASIMACILIGI
              TURIZM VE TIC. A.S.
              (GOLDEN INTERNATIONAL AIRLINES) ("LESSEE")
              B757-200
              Manufacturer's Serial No.:   28484
              Registration Mark:       _____ (the "Aircraft")

     The following security has subscribed to the following insurance and/or reinsurance policies:

     [LIST APPLICABLE POLICY NUMBERS, COMPANIES & PERCENTAGES]

     THIS IS TO CERTIFY THAT, as Insurance Brokers, we have effected Fleet Insurance in respect of aircraft owned or operated by LESSEE (including the Aircraft) as specified below.

## AIRCRAFT HULL ALL RISKS

COVERING:

     All risks of physical loss or damage to the Aircraft from any cause (subject only to the exclusions as specified below), for an Agreed Value of Aircraft in the amount of US$_____ [list amount calculated in accordance with Article 19.1]

DEDUCTIBLES:

     US$250,000 each and every loss (or such lesser amount as applicable to the rest of LESSEE's fleet). Not applicable to Total Loss/Constructive Total Loss or Arranged Total Loss

94

GEOGRAPHICAL COVERAGE:

Worldwide

## AVIATION AND AIRLINE GENERAL THIRD PARTY LIABILITY

COVERING:

Aircraft Third Party, Passenger, Baggage, Cargo and Mail Liability and Airline General Third Party Liability (including Premises, Hangarkeepers and Products Liability) for combined single limit of not less than US$750,000,000 (or such higher amount as LESSEE may carry on any other aircraft in its fleet) any one accident/occurrence (but in the aggregate in relation to Products Liability), extended to cover LESSEE's liability under the Lease to the extent of the risks covered by the policy including war and allied perils under Extended Coverage Endorsement as per AVN 52E (however, the total War and Allied Perils Liability Coverage including Third Party War Risks must be the same amount as the combined single limit by the purchase of Excess Third Party War Risks insurance) subject only to exclusions as specified below, unless otherwise agreed by LESSOR in writing

GEOGRAPHICAL LIMITS:

Worldwide

## HULL WAR AND ALLIED PERILS

COVERING:

Hull War Risks as per LSWSSS.C, but including (a) confiscation or requisition (including by State of Registration and state where airline is domiciled), (b) hijacking or other unlawful seizure or wrongful exercise of control of the Aircraft or crew in flight (including any attempt at such seizure or control) and covering claims excluded from Hull All Risks Policy while Aircraft outside Assured's control by reason of perils insured under this policy, for an Agreed Value of Aircraft in the amount of US$_____ [list amount calculated in accordance with Article 19.1]

DEDUCTIBLE:

No deductible

GEOGRAPHICAL LIMITS:

Worldwide



# AIRCRAFT SPARES ALL RISKS INSURANCE

<u>COVERING</u>:

All risks of physical loss or damage to Aircraft Parts or spares or Engines at all times when removed from the Aircraft from whatever cause, subject only to the exclusions specified below, including the risks set down in AVN 48B other than paragraphs (a) and (b) thereof (but including paragraph (a) in respect of transit risks) for limits of not less than:

US$ 10,000,000 any one location
US$  1,000,000 any one sending

and covering:

With respect to an Engine, replacement cost

With respect to Parts, replacement cost

<u>DEDUCTIBLE</u>:

US$10,000 each and every loss

<u>GEOGRAPHICAL COVERAGE</u>:

Worldwide

## CONTRACTUAL INDEMNITY

LESSEE has insurance coverage for the indemnities agreed to by LESSEE pursuant to Article 17 of the Lease

## PERIOD OF COVERAGE (ALL POLICIES)

From the Delivery Date of Aircraft to [EXPIRATION DATE]

It is further certified that LESSOR has an interest in respect of the Aircraft under the Lease. Accordingly, with respect to losses occurring during the period from the Effective Date until the expiry of the Insurance or (except as provided in the next sentence) until the expiry or agreed termination of the Lease or until the obligations under the Lease are terminated by any action of the Insured or LESSOR and in consideration of the Additional Premium it is confirmed that the Insurance afforded by the Policy is in full force and effect and it is further agreed that the provisions set forth below are specifically endorsed to the Policy. Notwithstanding the foregoing, if LESSEE has retained care, custody and control of the Aircraft even after such expiry or agreed termination of the Lease and LESSOR has not expressly agreed to insure the Aircraft, the Policy will remain in full force and effect until the earlier of expiry of the Insurance or the return of the Aircraft to LESSOR.

96



1.    **UNDER THE HULL (ALL RISKS AND HULL WAR AND ALLIED RISKS) AND AIRCRAFT SPARES INSURANCES**

(a)    In respect of any claim on the Aircraft that becomes payable on the basis of a Total Loss, settlement will be made to, or to the order of LESSOR as sole loss payee, up to the Agreed Value. With respect to repairable damage to an Aircraft or Engine, LESSOR will receive all insurance proceeds in excess of US$500,000 provided that upon receipt by the insurance broker of written notice of a material default on the part of LESSEE, all insurance proceeds which otherwise would be payable to LESSEE will be made directly to LESSOR. In respect of any other claim, settlement (net of any relevant policy deductible) will be made with such party(ies) as may be necessary to repair the Aircraft unless otherwise agreed after consultation between the Insurers and the Insured and, where necessary under the terms of the Lease, LESSOR. Such payments will only be made provided they are in compliance with all applicable laws and regulations.

(b)    Insurers agree on a 50/50 settlement in terms of AVS 103.

(c)    Insurers have no right to replace the Aircraft on a Total Loss (arranged, constructive or otherwise).

(d)    Insurers recognize that LESSEE and LESSOR have agreed that a Total Loss of the Airframe will constitute a Total Loss of the Aircraft.

(e)    In the event of a Total Loss of the Aircraft, Insurers agree to pay LESSOR all amounts up to the Agreed Value based solely upon LESSOR's (not LESSEE's) execution of the appropriate form of release/discharge document. LESSOR may sign any required release in lieu of the Insured in the event of a Total Loss, Constructive Total Loss or Arranged Total Loss.

(f)    "Cut-through clause": Insurers confirm that in the event of any claim arising under the hull insurances, the Reinsurers will in lieu of payment of the Insurers, its successors in interest and assigns, pay to the person named as sole loss payee under the original insurances that portion of any loss due for which the Reinsurers would otherwise be liable to pay the Insurers (subject to proof of loss), it being understood and agreed that any such payment by any Reinsurers will fully discharge and release such Reinsurer from any and all further liability in connection therewith and provide for payment to be made notwithstanding (i) any bankruptcy, insolvency, liquidation or dissolution of the Insurers and (ii) that the Insurers have made no payment under the original insurance policies.

(g)    Insurers confirm that under the insurance policies, if the Insured installs an engine owned by a third party on the Aircraft, either (i) the hull insurance will automatically increase to such higher amount as is necessary in order to satisfy both LESSOR's requirement to receive the Agreed Value in the event of a Total Loss, Constructive Total Loss or Arranged Total Loss and the amount required by the third party engine owner, or (ii) separate additional insurance on such engine will attach in order to satisfy separately the requirements of the Insured to such third party engine owner.

**2.    UNDER THE LEGAL LIABILITY INSURANCE**

(a)    Subject to the provisions of this Endorsement, the Insurance will operate in all respects as if a separate Policy had been issued covering each party insured hereunder, but this provision will not operate to include any claim arising howsoever in respect of loss or damage to the Aircraft insured under the Hull or Spares Insurance of the Insured. Notwithstanding the foregoing the total liability of Insurers in respect of any and all Insureds will not exceed the limits of liability stated in the Policy.

(b)    The Insurance provided hereunder will be primary and without right of contribution from any other insurance which may be available to LESSOR or its successors and assigns.

(c)    LESSOR and its successors, assigns, directors, officers and employees will be covered under LESSEE's legal liability insurance for death or injury to LESSEE's employees.

**3.    UNDER ALL INSURANCES**

(a)    LESSOR, its successors and assigns, and (with respect to Aviation and Airline General Third Party Liability only) its directors, officers and employees for their respective rights and interests, are included as Additional Insureds.

(b)    The cover afforded to LESSOR by the Policy in accordance with this Endorsement will not be invalidated by any act or omission (including misrepresentation and non-disclosure) of any other person or party which results in a breach of any term, condition or warranty of the Policy.

(c)    LESSOR will have no responsibility for premium and insurers will waive any right of set-off or counterclaim against LESSOR except in respect of outstanding premium in respect of the Aircraft, provided that Insurer may only set-off for premiums against the proceeds of the hull insurance for outstanding premiums in connection with hull all risks and hull war and allied perils insurance.

(d)    Upon payment of any loss or claim to or on behalf of LESSOR, Insurers will to the extent and in respect of such payment be thereupon subrogated to all legal and equitable rights of LESSOR indemnified hereby (but not against LESSOR). Insurers will not exercise such rights without the consent of those indemnified, such consent not to be unreasonably withheld. At the expense of Insurers LESSOR will do all things reasonably necessary to assist the Insurers to exercise said rights.

(e)    Except in respect of any provision for Cancellation or Automatic Termination specified in the Policy or any endorsement thereof, cover provided by this Endorsement may only be cancelled or materially altered in a manner adverse to LESSOR by the giving of not less than thirty (30) days notice in writing to LESSOR. Notice will be deemed to commence from the date such notice is given by the Insurers. Such notice will NOT, however, be given at normal expiry date of the Policy or any endorsement.

4.    **EXCEPT AS SPECIFICALLY VARIED OR PROVIDED BY THE TERMS OF THIS CERTIFICATE**

(a)    LESSOR IS COVERED BY THE POLICY SUBJECT TO ALL TERMS, CONDITIONS, LIMITATIONS, WARRANTIES, EXCLUSIONS AND CANCELLATION PROVISIONS THEREOF.

(b)    THE POLICY WILL NOT BE VARIED BY ANY PROVISIONS CONTAINED IN THE LEASE WHICH PURPORT TO SERVE AS AN ENDORSEMENT OR AMENDMENT TO THE POLICY.

SUBJECT (save as specifically stated in this Certificate) to policy terms, conditions, limitations and exclusions.

Yours faithfully,
[BROKERS]



99

**EXHIBIT D**

**BROKERS' LETTER OF UNDERTAKING (FOR LESSOR)**

Date:                                              Our Ref:                              .

To:   H&S GROUP COMPANIES, INC.
      9749 SW 111th Terr.
      Miami, FL  33176

Re:   ALTIN HAVAYOLU TASIMACILIGI
      TURIZM VE TIC. A.S.
      (GOLDEN INTERNATIONAL AIRLINES) ("LESSEE")
      B757-200
      Manufacturer's Serial No.:   28484
      Registration Mark:   _____ (the "Aircraft")

Dear Sirs:

        We confirm that insurance has been effected for the account of [LESSEE] (the "Operator") covering all aircraft owned or operated by them, including the above-referenced aircraft (the "Aircraft"). [Also confirm, if applicable, the amount of any hull all risks or hull war and allied perils on the Aircraft which LESSEE is carrying in excess of the Agreed Value (which excess insurance would be payable to LESSEE). Such excess insurance may not exceed ten percent (10 %) of the Agreed Value.]

        Pursuant to instructions received from the Operator and in consideration of your approving the arrangement of the Operator's "Fleet Policy" (under which the above-referenced Aircraft is insured) through the intermediary of ourselves as Brokers in connection with the insurance (the "Insurance") mentioned in our Certificate of Insurance (Reference No. [ ] dated [ ] and attached hereto), we undertake as follows:

        1.     In relation to the Hull and War Risks Insurance to hold to your order the insurance
Slips or Contracts and any Policies which may be issued or any policies substituted (with your consent) therefor (but only insofar as the same relate to the Aircraft only) and the benefit of the Hull and War Risks Insurance thereunder, but subject to our requirements to operate the Fleet Policy insofar as it relates to any other aircraft insured thereunder.
        2.     As to you and your successors, assigns, directors, officers and employees, Operator's active crew members are considered "passengers".
        3.     To advise you of any of the following:

              (a)     If any insurer or the Operator cancels or gives notice of cancellation of

100

any of the Insurance at least thirty (30) days (or such lesser period as may be available in the case of War and Allied Perils) before such cancellation is to take effect in respect of the Aircraft.

(b)     Of any act or omission or of any event (including non-payment of premium) of which we have knowledge or are notified and which might invalidate or render unenforceable in whole or in part any of the Insurance, insofar as the same relate to the Aircraft.

(c)     If we do not receive instructions to renew all or any of the Insurance at least thirty (30) days prior to their expiration.

(d)     If any of the Insurance are not renewed on the same terms (save as to premium and period of cover and as you might otherwise have notified us to be acceptable to you) seven (7) days prior to expiry thereof.

The above undertakings are given subject to our continuing appointment for the time being as Insurance Brokers to the Operator.

We also undertake to advise you if we cease to be Insurance Brokers to the Operator.

Yours faithfully,

101

